No. 24-20460

# United States Court of Appeals for the Fifth Circuit

TRINSEO EUROPE GMBH,

*Plaintiff-Appellant/Cross-Appellee*

*v.*

KELLOGG BROWN & ROOT, L.L.C.;
STEPHEN HARPER, *also known as* STEVE HARPER;
STEVE HARPER CONSULTING, INCORPORATED;
POLYCARBONATE CONSULTING SERVICES, INCORPORATED,

*Defendants-Appellees/Cross-Appellants*

Appeal from the United States District Court
for the Southern District of Texas
No. 4:20-cv-00478 (Hon. Andrew S. Hanen)

**PRINCIPAL BRIEF OF APPELLANT/CROSS-APPELLEE
TRINSEO EUROPE GMBH**

Eric Grant
grant@hicks-thomas.com
Justin R. Braga                     Stewart Hoffer
JBraga@hinckleyallen.com            shoffer@hicks-thomas.com
Hinckley, Allen & Snyder LLP        Hicks Thomas LLP
650 Elm Street, Suite 500           700 Louisiana Street, Suite 2300
Manchester, New Hampshire 03101     Houston, Texas 77002
(603) 545-6106                      (713) 547-9100

*Counsel for Plaintiff-Appellant/Cross-Appellee Trinseo Europe GmbH*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-20460

*Trinseo Europe GmbH*
*v.*
*Kellogg Brown & Root, L.L.C., et al.*

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| **Appellants:** | **Counsel for Appellants:** |
|---|---|
| Trinseo Europe GmbH | Eric Grant of Hicks Thomas LLP. Houston, TX |
| Trinseo Europe GmbH | Stewart Hoffer of Hicks Thomas LLP. Houston, TX |
| Trinseo Europe GmbH | Justin Braga of Hinckley, Allen & Snyder, LLP.  Manchester, NH |

| **Appellees:** | **Counsel for Appellees:** |
|---|---|
| Stephen Harper | Benjamin Foster of Foster Yarborough P.L.L.C.  Houston, TX |
| Kellogg Brown & Root, L.L.C. | Warren Harris of Bracewell, L.L.P. Houston, TX |
| Kellogg Brown & Root, L.L.C. | Jeffrey Oldham of Bracewell, L.L.P. Houston, TX |
| Kellogg Brown & Root, L.L.C. | Walter Simons of Bracewell, L.L.P. Houston, TX |
| Kellogg Brown & Root, L.L.C. | Geoffrey Harrison of Susman Godfrey, L.L.P.  Houston, TX |

| | |
|---|---|
| Kellogg Brown & Root, L.L.C. | Abigail Noebels of Susman Godfrey, L.L.P.  Houston, TX |
| Kellogg Brown & Root, L.L.C. | Katherine James of Susman Godfrey, L.L.P.  Houston, TX |
| Kellogg Brown & Root, L.L.C. | Matthew Behncke of Susman Godfrey, L.L.P.  Houston, TX |
| Polycarbonate Consulting Services, Incorporated | Benjamin Foster of Foster Yarborough P.L.L.C.  Houston, TX |
| Steve Harper Consulting, Incorporated | Benjamin Foster of Foster Yarborough P.L.L.C.  Houston, TX |

s/ *Eric Grant*
Eric Grant

*Attorney of Record for*
*Plaintiff-Appellant/Cross-Appellee*
*Trinseo Europe GmbH*

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellant/Cross-Appellee Trinseo Europe GmbH respectfully submits that oral argument is necessary and appropriate because this appeal involves several issues of significant importance in the interpretation and application of the federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act. These issues have not been definitively resolved by this Court, the United States Supreme Court, or the Texas Supreme Court. Moreover, the panel will benefit from argument because the record on appeal amounts to tens of thousands of pages, involving claims against multiple defendants (two sets of whom have filed cross-appeals) and trade secrets based on complicated chemical engineering concepts.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................ iii

TABLE OF AUTHORITIES ................................................................. viii

GLOSSARY.................................................................................. xvii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES............................................................3

STATEMENT OF THE CASE...............................................................4

    A.    In the Defend Trade Secrets Act, Congress grants
           federal protection against trade secret misappropriation
           like that of Defendants ............................................................4

    B.    Dow creates, and Trinseo acquires, trade secrets to
           manufacture the highest quality polycarbonate, a
           hi-tech thermoplastic .............................................................5

    C.    The Dow-developed, Trinseo-owned polycarbonate
           manufacturing process was unique .........................................7

    D.    Defendants steal Trinseo's polycarbonate trade secrets
           and sell them to Chinese companies for tens of millions
           of dollars.............................................................................8

    E.    After a three-week trial, the jury renders a verdict for
           Trinseo, finding that KBR and the Harper Defendants
           misappropriated four trade secrets and determining both
           reasonable royalty and unjust enrichment damages...........................14

    F.    In post-trial proceedings, the district court nullifies
           the jury's award of damages, effectively absolving
           Defendants' misappropriations .........................................15

SUMMARY OF ARGUMENT ..............................................................16

ARGUMENT ........................................................................................19

I.    The district court erred in nullifying the jury's award of
      reasonable royalty damages to Trinseo ..........................................20

      A.    Setting aside the district court's legally erroneous
            conception of "strict apportionment" from patent law,
            sufficient evidence of damages supports the properly
            instructed jury's award ........................................................21

            1.    The district court erred in construing the DTSA to
                  require Trinseo to prove its damages using "strict
                  apportionment" imported from patent law ................................24

                  a.    As properly understood, apportionment
                        requires only that Trinseo's damages reflect
                        the value attributable to the misappropriated
                        technology, and no more ................................24

                  b.    The text of neither the DTSA nor the statute
                        on which it was modeled contains the district
                        court's categorical requirement ......................................26

                  c.    *University Computing* supplies no warrant for
                        wholesale importation of patent-law concepts ..............27

                  d.    The weight of out-of-Circuit authority does
                        not support the district court's categorical
                        requirement. ..................................................29

                  e.    Even in patent cases, the Federal Circuit has
                        not adopted the district court's categorical
                        requirement ..................................................34

            2.    The jury had legally sufficient evidence to support its
                  award of a reasonable royalty from KBR to Trinseo ................37

                  a.    The jury was properly instructed on the
                        requisite "hypothetical negotiation" and
                        had sufficient evidence to apply those
                        instructions and make its award ......................................38

        b.    Given evidence that PC technology owners
like Trinseo license the whole package
rather than individual components á la carte,
the jury's findings on 6 of 10 alleged trade
secrets do not compel a contrary conclusion .................48

        c.    Alternatively, the jury could readily have
found that the "misappropriated technology"
here was the heart, core, and value driver of
Trinseo's PC technology ...............................................51

   B.   Alternatively, there is sufficient evidence of reasonable
royalty damages even under patent-law requirements
prevailing in the Federal Circuit...........................................59

      1.   The reasonable royalty award may be sustained
under built-in apportionment based on sufficiently
comparable licenses ...............................................59

      2.   The reasonable royalty award may also be sus-
tained under the entire market value exception .......................61

II.   The district court likewise erred in nullifying the jury's award
of unjust enrichment damages against KBR .................................65

   A.   It is the *jury's* province to award unjust enrichment
damages under the DTSA ...................................................66

   B.   Sufficient evidence supports the jury's unjust enrichment
award against KBR...........................................................69

      1.   The jury had evidence of the net profits to KBR
resulting from its misappropriation of Trinseo's
trade secrets ...............................................................69

      2.   KBR's "apportionment"-based attacks lack merit...................71

      3.   The jury had sufficient evidence of causation .........................74

   C.   The district court's "remittitur" should be rejected ............................75

III.    The district court likewise erred in nullifying the jury's award of unjust enrichment damages against the Harper Defendants .................... 77

IV.    If this Court does not reinstate the jury's award of damages to Trinseo, it should order a new trial on damages ........................................... 78

    A.    If the Court newly adopts a "strict apportionment" requirement from patent law, fairness demands that Trinseo receive a new trial on damages ............................... 79

    B.    If this Court orders a new trial on Trinseo's damages, it should rule that the district court wrongfully excluded relevant evidence bearing on KBR's knowledge and willfulness ................................................................................ 82

        1.    The district court erred in excluding the evidence ................... 85

            a.    The probative value of the evidence substantially outweighed any alleged unfair prejudice to KBR ............................................. 85

            b.    The hearsay rule does not justify exclusion ................... 86

        2.    The error adversely affected Trinseo's substantial rights .......................................................................... 87

V.    The district court erred in dismissing Trinseo's common-law claim for "misappropriation of confidential information" ........................... 89

    A.    TUTSA's plain text exempts Trinseo's claim from preemption .................................................................... 90

    B.    The district court erred in abrogating Trinseo's common law rights absent a clear command from the Texas Legislature ...................................................................... 94

    C.    Principles of uniformity confirm that reversal is required ................. 95

CONCLUSION ................................................................................ 96

CERTIFICATE OF COMPLIANCE ........................................................ 98

# TABLE OF AUTHORITIES

## Cases

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ..................................................... 36

*Adams v. Ethyl Corp.*,
838 Fed. Appx. 822 (5th Cir. 2020) ............................................. 73

*AMS Sensors USA Inc. v. Renesas Electronics America Inc.*,
2021 WL 765227 (E.D. Tex. Feb. 26, 2021), *appeal
docketed*, No. 22-2185 (Fed. Cir. Sept. 7, 2022) ..................... 31–32, 34

*Attia v. Google LLC*,
983 F.3d 420 (9th Cir. 2020) ......................................................... 4

*Barber v. Kimbrell's, Inc.*,
577 F.2d 216 (4th Cir. 1978) ....................................................... 68

*Bayer Healthcare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021) ..................................................... 74

*Beijing Neu Cloud Oriental Systems Technology Co., Ltd.
v. IBM Corp.*, 110 F.4th 106 (2d Cir. 2024) .............................. 88

*Bianco v. Globus Medical, Inc.*,
2014 WL 5462388 (E.D. Tex. Oct. 27, 2014),
*aff'd*, 618 Fed. Appx. 1032 (Fed. Cir. 2015) .......................... 65

*Bianco v. Globus Medical, Inc.*,
53 F. Supp. 3d 929 (E.D. Tex. 2014),
*aff'd*, 618 Fed. Appx. 1032 (Fed. Cir. 2015) .......................... 50

*Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ....................................... 35–36, 42, 60

*Bishop v. Miller*,
412 S.W.3d 758 (Tex. App.—Houston [14th Dist.]
2013, no pet.) ....................................................................... 32–33, 56

*Bocanegra v. Vicmar Services, Inc.*,
320 F.3d 581 (5th Cir. 2003) ........................................................88

*Bohnsack v. Varco, L.P.*,
668 F.3d 262 (5th Cir. 2012) .....................................................23, 42

*Brand Services, L.L.C. v. Irex Corp.*,
909 F.3d 151 (5th Cir. 2018) ........................................22, 37, 92–93

*Bruce v. Weekly World News*,
310 F.3d 25 (1st Cir. 2002)...........................................................50

*Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas,
Inc.*, 53 F.4th 368 (6th Cir. 2022)..............................................32, 81

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*,
494 U.S. 558 (1990)................................................................67–68

*Curtis v. Loether*,
415 U.S. 189 (1974)......................................................................67

*DHI Group, Inc. v. Kent*,
2022 WL 3755782 (5th Cir. Aug. 30, 2022) ..................................56

*E.R. ex rel. E.R. v. Spring Branch ISD*,
909 F.3d 754 (5th Cir. 2018) ........................................................84

*Egry Register Co. v. Standard Register Co.*,
23 F.2d 438 (6th Cir. 1928) ..........................................................28

*Enterprise Manufacturing Co. v. Shakespeare Co.*,
141 F.2d 916 (6th Cir. 1944) ........................................................23

*Environmental Integrity Project v. U.S. EPA*,
969 F.3d 529 (5th Cir. 2020) ........................................................92

*Ericsson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .........................................23, 35, 42

*Feltner v. Columbia Pictures Television, Inc.*,
523 U.S. 340 (1998)......................................................................67

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ...........................................25, 34–35

*Garretson v. Clark*,
111 U.S. 120 (1884)....................................................................25

*Gaylord v. United States*,
777 F.3d 1363 (Fed. Cir. 2015) ...................................................50

*Gibson, Inc. v. Armadillo Distribution Enterprises, Inc.*,
107 F.4th 441 (5th Cir. 2024) ....................................................88

*Gilbane Building Co. v. Admiral Insurance Co.*,
664 F.3d 589 (5th Cir. 2011) .....................................................90

*GlobeRanger Corp. v. Software AG United States of
America, Inc.*, 836 F.3d 477 (5th Cir. 2016) ....................................23, 75–76

*Holmes v. Reddoch*,
117 F.4th 309 (5th Cir. 2024) ...............................................21, 79

*Homoki v. Conversion Services, Inc.*,
717 F.3d 388 (5th Cir. 2013) .....................................................76

*In re Allen*,
366 S.W.3d 696 (Tex. 2012) ......................................................92

*In re Black Elk Energy Offshore Operations, LLC*,
114 F.4th 343 (5th Cir. 2024) ....................................................94

*In re CenterPoint Energy Houston Electric, LLC*,
629 S.W.3d 149 (Tex. 2021) ......................................................94

*In re Mandel*,
720 Fed. Appx. 186 (5th Cir. 2018) ............................................22

*In re Mandel*,
578 Fed. Appx. 376 (5th Cir. 2014) ............................................22

*In re Morrison*,
555 F.3d 473 (5th Cir. 2009) ...............................................86–87

*International Industries, Inc. v. Warren Petroleum Corp.*,
   248 F.2d 696 (3d Cir. 1957) ..........................................................28

*Jones v. Ruiz*,
   478 Fed. Appx. 834 (5th Cir. 2012) ...........................................79

*Kobs v. Arrow Services Bureau, Inc.*,
   134 F.3d 893 (7th Cir. 1998) ......................................................67

*Lamie v. U.S. Trustee*,
   540 U.S. 526, 538 (2004) .............................................................92

*Landgraf v. USI Film Products*,
   511 U.S. 244 (1994)......................................................................82

*Laser Dynamics, Inc. v. Quanta Computing, Inc.*,
   694 F.3d 51, 67 (Fed. Cir. 2012) ................................................61

*Liu v. SEC*,
   591 U.S. 71 (2020)................................................................70–71

*Lorillard v. Pons*,
   434 U.S. 575 (1978)......................................................................67

*Management & Engineering Technologies International, Inc.
   v. Information Systems Support, Inc.*,
   490 Fed. Appx. 30 (9th Cir. 2012) .............................................81

*Metallurgical Industries, Inc. v. Fourtek, Inc.*,
   790 F.2d 1195 (5th Cir. 1986) ....................................................56

*Montano v. Orange County*,
   842 F.3d 865 (5th Cir. 2016) ......................................................64

*Motorola Solutions, Inc. v. Hytera Communications Corp., Ltd.*,
   108 F.4th 458 (7th Cir. 2024) ...............................................4, 81

*Norfolk Redevelopment & Housing Authority v. Chesapeake &
   Potomac Telephone Co.*, 464 U.S. 30 (1983)..............................94

*Novick v. Shipcom Wireless, Inc.*,
946 F.3d 735 (5th Cir. 2020) ........................................................87

*O2 Micro International Ltd. v. Monolithic Power Systems,*
*Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005), *aff'd*,
221 Fed. Appx. 996 (Fed. Cir. 2007) ...............................29–30, 32

*Oakwood Labs. LLC v. Thanoo*,
999 F.3d 892 (3d Cir. 2021) ..........................................................88

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ......................................................36

*Pavo Solutions LLC v. Kingston Technology Co., Inc.*,
35 F.4th 1367 (Fed. Cir. 2022) ................................................36, 59

*Perez v. TDCJ-ID*,
395 F.3d 206 (5th Cir. 2004) ...................................................85, 87

*Providence Title Co. v. Truly Title, Inc.*,
547 F. Supp. 3d 585 (E.D. Tex. 2021), *aff'd*,
2023 WL 316138 (5th Cir. Jan. 19, 2023)......................................91

*Quantlab Technologies, Ltd. (BVI) v. Kuharsky*,
696 Fed. Appx. 682 (5th Cir. 2017) ..............................................23

*Quintel Technology Ltd. v. Huawei Technologies USA, Inc.*,
2018 WL 626355 (E.D. Tex. Jan. 30, 2018) ...........................33–34

*Reynolds v. Sanchez Oil & Gas Corp.*,
2023 WL 8262764 (Tex. App.—Houston [1st Dist.]
Nov. 30, 2023, no pet.) ............................................................89, 91

*Robinson v. Crown Cork & Seal Co., Inc.*,
335 S.W.3d 126 (Tex. 2010) ..........................................................82

*Rothe Development, Inc. v. U.S. DOD*,
666 F.3d 336 (5th Cir. 2011) .........................................................90

*Sabre GLBL, Inc v. Shan*,
779 Fed. Appx. 843 (3d Cir. 2019) ...............................................32

*Sam L. Majors Jewelers v. ABX, Inc.*,
117 F.3d 922 (5th Cir. 1997) ........................................................94

*Silguero v. CSL Plasma, Inc.*,
907 F.3d 323 (5th Cir. 2018) ........................................................96

*Silverthorne Seismic, LLC v. Sterling Seismic Services, Ltd.*,
2021 WL 4710813 (S.D. Tex. Oct. 7, 2021) ................................89

*Sullivan v. Stroop*,
496 U.S. 478 (1990).......................................................................95

*Super Starr International, LLC v. Fresh Tex Produce, LLC*,
531 S.W.3d 829 (Tex. App.—Corpus Christi 2017, no pet.).......93

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto*
*Group, Inc.*, 68 F.4th 792 (2d Cir.),
*cert. denied*, 144 S. Ct. 352 (2023)..............................................27

*Tewari De-Ox Systems, Inc. v. Mountain States/Rosen, L.L.C.*,
637 F.3d 604 (5th Cir. 2011) ...................................................56–57

*Texas Advanced Optoelectronic Solutions, Inc. v. Renesas*
*Electronics America, Inc.*, 895 F.3d 1304 (Fed. Cir. 2018) ...................30, 31

*Texas Entertainment Ass'n, Inc. v. Hegar*,
10 F.4th 495 (5th Cir. 2021) ........................................................82

*Thomas v. Hughes*,
27 F.4th 995 (5th Cir. 2022) ........................................................23

*Title Source, Inc. v. HouseCanary, Inc.*,
612 S.W.3d 517 (Tex. App.—San Antonio 2020, pet. denied) ...................93

*Treadway v. Otero*,
2024 WL 1654587 (5th Cir. Apr. 17, 2024)................. 21, 23, 37, 65, 69–70

*United States v. Carter*,
953 F.2d 1449 (5th Cir. 1992) ......................................................85

*United States v. Delgado*,
668 F.3d 219 (5th Cir. 2012) ........................................................64

*United States v. El-Mezain*,
664 F.3d 467 (5th Cir. 2011) ........................................................85

*United States v. ERR, LLC*,
35 F.4th 405 (5th Cir. 2022) ..................................................68–69

*United States v. Flores*,
981 F.2d 231 (5th Cir. 1993) ........................................................79

*United States v. King*,
93 F.4th 845 (5th Cir. 2024) ........................................................85

*United States v. Parry*,
649 F.2d 292 (5th Cir. 1981) ..................................................86–87

*United States v. Rao*,
123 F.4th 270 (5th Cir. 2024) ......................................................64

*United States v. Wen Chyu Liu*,
716 F.3d 159 (5th Cir. 2013) ..........................................4, 70, 71

*University Computing Co. v. Lykes-Youngtown Corp.*,
504 F.2d 518 (5th Cir. 1974) ................................................passim

*Vectura Ltd. v. GlaxoSmithKline LLC*,
981 F.3d 1030 (Fed. Cir. 2020) ....................................................36

*Versata Software, Inc. v. SAP America, Inc.*,
717 F.3d 1255 (Fed. Cir. 2013) ....................................................59

*VirnetX, Inc. v. Cisco Systems, Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ....................................................35

*Weeks v. Angelone*,
528 U.S. 225 (2000) ......................................................................73

*Wellogix, Inc. v. Accenture, L.L.P.*,
716 F.3d 867 (5th Cir. 2013) .................. 22–23, 35–37, 50, 73, 77

## Statutes and Court Rules

28 U.S.C. § 1291 ..................................................................................2

28 U.S.C. § 1331 ..................................................................................2

28 U.S.C. § 1332 ..................................................................................2

28 U.S.C. § 1367 ..................................................................................2

Copyright Act,
    17 U.S.C. § 504 ..............................................................................67

Defend Trade Secrets Act

    18 U.S.C. § 1836 ....................................................................passim

    18 U.S.C. § 1839 ......................................................................27, 85

Fair Debt Collection Practices Act,
    15 U.S.C. § 1692k ..........................................................................68

Louisiana Uniform Trade Secrets Act

    La. Stat. Ann. § 51:1437 ..........................................................92–93

    La. Stat. Ann. § 51:1438 ................................................................95

Oil Pollution Act,
    33 U.S.C. §§ 2702, 2712(f), 2715 ................................................68

Texas Uniform Trade Secrets Act ........................................4, 19, 90–96

    Tex. Civ. Prac. & Rem. Code § 134A.002 ....................................89

    Tex. Civ. Prac. & Rem. Code § 134A.007 ..........................16, 90–92

    Tex. Civ. Prac. & Rem. Code § 134A.008 ....................................95

Truth in Lending Act,
    15 U.S.C. § 1640 ............................................................................68

Uniform Trade Secrets Act,
    https://bit.ly/4jLXNVR ......................................................4, 27, 30, 88, 95–96

Fed. R. App. P. 4 ...........................................................................................2

Fed. R. Civ. P. 50 ................................................... 15, 23, 55, 64–65, 78

Fed. R. Civ. P. 59 ...................................................................2, 78–79

Fed. R. Evid. 402 .................................................................................85–86

Fed. R. Evid. 403 .................................................................................85–86

Fed. R. Evid. 801 .................................................................................86–87

Tex. R. App. P. 58.1 ................................................................................96

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law:*
    *The Interpretation of Legal Texts* (2012) .......................................94

H.R. Rep. No. 529, 114th Cong., 2d Sess. (2016),
    https://bit.ly/407hqP8 ..........................................................................27

*Restatement (Third) of Unfair Competition* (1995)

    § 39 ....................................................................................................56

    § 45 ....................................................................................................72

# GLOSSARY

| | |
|---|---|
| CZ or Cangzhou | The first licensee of KBR's PCMAX technology package |
| Dow | The Dow Chemical Company, Trinseo's predecessor-in-interest with respect to the polycarbonate technology at issue |
| DTSA | Defend Trade Secrets Act |
| Harper | Defendant-Appellee Stephen Harper |
| Harper Defendants | Defendant-Appellees Stephen Harper and his consulting entity, Polycarbonate Consulting Services, Incorporated |
| KBR | Defendant-Appellee Kellogg Brown & Root, L.L.C. |
| KTA | Kilotons per annum, or thousands of tons per year |
| LG | LG Chem. Ltd., or LG Chemical, of South Korea |
| LG-Dow | The polycarbonate joint venture between LG Chemical and The Dow Chemical Company |
| LUTSA | Louisiana Uniform Trade Secrets Act |
| PC | Polycarbonate |
| PCMAX | The polycarbonate manufacturing technology package that KBR licensed to two Chinese companies, Cangzhou and Pingmei |
| PMSI or Pingmei | The second licensee of KBR's PCMAX package |
| Tech Team | Retired polycarbonate-sector employees of The Dow Chemical Company led by Defendant-Appellee Stephen Harper |
| Train | Separate chemical process product line, usually located on the same site with other trains |
| TUTSA | Texas Uniform Trade Secrets Act |
| UTSA | Uniform Trade Secrets Act |

**INTRODUCTION**

It has long been a federal crime to steal American-made technology and sell it to foreign companies.  In the Defend Trade Secrets Act of 2016, Congress created a federal civil remedy to victims of such crimes, authorizing juries to award victims damages measured by a reasonable royalty or by the thieves' unjust profits.  In this case involving sophisticated chemical manufacturing technology developed in Freeport, Texas, the jury found that Plaintiff-Appellant Trinseo was the victim, and Defendants-Appellees KBR, Stephen Harper, and his alter egos were the thieves.

Harper and his "Tech Team" stole that technology — crucial parts of which were documents expressly marked "Dow Confidential" — from their former employer and transferred it to Chinese companies via lucrative "consulting" gigs.  But the real money flowed when Harper met KBR, a company that had for years sought to acquire Trinseo's "best in the industry" technology but whose efforts to acquire it legitimately had failed.  KBR paid Harper millions of dollars for the stolen knowledge and in turn made tens of millions selling it to Trinseo's Chinese competitors.

The jury rightly awarded Trinseo both reasonable royalty damages and unjust enrichment damages — far less than what Trinseo sought but in accord with industry licensing arrangements and Defendants' profits.  But applying a legal theory never adopted by this Court, the district court wrongly nullified the jury's awards.  As elaborated herein, this Court should reverse and restore the jury's verdict.

1

# JURISDICTIONAL STATEMENT

(A)    Pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(d), the district court had original subject matter jurisdiction because Trinseo's first claim for relief arose under a law of the United States, namely, the DTSA.  ROA.680–82.  Pursuant to 28 U.S.C. § 1367(a), the court had supplemental jurisdiction over Trinseo's related state-law claim for misappropriation of confidential information.  ROA.682–83.  Pursuant to 28 U.S.C. § 1332(a)(2), the court independently had original subject matter jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, Trinseo is a citizen of Switzerland, and all Defendants are citizens of one or more states in the United States.

(B)    This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the district court entered a final judgment.  ROA.8201.

(C)    The district court entered judgment on September 11, 2024.  *Id.*  Trinseo timely filed a motion for a new trial under Federal Rule of Civil Procedure 59(a)(1) on October 3, 2024, or 22 days later.  ROA.8235.  The court denied Trinseo's motion on November 13, 2024.  ROA.8422.  Trinseo filed an amended notice of appeal on November 22, 2024, or 9 days later.  Record Excerpts, Tab 12.  Therefore, the appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A), (4)(A)(v).

(D)    The appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in nullifying the jury's award of reasonable royalty damages from KBR to Trinseo.  This issue encompasses —

     a.     whether the district court erred in importing into the DTSA from patent law a requirement of "strict apportionment";

     b.     whether, if that erroneous requirement is set aside, there was sufficient evidence to support the properly instructed jury's award; and

     c.     whether, even if patent-law requirements apply, Trinseo satisfied those requirements by means of either "built-in apportionment" or the "entire market value" exception.

2.     Whether the district court erred in nullifying the jury's award of unjust enrichment damages from KBR to Trinseo.  This issue encompasses —

     a.     whether it is the province of the jury (as opposed to the judge) to award unjust enrichment damages under the DTSA;

     b.     whether sufficient evidence supports the unjust enrichment award against KBR; and

     c.     whether the district court erred in granting KBR's request for a "remittitur" of unjust enrichment damages

3.     Whether the district court erred in nullifying the jury's award of unjust enrichment damages from the Harper Defendants to Trinseo.

4.     Whether, if this Court does not reinstate the jury's award of damages to Trinseo, it should order a new trial on damages at which relevant evidence bearing on KBR's knowledge and willfulness is not wrongfully excluded.

5.     Whether the district court erred in dismissing Trinseo's common-law claim for "misappropriation of confidential information" on the ground that the claim was preempted by the Texas Uniform Trade Secrets Act.

## STATEMENT OF THE CASE

**A.     In the Defend Trade Secrets Act, Congress grants federal protection against trade secret misappropriation like that of Defendants.**

By 2016, 48 states had adopted variations of the Uniform Trade Secrets Act (UTSA).  *See Attia v. Google LLC*, 983 F.3d 420, 425 (9th Cir. 2020).  Despite this widespread protection for trade secrets in the purely domestic sphere, "Congress was concerned with actions taking place outside of the United States in relation to the misappropriation of U.S. trade secrets," and it was "especially concerned with foreign misappropriation of U.S. trade secrets."  *Motorola Solutions, Inc. v. Hytera Communications Corp. Ltd.*, 108 F.4th 458, 483 (7th Cir. 2024).  That is to say, Congress was motivated by the theft of American-made technology and its improper sale to foreign companies in places like China — the very misconduct that Defendants committed here.  *Cf. United States v. Wen Chyu Liu*, 716 F.3d 159, 161 (5th Cir. 2013) (affirming conviction of former Dow Chemical employee who "conspired to steal Dow's trade secrets and sell that information to Chinese companies").

Congress enacted the DTSA to prevent such theft, to punish the thieves, and to compensate the victims, authorizing an "owner of a trade secret that is misappropriated [to] bring a civil action" against the misappropriator in federal district court. 18 U.S.C. § 1836(b)(1), (c). The DTSA offers a menu of remedies, including injunctive relief, money damages, and attorneys' fees. *Id.* § 1836(b)(2)–(3). As relevant here, available monetary relief includes both —

- "damages for any **unjust enrichment** caused by the misappropriation of the trade secret"; and

- "in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a **reasonable royalty** for the misappropriator's unauthorized disclosure or use of the trade secret."

*Id.* § 1836(c)(3)(B)(i)(II), (ii) (emphasis added).

### B. Dow creates, and Trinseo acquires, trade secrets to manufacture the highest quality polycarbonate, a hi-tech thermoplastic.

Known for its high heat tolerance, optical clarity, and high impact strength, polycarbonate (PC) is a material used by manufacturers of consumer and industrial products like eyeglass lenses, automotive headlamp lenses, lighting fixtures, medical devices, and "bulletproof" glass. ROA.9590:5–9592:14. Starting in the late 1950's, and for nearly fifteen years thereafter, The Dow Chemical Company (Dow) assigned hundreds of employees, and spent more than $200M in today's dollars, to develop a novel process to manufacture PC, which Dow first employed at its inaugural PC plant located in Freeport, Texas. ROA.9587.23–9588:17, 9611:22–9613:20, 10667:6–22,

13750:11–22, 13753:3–8. As Dow learned lessons from operating its Freeport plant, it improved its PC process technology and incorporated those improvements into successive PC plants like Dow's plant in Stade, Germany that opened in 1995:



ROA.14165; *see also* ROA.9612:11–14, 9616:6–13, 9617:11–20, 9618:25–9619:21.

In addition to owning and operating its own PC manufacturing plants, Dow profitably licensed its PC technology to two joint ventures that Dow later formed, one with Sumitomo in Japan and the other with LG Chemical (LG) in South Korea. ROA.9624:11–9625:4. The LG-Dow joint venture built two PC product lines — known as "trains" — at the LG Plant in South Korea, and that joint venture paid Dow (and later Trinseo) more than $160M to license the PC technology over several years. *Id.*; ROA.11567:14–11568:9, 24046.

Dow decided to sell several chemical businesses, including its PC business, which it packaged into an entity known as Styron. ROA.12060:4–12. In 2010, Dow sold Styron's assets, which included all of Dow's intellectual property related to PC technology, to an affiliate of the private equity group Bain Capital. ROA.10124:16–10125:4. Bain subsequently changed the name of the business to Trinseo. *Id*.

### C. The Dow-developed, Trinseo-owned polycarbonate manufacturing process was unique.

Dow's novel PC manufacturing process was based on a so-called "interfacial" process.[1] The initial phase was the chemical processing side of the plant, often called the "wet side." ROA.9593:7–9594:15. The wet side of the plant produced virgin PC in a "flake" form; flake was the hallmark of the Dow PC process, as the process that competitors used formed a powder. *Id.*; *see also* ROA.9797:12–9800:15. The flake is then transferred to the compounding side, often called the "dry side" of the plant. ROA.9593:7–9594:15. There, the flake is combined with additives (like ultraviolet light inhibitors, mold release agents, or pigments and dyes) and extruded through heat extruders to form long strands, which are pelletized, packaged, and sold to manufacturers who incorporate polycarbonate into their products. *See id.*; ROA.46071–99. The four trade secrets found by the jury come from the chemical processing or "wet side" of the process and constitute the core of the Dow/Trinseo chemical production process that makes the unique Dow flake. ROA.9652:20–23, 13320:20–25; *see also infra* pp. 51–55 (discussing the "heart, core, and value driver" of this technology).

At a high level, the Dow chemical processing technology design included five sequential stages, which are illustrated at ROA.46080. The first stage combines

---

[1] The alternative polycarbonate manufacturing process — known as the "transesterification" (or "melt") method — is not directly competitive with most of Trinseo's "interfacial" (or "phosgene-based") PC product grades. ROA.10622:21–10623:21, 11579:22–11580:9, 46386.

carbon monoxide and chlorine gas in the specially designed **Phosgene Reactor**, one of the items that the jury found was a misappropriated trade secret, to make phosgene gas. That gas is combined with other chemicals in the **Oligomerization Reactor**, another of the items that the jury found was a misappropriated trade secret. The resulting solution goes through another reactor and a series of centrifuges, yielding polycarbonate molecules dissolved in methylene chloride.

The solution moves into the **Steam Devolatilization Process**, another of the items that the jury found was a misappropriated trade secret. In this "devol" process, the polycarbonate molecules are first combined with a thermal stabilizer, and then "agglomerated" together while being separated from the methylene chloride solvent solution using a specially designed nozzle and snake apparatus and other equipment. Here is formed the hallmark Dow "flake," which is then sent through a series of dryers and transported to the compounding side for later extrusion into pellet form. The entire process is controlled by the **Process Control System**, a portion of which was the final trade secret that the jury found was misappropriated. Together, these components made the Dow process "unique." ROA.10079:3–10081:13.

> ### D. Defendants steal Trinseo's polycarbonate trade secrets and sell them to Chinese companies for tens of millions of dollars.

In 2012, KBR determined that it wanted to offer to prospective clients in China a licensing package that would enable those clients to design, build, and operate PC manufacturing plants. ROA.11055:19–11056:22, 46457. KBR knew that it could

not develop that package on its own, because the PC technology was too complex to learn in the short window of time that KBR believed was available to capitalize on perceived market opportunity. ROA.10666:15–25, 11070:11–11072:19, 11102:21–11103:14. Lacking both time and knowledge to develop the complex technology internally, KBR scoured the market for a licensing partner. *Id*. KBR approached at least three PC manufacturers, all of whom spurned a relationship with KBR. *Id*.

In September 2013, KBR approached Trinseo (then known as Styron) about licensing its commercially proven, "best in the industry" PC technology developed by Dow. ROA.11073:9–20, 45980. Talks between Trinseo and KBR intensified in 2014, and KBR signed a confidentiality agreement that specifically defined Trinseo's trade secrets. ROA.11072:20–25, 12544:8–12545:6, 46046–48. The parties discussed the potential licensing deal for several weeks, but (for reasons unrelated to KBR in particular) Trinseo decided to stop licensing its PC technology and discontinued talks with KBR in May 2014. ROA.11074:4–13, 11588:7–11589:7, 12074:9–12076:10.

Trinseo's rejection of KBR's advances left KBR's PC business plans in tatters. ROA.11101:7–11102:20. The market window that KBR thought existed was rapidly closing, and KBR had no licensing partner, despite months of fruitless searches. ROA.11066:10–11067:2. Since KBR had never before designed, built, or operated a PC manufacturing facility, KBR knew that it had neither time nor ability to develop its own PC technology; and it was fully aware that a home-grown licensing package

from a PC novice would be difficult to sell, because no potential licensee looking to enter PC manufacturing would invest hundreds of millions of dollars to build a plant based on unproven technology design. ROA.11075:22–11079:17, 11204:7–15. KBR searched for another two years to achieve its goal of gaining access to the most recent Dow PC technology — the very same technology that Trinseo had refused to license to KBR. ROA.11074:4–13, 11098:15–19, 11588:7–11589:7, 12074:9–12076:10.

In 2016, KBR learned of Defendant Stephen Harper and his so-called "Tech Team" of retired Dow employees, all of whom had extensive experience with Dow's PC technology through their employment with Dow. ROA.10642:9–21, 10655:11–20, 10660:11–10664:3, 10701:1–25, 10944:8–10945:16, 11135:10–11136:21; *see also* ROA.14465 (KBR's Tsang admitting that KBR needed Tech Team because final 10% of design "is very complicated"). From 2012 to 2016, unbeknownst to Trinseo, the Tech Team had helped Luxi Chemical Group (Luxi), a Chinese fertilizer company, design its first PC plant using Dow engineering drawings for the design of the LG Plant that Dow had licensed. ROA.9658:9–25, 10624:7–10625:6, 10651:13–10652:19, 10703:1–11. There was nothing subtle about this help: a member of the Tech Team brazenly stole the drawings — all expressly marked "Dow Confidential" — from his former employer. ROA.10707:21–10710:11, 23997–24035.

The LG Plant was widely seen as the finest PC plant in the world, which is why Luxi (and other Chinese PC upstarts) sought to copy the design. As even Harper

admitted, "everyone wanted LG." ROA.10690:11–22, 10706:5–8, 10714:3–10715:2. Via their theft of the LG Process Flow Diagram and other "Dow Confidential" materials (such as the "Stade Report"), ROA.23856–930, Harper's Tech Team made more than $2.9M "consulting" for Luxi. ROA.9686:17–9696:3, 10724:7–12. Harper would later admit that the trove of stolen Dow materials was a "fortune of engineering data from a state-of-the-art Dow PC plant that in essence [would] provide a high degree of probability for a successful start up and performance of Luxi's PC plant." ROA.10731:16–21, 46274. Indeed, that fortune was "priceless." ROA.10733:8–16.

KBR eventually entered into an agreement with Harper's new company, Polycarbonate Consulting Services, Inc. (PCS), to help KBR sell its "PCMAX" licensing package to LG, knowing that Harper's work would be based on the LG Plant design. ROA.10652:12-19, 10872:7–10874:17, 10876:10–18, 14470. Though the LG joint venture already had the latest version of Dow's PC technology (by then owned by Trinseo) through its earlier joint venture licensing arrangement with Dow, LG wished to build an additional (third) PC manufacturing train. ROA.11196:17–20, 11198:12–16. Using Harper as a "sales consultant," KBR unsuccessfully tried to sell its PCMAX package to LG. ROA.10780:3–6, 10781:6–23, 11224:4–13, 46842–49. Trinseo's trial evidence showed that LG rebuffed KBR's efforts in part due to fear of legal action by Trinseo if LG was seen as providing KBR with access to the LG Plant design and materials for the PC trains that LG had licensed from Dow as Trinseo's

predecessor. As argued in Section IV.B below (pp. 82–89), however, the district court erroneously excluded this evidence.

Notwithstanding LG's rejection, KBR's partnership with Harper and the Tech Team bore fruit for them all when, in late 2017, KBR landed its first PCMAX customer, a Chinese company called Cangzhou. ROA.12176:13–18, 47302. As a result, KBR officially hired Harper and the Tech Team (or their consulting entities) "to assist KBR in development of a complete PC Technology package." ROA.47575–95, 47666. KBR now had access to Trinseo's highly regarded PC technology, which KBR had long coveted, via an assembled team of former Dow employees having extensive experience in Trinseo's PC technology and improper access to Trinseo's confidential engineering data. For their assistance, KBR paid Harper and the Tech Team $1.325M for a Preliminary Design Package (PDP) — a document concededly derived from the stolen LG Plant drawings discussed above. ROA.10872:11–15, 10874:1–5, 10876:10–18, 10880:4–6, 10881:12–24, 47038–39, 47575–95, 47703–05.

After providing the PDP, Harper continued to use the stolen LG Plant drawings to help KBR to develop PCMAX by answering KBR's questions and revising KBR's engineering drawings. ROA.10651:20–10652:19, 47610, 47615–18, 47870–77. Harper's and KBR's blatant misappropriation continued for months thereafter, with the knowledge and approval of KBR employees and officers who not only knew about it but also outright demanded it. *Id*. Harper went so far as to send pictures of

the stolen LG drawings to KBR employees so that they could validate that he was actually using the "real thing" to answer their questions.  ROA.47796–802, 47870–77.

The month after securing the Tech Team's help and stolen data, KBR began marketing PCMAX to potential licensees with reference to Trinseo by name, claiming that KBR's technology was "related to Dow/Trinseo PC technology" that "Dow/Trinseo implemented" at (among other sites) the LG Plant in Yeosu, South Korea:



ROA.14476, 49978; *see also* ROA.14533–34 ("Technology Advantages").  This marketing succeeded:  KBR sold two PCMAX packages — to Chinese companies Cangzhou and Pingmei — for nearly $59M, including license fees and additional revenue that flowed therefrom.  ROA.11828:15–11832:18, 13076:21–25, 50158.

**E.** **After a three-week trial, the jury renders a verdict for Trinseo, finding that KBR and the Harper Defendants misappropriated four trade secrets and determining both reasonable royalty and unjust enrichment damages.**

Trinseo sued Defendants under the DTSA, alleging that they misappropriated ten components of its PC technology. ROA.734–36. After a three-week trial, and after two full days of deliberations, the jury found that four of these components were trade secrets:

(1) Process control strategy and Concepts and Control Algorithms;

(3) Phosgene Reactor Design and Associated Pressure Vessel Containment;

(4) Continuous Plug Flow Oligomerization Reactor Inside Pressure Vessel Containment (with static mixer design); and

(6) Steam Devolatilization Process.

ROA.7546. Moreover, the jury found that Defendants misappropriated all four of these trade secrets. ROA.7849–52.

To remedy the harm Defendants' misappropriation caused, the jury awarded Trinseo (i) $50.0M in reasonable royalty damages against KBR; (ii) $21.2M in unjust enrichment damages against KBR; and (iii) $5.5M in unjust enrichment damages against the Harper Defendants. ROA.7557–58. Under 18 U.S.C. § 1836(b)(3)(B)(ii) (authorizing a reasonable royalty "in lieu of [other] damages"), awards (i) and (ii) are alternative remedies that Trinseo must ultimately elect.

14

**F.  In post-trial proceedings, the district court nullifies the jury's award of damages, effectively absolving Defendants' misappropriations.**

Before jury deliberations, the parties expressly negotiated — and the district court readily accepted — an instruction for properly measuring a reasonable royalty should the jury find that KBR misappropriated some or all of Trinseo's trade secrets: a reasonable royalty from KBR to Trinseo "must reflect the **value attributable to the misappropriated technology**, **and no more**."  ROA.7556 (emphasis added); ROA.13804:17–13805:5 (agreement).  Based on that agreed and proper instruction, the jury awarded the damages described above.  Notably, the district court **rejected** Defendants' proposed instruction that would have asked the jury to award damages "per trade secret," i.e., insert a separate number for each distinct secret that had been misappropriated.  ROA.6484–87.

But **after** the jury returned its verdict and was dismissed, the district court essentially adopted Defendants' position on damages.  In granting KBR's Rule 50(b) motion post-trial, the district court held there was insufficient evidence to support the jury's verdicts because Trinseo did not apportion its damages on a "per trade secret" basis.  ROA.38652–87.  On this basis, the district court nullified the jury's verdict and entered a take-nothing judgment against Trinseo.  ROA.8201.

As for the six technology components the jury did not find to constitute trade secrets under the DTSA, the jury had no opportunity to determine whether those components were protectable "confidential information" under Texas common law,

as Trinseo had alternatively pled. That is because, months before trial, the district court dismissed Trinseo's claim for "misappropriation of confidential information." ROA.23395–400. The court held the Texas Uniform Trade Secrets Act (TUTSA), Tex. Civ. Prac. & Rem. Code § 134A.007(a), preempted this claim. ROA.23400.

Trinseo timely moved for a new trial on damages, ROA.8235–8241, which the district court summarily denied, ROA.8422–23. Trinseo timely filed an amended notice of appeal. Record Excerpts, Tab 12.

## SUMMARY OF ARGUMENT

1. The district court erred in nullifying the jury's award of reasonable royalty damages to Trinseo.

The district court erred as matter of law in construing the DTSA to require Trinseo to prove its damages using "strict apportionment" imported from patent law:

- As properly understood, apportionment requires only that Trinseo's damages reflect the value attributable to the misappropriated technology, and no more.

- The text of neither the DTSA nor the statute on which it was modeled contains the district court's additional, patent law-based requirement.

- This Court's decisions supply no warrant for wholesale importation of patent-law concepts, and the weight of out-of-Circuit authority does not either.

- Even in patent cases, the Federal Circuit has not adopted the district court's categorical requirement.

Setting aside the district court's legally erroneous conception of "strict apportionment" from patent law, sufficient evidence supports the properly instructed jury's award of a reasonable royalty from KBR to Trinseo:

16

- The jury was properly instructed on the requisite "hypothetical negotiation" and had sufficient evidence to apply those instructions and make its award.

- Given undisputed evidence that PC technology owners license an entire technology package rather than individual components á la carte, the jury's negative findings on 6 of 10 alleged trade secrets do not compel a contrary conclusion.

- Alternatively, the jury could readily have found that the "misappropriated technology" here was the heart, core, and value driver of Trinseo's PC technology.

Even under patent-law requirements prevailing in the Federal Circuit, there is sufficient evidence of reasonable royalty damages:

- The reasonable royalty award may be sustained under "built-in apportionment" based on sufficiently comparable licenses of PC technology.

- In the alternative, the reasonable royalty award may also be sustained under the "entire market value" exception.

2.     The district court likewise erred in nullifying the jury's award of unjust enrichment damages against KBR.

Given Congress's deliberate use in the DTSA of the term "damages," which are quintessential "legal" relief, it is the province of the **jury** — not the district judge — to award unjust enrichment damages under the statute.

Sufficient evidence supports the jury's unjust enrichment award against KBR. The jury had evidence of the net profits to KBR resulting from its misappropriation of Trinseo's trade secrets, KBR's "apportionment"-based attacks on the award lack merit, and the jury had sufficient evidence of causation.

Because the evidence does not support the conclusion that the jury's damage award was excessive, this Court should reject the district court's "remittitur."

3.     The district court likewise erred in nullifying the jury's award of unjust enrichment damages against the Harper Defendants.

Once this Court sets aside the district court's legally erroneous conception of "strict apportionment" from patent law, sufficient evidence supports the properly instructed jury's award:  the jury had evidence from which it rationally could find that the Harper Defendants would have obtained no profits at all had they not misappropriated the Trinseo technology that the jury determined to be trade secrets.

4.     If this Court does not reinstate the jury's award of damages to Trinseo, it should order a new trial on damages.

If the Court newly adopts a "strict apportionment" requirement from patent law, fairness demands that Trinseo receive a new trial on damages.  This Court has never before applied the patent-law doctrine of "strict apportionment" to damages in trade secret misappropriation cases, and thus Trinseo could not reasonably have anticipated the imposition of such a requirement.

If this Court orders a new trial on Trinseo's damages, it should rule that the district court wrongfully excluded relevant evidence bearing on KBR's knowledge and willfulness, specifically evidence that KBR knew that Trinseo would file suit if KBR obtained access to the materials that it later acquired from the Tech Team.  The district court erred in excluding the evidence because the probative value of the evidence substantially outweighed any alleged unfair prejudice to KBR, and because

the hearsay rule does not justify exclusion (as the evidence concerns KBR's knowledge).  The wrongful exclusion adversely affected Trinseo's substantial rights.

5.    The district court erred in dismissing Trinseo's common-law claim for "misappropriation of confidential information" on the ground that it was preempted by TUTSA.  As confirmed by a decision of this Court construing an essentially identical provision of a Louisiana statute, TUTSA's plain text exempts Trinseo's claim from preemption.  Moreover, the district court erred in abrogating Trinseo's common law rights absent a clear command from the Texas Legislature.  Finally, principles of uniformity confirm that reversal of the preemption ruling is required.

\*    \*    \*

The district court's judgment nullifying the jury's verdict on damages should be reversed, and the case should be remanded with instructions that the court resolve on the merits Trinseo's claim for misappropriation of confidential information, consider pre-judgment interest, and thereafter enter judgment in favor of Trinseo.

## ARGUMENT

Although the district court found that "the jury's liability determinations" were "clearly supported" by "an abundance of evidence," ROA.38652, the court nevertheless nullified all of the jury's damage awards, claiming that they were "unsupported by the law or the evidence" or (to say the same thing) "unsupported by proper evidence."  ROA.38677, 38681.  In so ruling, the district court erred as a matter of law.

Part I addresses the reasonable royalty award, while Parts II and III address the unjust enrichment awards against KBR and the Harper Defendants, respectively.

Part IV proffers an argument in the alternative, namely, that if this Court does not reinstate the jury's award of damages to Trinseo, the Court should order a new trial on damages.

Part V shows that the district court erred in dismissing Trinseo's common-law claim for "misappropriation of confidential information."

## I. The district court erred in nullifying the jury's award of reasonable royalty damages to Trinseo.

In vacating the jury's reasonable royalty award, the district court framed the legal issue as "whether, and to what extent, apportionment is required in a trade secrets case like this one, in which the jury finds liability on some but not all of the alleged trade secrets." ROA.38653. The district court acknowledged that "the Fifth Circuit does not appear to have encountered a case involving apportionment in trade secrets cases." ROA.38658. "Looking [instead] to patent law" as developed by the Federal Circuit, ROA.38657, the court accepted KBR's argument that "apportionment is required unless the 'entire market value' exception applies, and that Trinseo failed to provide the proof needed to invoke this exception to apportionment." ROA.38653.

As demonstrated in Section I.A below, once the district court's legally erroneous conception of "strict apportionment" from patent law is set aside, sufficient evidence supports the properly instructed jury's award of a reasonable royalty. In

the alternative, as demonstrated in Section I.B, the jury had sufficient evidence of reasonable royalty damages even applying the patent-law requirements prevailing in the Federal Circuit, whether under the rubric of "built-in apportionment" or the "entire market value" exception.

### A. Setting aside the district court's legally erroneous conception of "strict apportionment" from patent law, sufficient evidence of damages supports the properly instructed jury's award.

A court is "required to accept the verdict of a properly instructed jury unless, viewed in the light most favorable to the verdict, there is a complete absence of evidence to support it." *Treadway v. Otero*, 2024 WL 1654587, at *1 (5th Cir. Apr. 17, 2024). That is, a court "must deny a motion for judgment as a matter of law unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Holmes v. Reddoch*, 117 F.4th 309, 315 (5th Cir. 2024) (internal quotation marks omitted). A court "must consider all of the evidence in the light most favorable to the nonmovant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury." *Id.* (same). In its review, this Court "credit[s] the non-moving party's evidence and disregard[s] all evidence favorable to the moving party that the jury is not required to believe." *Id.* (same). "After a jury trial, the standard of review is especially deferential." *Id.* (cleaned up).

In trade secret misappropriation cases in particular, this Court takes a **very broad view** of what evidence sufficiently supports a verdict:

> Damages need not be proved with great specificity. A flexible approach is applied to the calculation of damages in a misappropriation of trade secrets case. Where the damages are uncertain, we do not feel that the uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown. It is sufficient that the plaintiff demonstrates the extent of damages as a matter of just and reasonable inference even if the extent is only an approximation.

*In re Mandel*, 720 Fed. Appx. 186, 190–91 (5th Cir. 2018) (cleaned up) (quoting *In re Mandel*, 578 Fed. Appx. 376, 390 (5th Cir. 2014)); *accord, e.g., Brand Services, L.L.C. v. Irex Corp.*, 909 F.3d 151, 157 (5th Cir. 2018) ("A [trade secret] plaintiff need not prove precise damages; indeed, uncertainty in damages should not preclude recovery." (citations omitted)); *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 879 (5th Cir. 2013) ("It will be enough if the evidence shows the extent of the [trade secret] damages as a matter of just and reasonable inference, although the result be only approximate." (cleaned up)).

A hallmark of this Court's approach to trade secret damages is **flexibility**, a concept that stretches at least as far back as *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974). There, the Court held that "every [trade secret] case requires a flexible and imaginative approach to the problem of damages." Thus, "the standard for measuring damages which emerges is **very flexible,**" *id.* at 535 (emphasis added), a standard that the Court has repeatedly

22

reaffirmed and applied to affirm jury awards in trade secret cases. *See, e.g., Thomas v. Hughes*, 27 F.4th 995, 1009 (5th Cir. 2022); *GlobeRanger Corp. v. Software AG United States of America, Inc.*, 836 F.3d 477, 499 (5th Cir. 2016); *Wellogix*, 716 F.3d at 879; *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012).

An important corollary to flexibility in calculating damages in trade secret cases is that "each case is controlled by its own peculiar facts and circumstances." *University Computing*, 504 F.2d at 538 (quoting *Enterprise Manufacturing Co. v. Shakespeare Co.*, 141 F.2d 916, 920 (6th Cir. 1944)), *quoted in Quantlab Technologies, Ltd. (BVI) v. Kuharsky*, 696 Fed. Appx. 682, 686 (5th Cir. 2017). Thus, "plaintiffs are entitled to adapt their damages theory to fit within the particular facts of the case," *Wellogix*, 716 F.3d at 879 (cleaned up), while juries may base their damages conclusions on "a reasoned evaluation of competing evidence," *GlobeRanger*, 836 F.3d at 501 (affirming jury's damages award and rejecting defendant's challenge that expert did not "exclude all costs for non-proprietary elements of" the software at issue).

In the present case, it is indisputable that the jury was "properly instructed." *Treadway*, 2024 WL 1654587, at *1. Indeed, KBR expressly agreed to the instruction on reasonable royalty damages. Accordingly, in resolving KBR's Rule 50(b) motion, the district court should have applied the foregoing standards regarding trade secret damages to determine whether there was a "complete absence of evidence to support" the verdict awarding Trinseo a reasonable royalty for KBR's misappropriation. *Id.*

1. **The district court erred in construing the DTSA to require Trinseo to prove its damages using "strict apportionment" imported from patent law.**

The district court did not apply this Court's standards. Rather, it concededly borrowed from the Federal Circuit's decisions about patent law to impose the very opposite of this Court's "flexible approach" to trade secret damages. Specifically, the district court imposed what it twice called "strict apportionment," ROA.38653, 38654 — a categorical requirement that Trinseo "divide up the value of its PC package **per trade secret** or otherwise provide evidence that would enable the jury to place a dollar value [on] **each individually alleged trade secret**." ROA.38652–53 (emphasis added); *see also* ROA.38653 (faulting Trinseo because it "did not provide a method for calculating the percentage of the total value of the PC package that would be attributable to **each trade secret**" (emphasis added)); ROA.38677 (holding that "there must be some evidence apportioning damages **per trade secret**" (emphasis added)). In imposing such "strict apportionment" from patent law, the district court reversibly erred. Review of this purely legal ruling construing the DTSA is de novo.

a. **As properly understood, apportionment requires only that Trinseo's damages reflect the value attributable to the misappropriated technology, and no more.**

As the district court correctly observed, the concept of "apportionment" originated in patent infringement cases: "Looking then to patent law, it is a long-standing requirement that patent owners '**must** in every case give evidence tending to separate

or **apportion** the defendant's profits and the patentee's damages **between the pat-
ented feature and the unpatented features**.'" ROA.38657 (emphasis by district
court) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).

At a high level, this patent-law concept is not necessarily inconsistent with how
this Court has conceived of damages in trade secret misappropriation cases. Thus, in
adopting the reasonable royalty measure of damages, *University Computing* observed
that such measure would yield "an apportionment of profits based on an approxima-
tion of the actual value of the infringed device to the defendant." 504 F.3d at 537.
In adopting what has come to be known as the unjust enrichment measure of damages,
*University Computing* similarly observed that such measure permitted recovery of
"the full total of defendant's profits or some apportioned amount designed to corre-
spond to the actual contribution the plaintiff's trade secret made to the defendant's
commercial success." *Id.* at 539.

Again at a high level, the apportionment concept from patent infringement
cases has been distilled to the rule that damages "must reflect the value **attributable
to the infringing features of the [defendant's] product, and no more**." ROA.6140
(emphasis added; alteration by district court) (quoting *Finjan, Inc. v. Blue Coat Sys-
tems, Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018), in turn quoting *Ericsson, Inc. v.
D-Link Systems, Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)). The jury instruction
on reasonable royalty damages reflected that high-level rule. The parties expressly

negotiated — and the district court readily accepted — an instruction using this very formulation to implement apportionment of this kind: a reasonable royalty from KBR to Trinseo "must reflect the value **attributable** to the misappropriated technology, **and no more**." ROA.7556 (emphasis added); *see also* ROA.13804:17–13805:5 (KBR's agreement to this instruction).

Not satisfied with these proper measures of damages implementing apportionment at a high level, the district court imposed its "strict apportionment" requirement **after** the jury returned a verdict in favor of Trinseo. On what authority? Certainly not authority from **this Court**. As the district court candidly acknowledged, "the Fifth Circuit does not appear to have encountered a case involving apportionment in trade secrets cases." ROA.38658. Indeed, the district court's requirement of strict apportionment comes not from the DTSA or trade secret cases more generally; rather, it is (according to the court itself) a "patent law requirement." *Id.* For the multiple reasons set out below, this Court should reject that categorical requirement.

> ### b. The text of neither the DTSA nor the statute on which it was modeled contains the district court's categorical requirement.

The DTSA expressly authorizes damages measured both by "unjust enrichment" and by a "reasonable royalty." 18 U.S.C. § 1836(b)(3)(B)(i)(II), (ii). Yet despite its (i) detailed provisions for addressing both injunctive and monetary relief, *see id.* § 1836(b)(3)(A)–(D); (ii) detailed definitions of terms like "trade secret" and

"misappropriation," *id.* § 1839(3), (5); and (iii) adoption following years of precedent in patent law speaking to strict apportionment, the text of the DTSA nowhere imposes a categorical requirement of strict apportionment on a per-trade secret basis.

Nor does such a requirement appear in the Uniform Trade Secrets Act (UTSA), the universally acknowledged model for the DTSA, specifically including UTSA's damages provisions. *See, e.g.*, H.R. Rep. No. 529, 114th Cong., 2d Sess. 13 (2016) ("Subparagraph (B) [of what is now 18 U.S.C. § 1836(b)(3)], **drawn directly from § 3 of the UTSA**, specifies the damage award that a court may issue." (emphasis added)), https://bit.ly/407hqP8; *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Group, Inc.*, 68 F.4th 792, 808 (2d Cir.) (observing that the DTSA "directly incorporates certain provisions from the UTSA — for example, the DTSA's compensatory damages provision is 'drawn directly' from § 3 of the UTSA"), *cert. denied*, 144 S. Ct. 352 (2023). Notably, the UTSA has "served as a model statute for trade secret laws in" no fewer than 51 U.S. jurisdictions, and the statute's damages provision has existed in its current form since 1985. *See id.* at 807, 808 n.24.

### c. *University Computing* supplies no warrant for wholesale importation of patent-law concepts.

Faced with no grounding for strict apportionment in the text of the **trade secret** statutes, the district court purported to find warrant for the wholesale importation of **patent-law** concepts into DTSA cases like this one. Thus, the court opined that in *University Computing*, "the Fifth Circuit imported these damage principles from

patent law into trade secret reasonable royalty law and held that 'the proper measure of damages in the case of a trade secret appropriation is to be determined by reference to the analogous line of cases involving patent infringement.'" ROA.38657 (quoting 504 F.2d at 535, in turn quoting *International Industries, Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957)).  Although the quotation is accurate, not so is the district court's conclusion therefrom that this Court categorically "imported [all] damage principles from patent law."

Read in context, the statement from *University Computing* evinces no more than this Court's intent to join the Third Circuit in adopting the "unjust enrichment" measure of damages as an alternative to "the loss suffered by the plaintiff," which was an "inappropriate measure" in *University Computing* itself:  "In the case before us, then, the 'appropriate measure of damages, **by analogy to patent infringement**, is not what plaintiff lost, but rather the benefits, profits, or advantages gained by the defendant in the use of the trade secret.'" 504 F.2d at 535–36 (emphasis added; again quoting *International Industries*, 248 F.2d at 699).  In addition, this Court drew on a "patent infringement case" to adopt as a third alternative the "reasonable royalty" measure of damages.  *Id.* at 536–37 (citing *Egry Register Co. v. Standard Register Co.*, 23 F.2d 438 (6th Cir. 1928)).

To craft appropriate measures of damages for trade secret misappropriation "by analogy to patent infringement" with reference to a single "patent infringement

case" hardly bespeaks an intent to adopt every jot and tittle of patent law as it might happen to develop over the ensuing half-century. Had that been this Court's intent, one might expect to find at least one decision of this Court so holding; however, neither the district court nor KBR cited one. Indeed, it would be perverse to find such a novelty in *University Computing* when it was in that very context that this Court held that "the standard for measuring damages which emerges is **very flexible**." *Id.* at 535 (emphasis added).

> ### d. The weight of out-of-Circuit authority does not support the district court's categorical requirement.

Lacking any appreciable authority from the trade secret statutes or from this Court, the district court looked far and wide for decisions supporting its categorical requirement. Despite literally decades of trade secret litigation in federal and state courts nationwide under both federal and state law, the district court could identify a mere four decisions that supported its imposition of strict apportionment per trade secret. ROA.38658–60.

In the court's view, the "most notable" was *O2 Micro International Ltd. v. Monolithic Power Systems, Inc.*, 399 F. Supp. 2d 1064 (N.D. Cal. 2005), *aff'd*, 221 Fed. Appx. 996 (Fed. Cir. 2007). ROA.38658. As the district court described the case, "the plaintiff alleged misappropriation of eleven trade secrets and presented unjust enrichment evidence relating to all eleven in one lump sum ($16 million). The jury found that only five of eleven trade secrets were misappropriated and that

only one of those (the transformer information) resulted in the defendant being unjustly enriched." *Id.* (citing 399 F. Supp. 2d at 1067). But the Northern District of California ruled that, on the evidence presented, "there was no reasonable basis for the jury to award $12 million in unjust enrichment damages for misappropriation of *just* the transformer." *Id.* (citing 399 F. Supp. 2d at 1077).

This ruling hardly provides the foundation for a categorical requirement that trade secret plaintiffs strictly apportion on a per trade secret basis. Indeed, *O2 Micro* awarded the plaintiff a reasonable royalty, rejecting the defendant's argument that the plaintiff's "reasonable royalty estimate is plagued with the same problem as its unjust enrichment damages award, i.e., it is based on misappropriation of all the trade secrets and not just the five found by the jury." 399 F. Supp. 2d at 1077–78. The court simply looked to other evidence, namely, that the plaintiff's expert had "determined that the parties in a hypothetical negotiation would agree to a $900,000 paid-up reasonable royalty for **any one group of trade secrets**; he stated that the transformer trade secrets would be an example of a group of trade secrets." *Id.* at 1078 (emphasis added).

The district court next relied on *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics America, Inc.*, 895 F.3d 1304 (Fed. Cir. 2018) (*TAOS*), a case based on neither the DTSA nor any version of the UTSA. ROA.38659. In *TAOS*, the plaintiff charged the defendant with "three distinct acts of misappropriation of

three distinct trade secrets." <u>895 F.3d at 1312</u>. The plaintiff's calculation of unjust enrichment damages resulting from the three misappropriations "did not distinguish among those grounds"; i.e., the plaintiff "did not explain which of the trade secrets contributed to what amount of [the defendant's] profit to be disgorged" but rather "assigned all profits to the misappropriation of all trade secrets." *Id.* at 1317. Having "determined that misappropriation liability here can properly rest on only one of the three grounds that [the plaintiff] presented to the jury," the Federal Circuit vacated the jury's award of unjust enrichment damages: "**On this record**, we have no basis to conclude that the remaining ground for liability — the photodiode structure trade secret — supports the entire award." *Id.* (emphasis added).

Again, this "record"-specific conclusion cannot be read to impose a categorical requirement of strict apportionment. In the first place, the court expressly disclaimed any intent to address issues of "proper apportionment." *Id.* at 1317 n.7. Moreover, the district court's reading of *TAOS* cannot be reconciled with the Federal Circuit's consistent (and later-in-time) endorsement of "built-in apportionment" on an appropriate record, as discussed in the following section. Finally, on remand, the district court refused to exclude the plaintiff's evidence that "the lone [remaining trade secret] drove demand" and thus supported "the same damages as before." *AMS Sensors USA Inc. v. Renesas Electronics America Inc.*, <u>2021 WL 765227</u>, at *6 (E.D. Tex. Feb. 26, 2021), *appeal docketed*, No. 22-2185 (Fed. Cir. Sept. 7, 2022). That

is because the "jury determines whether the full amount of the infringer's profits is attributable to the alleged misappropriation of trade secrets." *Id.* (cleaned up).

Notably, the Sixth Circuit recently addressed both *O2 Micro* and *TAOS* in *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368 (6th Cir. 2022). The plaintiff's expert "assumed as part of his analysis that Caudill would recover on all six alleged trade secrets," but the jury "found no misappropriation of Trade Secrets 2 or 6." *Id.* at 388. Relying on *O2 Micro* and *TAOS*, the defendant argued categorically that "the jury could not have given Caudill the full recovery that it sought for Trade Secret 1," and that an "expert's reliance on trade secrets that were not misappropriated doom[s] a damages award" as a matter of law. *Id.* at 388–89. The Sixth Circuit rejected that argument, distinguishing *O2 Micro* and *TAOS* on their respective facts, while spurning the defendant's "narrow view of the evidence that can support a trade-secrets damages award." *Id.* at 390. In accord with this Court, the Sixth Circuit "adhere[d] to the broader view that a court may **flexibly** award trade-secrets damages." *Id.* (emphasis added). The Third Circuit has viewed *TAOS* similarly, holding that it "does not establish that apportionment of damages is required in all cases involving trade secrets." *Sabre GLBL, Inc v. Shan*, 779 Fed. Appx. 843, 852 (3d Cir. 2019).

Also on the flexible, non-categorical side of trade secret damage cases is *Bishop v. Miller*, 412 S.W.3d 758 (Tex. App.—Houston [14th Dist.] 2013, no pet.),

*cited in* ROA.38674–76.  There, the defendant advanced a categorical requirement like the district court's, arguing as a matter of law that the calculations of the plaintiff's damages expert "were unreliable because he failed to provide separate values for each of the items the jury found to be [the plaintiff's] trade secrets and instead provided only one value for misappropriation." *Id.* at 777–78.  The court rejected that argument on the evidence presented, observing (1) that "the jury, after all, found Bishop owned a compilation trade secret comprised of some or all of the thirteen items listed in the jury charge"; and (2) that the expert "appears to have reasonably concluded that within Bishop's trade secrets there exists a 'tipping point' of sorts without which mining in the Ten Mile Area was not economically feasible." *Id.* at 778 (emphasis added); *see also infra* pp. 56–57 (Trinseo's compilation trade secret). On these observations, *Bishop* held that "it would be illogical to **assign a value to each separate piece**" of the technology at issue.  *Id.* (emphasis added).

In *Quintel Technology Ltd. v. Huawei Technologies USA, Inc.*, 2018 WL 626355, at \*7 (E.D. Tex. Jan. 30, 2018), the defendants sought to exclude expert testimony in a trade secret case for "failure to apportion," i.e., because the expert did "not attempt to apportion his unjust enrichment damages between those features of the [product] that use Plaintiff's technology and those that do not."  The court rejected that reasoning, finding in the law no categorical requirement for feature-by-feature apportionment.  Though unjust enrichment damages must measure "'an apportioned

amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success,'" the extent of "the infringer's profits . . . attributable to the alleged misappropriation of trade secrets is for the jury to decide." *Id.* (quoting *University Computing*, 504 F.2d at 539); *see also AMS Sensors*, 2021 WL 765227, at *6 (applying this rule to reject the defendant's argument that the plaintiff "failed to properly apportion" reasonable royalty damages).

Although mildly supported by sparse and distinguishable authority, the district court's categorical requirement of strict apportionment has not been widely adopted; more recently, it has been rejected by the Sixth Circuit, the Third Circuit, and other federal and state courts in Texas. In this light, the few cases supporting the district court's categorical, erroneously <u>in</u>flexible requirement cannot overcome the "flexible approach" used by this Court "to calculate damages for claims of misappropriation of trade secrets." *Wellogix*, 716 F.3d at 879.

e. **Even in patent cases, the Federal Circuit has not adopted the district court's categorical requirement.**

Even the Federal Circuit has essentially rejected the district court's categorical requirement for patent infringement cases. Recall that the district court began by "[l]ooking . . . to patent law" for inspiration, specifically to the Federal Circuit's decisions holding that when "the accused [patented] technology does not make up the whole of the accused product, apportionment is required," ROA.38657 (quoting *Finjan*, 879 F.3d at 1309); and that as "with all patents, the royalty rate for [standard

essential patents] must be apportioned to the value of the patented invention," *id.* (quoting *Ericsson*, 773 F.3d at 1232).

Trinseo has already cited these two decisions for the precept — reflected in the agreed-upon jury instructions — that damages "must reflect the value attributable to the infringing features of the [defendant's] product, and no more." *Supra* p. 25 (quoting *Finjan*, 879 F.3d at 1309; *Ericsson*, 773 F.3d at 1226). But these very general statements in **patent infringement** cases cannot be said to impose a requirement of strict apportionment in **trade secret misappropriation** cases. Moreover, even in patent infringement cases, the Federal Circuit has rejected such a categorical requirement in categorical terms.

In *Bio-Rad Laboratories, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1376 (Fed. Cir. 2020), the court reiterated the familiar dual precepts that when "the accused technology does not make up the whole of the accused product, apportionment is required," and royalty damages "must reflect the value attributable to the infringing features of the product, and no more." But "there is **no blanket rule** of quantitative apportionment in every comparable license case." *Id.* (emphasis altered); *see also id.* (observing that the Federal Circuit has "never required absolute precision in applying the principles of apportionment" (quoting *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014))). Thus, contrary to the district court's decision, even in patent law, there is no blanket rule requiring strict apportionment.

The Federal Circuit continues to adhere to this "no blanket rule" rule. In applying the general concept that patentees "must in every case give evidence tending to separate or apportion the patentee's damages between the patented feature and the unpatented features," that court has repeatedly held that "'when a sufficiently comparable license is used as the basis for determining the appropriate royalty, **further apportionment may not necessarily be required**.'" *Pavo Solutions LLC v. Kingston Technology Co., Inc.*, 35 F.4th 1367, 1380 (Fed. Cir. 2022) (cleaned up; emphasis added; quoting *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020)). Strict apportionment is not categorically required

> because a damages theory that is dependent on a comparable license (or a comparable negotiation) may in some cases have "built-in apportionment." Built-in apportionment effectively assumes that the negotiators of a comparable license settled on a [license] embodying the value of the asserted patent.

*Id.* (cleaned up; quoting *Vectura*, 981 F.3d at 1040–41); *accord, e.g., Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376–77 (Fed. Cir. 2021) (same). Crucially, the "degree of comparability of the [relevant] license agreements as well as any failure on the part of [plaintiff's] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion" or other categorical rules. *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). Thus, the "'degree of comparability' [is] appropriately left for the jury to decide." *Bio-Rad*, 967 F.3d at 1374.

Regardless of whatever authority the Federal Circuit decisions in patent infringement cases might otherwise exert for trade secret cases, they do not support the district court's categorical requirement that Trinseo engage in "strict apportionment" on a "per trade secret" basis.

\* \* \*

For these reasons, the district court erred in construing the DTSA to require Trinseo to prove its damages using "strict apportionment." Because the jury was "properly instructed" on reasonable royalty damages, the court should have instead simply viewed the evidence in the light most favorable to the verdict and asked whether there was a "complete absence of evidence to support" that verdict. *Treadway*, 2024 WL 1654587, at \*1. And the district court should have done so mindful of this Court's consistent holdings that a trade secret plaintiff "need not prove precise damages; indeed, uncertainty in damages should not preclude recovery," *Brand Services*, 909 F.3d at 157; and that it "will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate," *Wellogix*, 716 F.3d at 879. In accord with these precepts, we undertake that exercise in the following Subsection I.A.2.

### 2. The jury had legally sufficient evidence to support its award of a reasonable royalty from KBR to Trinseo.

As the district court correctly recounted, "Trinseo alleged misappropriation of ten trade secrets relating to its polycarbonate technology," and the jury "was given

these ten items in a list and instructed to answer 'yes' or 'no' as to whether each of them constituted a trade secret.  Of the ten claimed trade secrets, the jury found that only four were trade secrets — numbers (1), (3), (4), and (6)."  ROA.38669–70; *see also* ROA.7546 (list and answers).  The jury "found that KBR and the Harper Defendants had misappropriated these four trade secrets."  ROA.38670; *see also* ROA.7549–52 (findings).  Finally, after having been properly instructed that a "reasonable royalty compensating Trinseo . . . must reflect the value attributable to the misappropriated technology," the jury awarded Trinseo $50M in reasonable royalty damages against KBR.  ROA.7556–57.  That was $25M for each of the two "trains" at issue.

> **a.** **The jury was properly instructed on the requisite "hypothetical negotiation" and had sufficient evidence to apply those instructions and make its award.**

In an instruction to which KBR agreed, the Court charged the jury that "a reasonable royalty is the amount of the royalty payment to which Trinseo and KBR would have agreed to in a **hypothetical negotiation** taking place at the time KBR's alleged misappropriation first began."  ROA.7556 (emphasis added).  The Court also charged the jury that in "determining the reasonable royalty, you should consider all the facts known and available to the parties at the time . . . KBR's alleged misappropriation began.  The factors that you may consider in making your determination include" the five factors mentioned in *University Computing*.  ROA.7556–57.  The jury was further instructed that no one factor was dispositive, and so it was free to

"consider any other factors that in your mind would have increased or decreased the [reasonable] royalty." ROA.7557.

One of those factors was "royalty prices that past purchasers may have paid." ROA.7556. Scott Moore, Trinseo's Director of Corporate Development, testified both about Trinseo's royalty agreement with an actual licensor, the LG-Dow joint venture, and about negotiations with other companies in China and elsewhere that expressed interest in licensing Trinseo's polycarbonate technology. ROA.11562:18–20, 11569:10–11. In 1999, the LG-Dow joint venture licensed, on a limited geographic basis, what was then Dow's technology for two 65KTA PC manufacturing trains for more than **$160M**, comprising a $40M up-front license fee, plus a 3–5% running royalty for fifteen years thereafter. ROA.9627:3–8, 11563:3-15, 11567:14–11568:9, 24043–45.

Moore also testified about Trinseo's licensing negotiations in the 2011–2014 timeframe. With one potential licensor (PTT in Thailand), the negotiations went so far that Trinseo "had drafted an agreement with them and come to an agreement on the terms," crucially including a license price of $380 per ton for the first train and $342 per ton for the second train. ROA.11584:14–11586:10. When applied to KBR's two copycat 100KTA PC design packages, those numbers yield a royalty between $34.2M and $38M per train.

For negotiations with potential licensee United Petrochemical Company (UPC) of Russia, Trinseo "had agreed to a price with them, and we actually drafted the license agreement with them"; specifically, "the net present value of the whole thing was like $215 per ton up front, and then ten years, which would have added an additional $125 per ton [totaling $340 per ton], which would have been about $30 million for the train." ROA.11587:19–11588:3; *see also* ROA.11587:8 (testifying about negotiations with Yinguang Gansu, which was seeking a licensing fee in the "mid-300s" per ton); ROA.11592:1–2 (testifying about negotiations with Fujian SEEC, which sought a licensing fee "in the low 300s" per ton); ROA.11201:23–11202:2, 46642 (reflecting KBR's research showing that PC competitor Asahi was charging a license fee of $400 per ton); ROA.46960 (outlining KBR's belief that Trinseo licensee LG was prepared to pay "$40–50MM additional license fee to Trinseo" for contemplated third PC manufacturing train).

These and other licensing negotiations — which included "discussions with multiple Chinese companies for licenses in the range of **$25MM for one train** with restricted use in China" — were summarized on an exhibit showed to the jury during Moore's testimony:



## Technology Value

- Trinseo has experience licensing polycarbonate technology
  - Licenses sold by Dow to both LG and Sumitomo
  - From 2011-2014 Trinseo pursued licenses before choosing to exit the licensing business to focus on production with our own assets. In polycarbonate, Trinseo was working with multiple targets at the time:
    - Nearly sold a license to a Russian company for $30MM for one train with restricted use in Russia
    - In discussions with multiple Chinese companies for licenses in the range of $25MM for one train with restricted use in China
    - New Chinese five year plan under development and interest in polycarbonate licenses is again very high
    - The value of technology permitting unrestricted use to a Chinese buyer in particular will be high – Certainly well above $25MM

### Historical Examples

| Company | Technology | Capacity | $MM USD* | $USD per KT |
|---|---|---|---|---|
| Huajin (2008) | Mass ABS | 130KT | $15+$5=$20 | $115-$154 |
| Sinopec (2004) | Mass ABS | 200KT | $28+$9=$37 | $140-$185 |
| Sibur (2014) | Styrene Monomer | 250KT | $9 to $11 | $36-$44 |
| SEEC (2014) | PC | 80KT | $26+$7=$33 | $320-$412 |
| LCY | SSBR | 50KT | $25 | $500 |

ROA.50134 (emphasis added); ROA.11589:22–11590:14. The jury awarded exactly this figure, or $50M for the two packages that KBR licensed.

Perhaps the evidence regarding the negotiated license agreements would have been even stronger for Trinseo if those agreements had been "executed." But KBR's own expert David Leathers readily agreed that an agreement-in-principle "doesn't have to be an executed contract in order for it to be relevant to the evaluation of what a reasonable royalty might have been" at the pertinent time. ROA.13742:8–13. Similarly, this Court found sufficient evidence to support a jury's reasonable royalty award in a trade secret case based on an "agree[ment] in principle," because that agreement showed a negotiating party's "willingness to pay" for the misappropriated secrets.

*Bohnsack*, <u>668 F.3d at 280</u>; *see also University Computing*, <u>504 F.2d at 542</u> (holding that a trade secret plaintiff should not be "denied damages" just because it is "unable to show past transactions to show how [a hypothetical licensing] agreement of this sort would be reached"). That these negotiations yielding agreed-upon prices were not fully consummated simply means that the license was "not perfectly analogous" — a fact that "generally goes to the weight of the evidence, not its admissibility." *Ericsson*, <u>773 F.3d at 1227</u>. Accordingly, that decision is "appropriately left for the jury to decide." *Bio-Rad*, <u>967 F.3d at 1374</u>.

The district court denigrated this evidence based on KBR's argument that from 2014 to 2017, Trinseo executed no licensing agreements. <u>ROA.38672</u> n.22. But the court ignored the evidence showing why: Trinseo deliberately decided to cease wholesale licensing of its PC technology to restrict PC supply and thereby bolster long-term profitability — goals thwarted by Defendants' misappropriation. Scott Moore explained the rationale for that decision: the CEO stopped the licensing because "he didn't want to get additional interfacial polycarbonate into the market **because he felt that would have an effect on the market**"; specifically, "we made a lot of money over the coming years and **injecting additional capacity in the market certainly would have affected that**." <u>ROA.11588</u>:23–11589:7 (emphasis added); *see also* <u>ROA.11671</u>:19–20. KBR officer Doug Kelly understood this in **2017**, informing his subordinates by email that "Trinseo is also a [PC] operator and

they are planning to reduce their licensing efforts **because they feel like they are enabling competitors**." ROA.46539 (emphasis added).

Thus, the jury had evidence that Trinseo believed — and KBR understood Trinseo to believe — that additional licensing of its PC technology would enable competitors and thereby increase the supply of polycarbonate to the detriment of Trinseo's long-term profits. Having been charged that it could and should consider "resulting and foreseeable changes in the parties' competitive posture," ROA.7556, a rational jury could have concluded that such belief would have led to an even higher reasonable royalty hypothetically negotiated between Trinseo and KBR. *See also University Computing*, 504 F.2d at 544 ("Both sides in such a hypothetical transaction have interests they wish to protect; such interests affect the price at which they are prepared to buy or sell . . . . [W]here the 'willing seller' would have been unwilling to sell but for the theft of his secret, the Court reconstructing the agreement should consider the reasons the seller is unprepared to sell, and take into account such factors as the possible decline in the seller's future competitive posture.").

The jury was also charged that it could and should consider the "total value to Trinseo of the misappropriated trade secrets, including the cost to develop the trade secrets and the importance of those secrets to Trinseo's business." ROA.7556. On this point, Defendant Steve Harper recalled that in the early 1980s, Dow invested "$75 million for its first PC plant" — i.e., "the actual capital cost for the Freeport

Train 1 with all the infrastructure for Train 2" — and that "the design part was even more."  ROA.10667:16–22; *accord* ROA.14231.  KBR's damages expert conceded (begrudgingly) that "$75 million in 1985-dollars is worth over $200 million today." ROA.13753:3–8.

As for value more generally, KBR's damages expert further acknowledged that Trinseo's PC licensee LG was willing — "in the relevant time period of 2017" — to pay Trinseo as much as $50M to license a 200KTA plant, i.e., as much as $25M in royalties per 100KTA train.  ROA.13771:14–13772:5; *accord* ROA.13746:12–24 (same numbers).  The $25M per train that the jury found as Trinseo's reasonable royalty was further supported by Defendants' admitted Exhibit 357 (ROA.51963), which **KBR's expert** himself identified as "**very strong evidence** . . . of internally what [Trinseo] believed was the potential market value for an 80 KTA technology." ROA.13655:14–17 (emphasis added).  That value was $20M per license, or — as KBR's counsel and damages expert agreed — "$250 per ton."  ROA.13655:21–23. For the two 100KTA train packages KBR licensed to its Chinese licensees, Cangzhou and Pingmei, that per-ton license fee translates to $25M per train — again, **the exact number that the jury found**.

The "nature and extent of the use that [KBR] intended for the misappropriated secrets" was another factor that the district court instructed the jury to consider in determining a reasonable royalty.  ROA.7556.  Although in some cases a defendant's

intended use of the misappropriated trade secrets must be the subject of counter-factual prediction, no such prediction was required here. The jury saw KBR's April 2017 PowerPoint presentation titled "Polycarbonate Technology Acquisition" which trumpeted KBR's "Opportunity to acquire Polycarbonate Technology" and reflected KBR's expectation "to sell 5 plants in 10 years" after acquiring "full, exclusive rights to globally market and sell PC technology." ROA.46543–47. The jury also heard KBR's Francis Tsang confirm that same planned use. ROA.11068:1–4. KBR's damages expert conceded that this intended use "would have an **upward impact**" on the reasonable royalty to which Trinseo is entitled. ROA.13755:22–24 (emphasis added); *accord* ROA.13756:2–7, 9662:20–9663:20, 10082:25–10083:22, 11063:17–11065:25, 13756:20–25, 46223 (evidence of upward impact).

Finally, the jury was charged that it could and should consider "the ready availability of alternative processes." ROA.7557. KBR asserted that such availability existed because "it was technologically feasible for KBR to have developed PCMAX without the use of Trinseo's trade secrets." ROA.25109. This assertion was belied by evidence that KBR was rebuffed by every PC technology provider it approached and that KBR lacked the technical expertise to compete on its own — precisely why KBR sought to license PC technology from Trinseo in 2014. ROA.11307:18–21 (admission of KBR's Eric Wong). KBR's view that it lacked the time and the talent to develop its own package remained true the following year, as a Wong email

admitted.  ROA.46349 (acknowledging that some sections of a PC plant were so specialized that KBR "will never be able to understand and execute the work even after 2 projects" unless KBR hired "someone with the necessary skills").

Wong's view held true through the second half of 2017, as Wong noted when he admitted in an e-mail:  "We have a real challenge.  We need the Tech Team input before we can do a quality job, i.e., material balance and also the control scheme." ROA.46987.  The "challenge" that Wong identified stemmed in part from the fact that the only alternative process to which KBR had access before hiring the Tech Team came from a small engineering firm called Enex, which KBR's "smartest engineer" had already decided so was "riddled with errors" that it would have been "irresponsible and dangerous" to use that firm.  ROA.11138:15–11140:6, 12629:18–12630:4, 14579 (¶ 18).

Several years later, and despite increasing pressure from the president of KBR's technology business unit, KBR's Francis Tsang held the same view as Wong.  In a May 21, 2017 e-mail sent to "the top executives in [KBR's] technology business unit" about his meeting with the Tech Team, ROA.11213:6–23, Tsang reported that we "have 90% of the design necessary **but the final 10% is very complicated and we will need [Harper's Tech Team]**." ROA.14465 (emphasis added).  As late as May 21, 2019, Tsang wrote to Harper that "there is no way we think that we can do this alone and without you and your team." ROA.48655.  As Tsang admitted at trial,

"the 'this' that [KBR] didn't think [it] could do alone without the tech team" was "[c]ontinuing to deliver polycarbonate technology." ROA.11263:18–21.

To be sure, KBR's Steve Pringle testified that it "may have taken a few months, on the outside a year, but we would have developed [PCMAX] anyway without the Tech Team." ROA.13036:3–7. But the jury could disbelieve Pringle's uninformed opinion, because it was contradicted by (a) evidence that KBR had five years (from 2012 to 2017) to develop PCMAX on its own but never did so, instead seeking to license technology from no fewer than four PC manufacturers (including Trinseo), ROA.13108:10–14; and (b) Pringle's concessions on cross-examination that "KBR was not able to come up with a marketable polycarbonate design on its own because KBR did not have the subject matter experts in polycarbonate," ROA.11072:7–15.

Therefore, the admitted evidence enabled a rational jury to find that KBR's position was not credible and that, in fact, there were **no** readily available alternatives to Trinseo's PC technology misappropriated first by the Tech Team and then by KBR. Even if such alternatives could be identified and licensed, moreover, KBR sought to associate Trinseo's specific type of polycarbonate technology with its PCMAX package, ROA.9681:2–13, 46223 (PC was "an integral component" of the phenolic chain and KBR wanted to "associate Styron's brand to it"), as demonstrated by the evidence that KBR marketed its PCMAX licensing design package as based on Dow's (now Trinseo's) "commercially proven" version, ROA.11113:11–11115:18, 46477.

In sum, the district court reversibly erred by nullifying the verdict of a properly instructed jury that had more than sufficient evidence upon which to support its reasonable royalty determination.

> **b.** **Given evidence that PC technology owners like Trinseo license the whole package rather than individual components á la carte, the jury's findings on 6 of 10 alleged trade secrets do not compel a contrary conclusion.**

As noted above, of "the ten claimed trade secrets, the jury found that only four were trade secrets." ROA.38670. Given that verdict, one may rightly ask what evidence enabled the jury to award a reasonable royalty that was comparable to licenses (described in the previous section) for **all** of Trinseo's PC technology? The answer is simple: as the district court itself recognized, "in the industry, the entire PC package, although made up of multiple components, was the product. In other words, PC packages are purchased or licensed in their entirety — there was no evidence that there ever was any *a la carte* sales of individual trade secrets within the package." ROA.38679; *accord* ROA.38680 (recognizing "testimony from Trinseo employees that confirmed that Trinseo would never have sold its PC package piecemeal").

This evidence came from the experts on both sides. Trinseo's Jerry Duane testified that Trinseo had never "considered licensing by itself one or just a few of the 10 claimed trade secrets if sought by a potential licensee"; rather, licensing of PC technology "was a complete package," and components "were not licensed singularly." ROA.10085:19–10086:10. As Trinseo's damages expert Tom Pastore put it:

"Trinseo doesn't do a la carte.  They license the entire package."  ROA.11902:10–11.

Even **KBR's own damages expert** conceded that he was aware of "no example in the history of licensing polycarbonate technology when any PC technology owner has ever licensed their technology á la carte or piecemeal."  ROA.13723:1–8.

The legal significance of this evidence is obvious.  Recall that to award a reasonable royalty, the jury was properly instructed to calculate "the amount of the royalty payment to which Trinseo and KBR would have agreed in a hypothetical negotiation taking place at the time KBR's alleged misappropriation first began."  ROA.7556.  Given the foregoing evidence, that (hypothetically) negotiated amount **would have been the same** regardless of the number of Trinseo's trade secrets that KBR had (hypothetically) licensed — only the four found by the jury, or all ten alleged by Trinseo, or some number in between.  In other words, the amount of the reasonable royalty **would not vary** depending on the number of trade secrets licensed by KBR or (to say the same thing) on the percentage of Trinseo's PC manufacturing technology licensed by KBR.  Consequently, the jury acted rationally in declining to "discount" the reasonable royalty merely because Trinseo did not prove that every last sliver of its technology was a trade secret.

The foregoing analysis accords with the law.  As an aspect of this Court's "flexible and imaginative approach" to damages in trade secret cases, *University Computing* stressed the necessity to "take into account the commercial context in

which the misappropriation occurred." 504 F.2d at 538. As all parties and the district court agreed, the commercial context here includes the fact that "PC packages are purchased or licensed in their entirety." ROA.38679. Moreover, trade secret plaintiffs like Trinseo "are entitled to adapt their damages theory to fit within the particular facts of the case." *Wellogix*, 716 F.3d at 879. The particular facts here include the fact that no "PC technology owner has ever licensed their technology á la carte or piecemeal." ROA.13723:1–8.

Other courts agree with this Court's contextual and fact-specific approach. For example, in awarding a reasonable royalty in a trade secret misappropriation case, Federal Circuit Judge William Bryson adopted a hypothetical negotiation model that "comports with the evidence at trial and at the hearing on future damages as to [the plaintiff's] **typical practices** for negotiating royalties." *Bianco v. Globus Medical, Inc.*, 53 F. Supp. 3d 929, 938 (E.D. Tex. 2014) (emphasis added), *aff'd*, 618 Fed. Appx. 1032 (Fed. Cir. 2015); *see also, e.g., Gaylord v. United States*, 777 F.3d 1363, 1369 (Fed. Cir. 2015) (opining that the amount of a reasonable royalty "is first and foremost a question of fact," with review "based on what the record says about the **particular circumstances** defining the hypothetical negotiation," and endorsing the holding of *Bruce v. Weekly World News*, 310 F.3d 25, 29–30 (1st Cir. 2002), that there was no error in the factfinder's "adoption of lump-sum license based on **industry practice**" (emphasis added)).

Thus, under the proper instruction defining reasonable royalty, and in accord with this Court's decisions, the jury was **not** required to discount its royalty award merely because it found for Trinseo on fewer than all of its ten claimed trade secrets.

> **c.** **Alternatively, the jury could readily have found that the "misappropriated technology" here was the heart, core, and value driver of Trinseo's PC technology.**

There is an alternative ground upon which this Court may find sufficient evidence to sustain the reasonable royalty award even though the jury found only four claimed trade secrets: those four secrets — constituting the "misappropriated technology" upon which the jury was charged to base its reasonable royalty award — were the heart, core, and driver of the demand for Trinseo's PC manufacturing technology. That is to say, in finding that KBR misappropriated four of Trinseo's claimed trade secrets, the jury essentially found that KBR misappropriated **all** of the valuable portions of Trinseo's PC manufacturing technology. On that premise, the jury was likewise **not** required to discount its royalty award merely because it did not find all ten claimed secrets.

The four trade secrets the jury found that Defendants misappropriated were:

(1) Process control strategy and Concepts and Control Algorithms;

(3) Phosgene Reactor Design and Associated Pressure Vessel Containment;

(4) Continuous Plug Flow Oligomerization Reactor Inside Pressure Vessel Containment (with static mixer design); and

(6) Steam Devolatilization Process.

ROA.7546.

Of these, the Steam Devolatilization Process is the secret that quintessentially defines the value of Trinseo's PC technology. As Trinseo's expert Jerry Duane explained without contradiction, that process "takes steam, mixes it with the methylene chloride polymer solution, makes small droplets, . . . evaporates the methylene chloride, and then as . . . the sticky droplets of polymer go through the what we call snake or agglomerator tube . . . , they combine together and that's where you end up with the flake that you saw earlier today." ROA.9797:16–24. The "overall process" encompasses numerous "specific components," beginning with the "mixing nozzle," "one of the components of [which] is a critical venturi that controls the steam flow to the mixing nozzle"; next is the "agglomerator tube" (also called the "snake"); and "after that, you have your drying tube to remove additional water" and "your methylene chloride stripper column, which performs the separation of the vapor as well as the removal of the remaining methylene chloride in the flake." ROA.9803:14–9804:9. Duane later described the steam devolatilization process as "a combination of the nozzle[,] snake, critical venturi, drying tube and methylene chloride stripper column." ROA.10061:23–25, 10062:9–10.

Another driver of the demand for Trinseo's unique manufacturing process is the design of the Oligomerization Reactor, in which begins "the interfacial reaction where you mix bisphenol and caustic and phosgene and methylene chloride together

to make polycarbonate"; i.e., the reactor is the place where "all of these things mix up" (react) prior to the Steam Devolatilization Process. ROA.9644:14–16, 9645:9–14. The Dow/Trinseo Oligomerization Reactor is a **continuous plug flow** reactor that employs **static mixers** all housed in a **pressurized, double containment** vessel to contain phosgene release. ROA.9716:13–23, 9717:16–9718:9, 9722:16–9723:18 (emphasis added).

Of course, the "heart" of the entire plant operation must contain a brain, and this is how the Dow/Trinseo "process control strategy" (Trade Secret No. 1) contributes. The process control strategy is the "general overview of how do I control this [PC manufacturing] process," i.e., "a pathway to follow on how to . . . manufacture polycarbonate"; without an adequate process control strategy and design, even the most perfectly designed and constructed PC plant "pathway" would not function correctly. ROA.9704:6–9715:3, 9705:17–9706:19, 9707:23–9708:4. These are facts that both KBR and Steve Harper recognized. ROA.48057–58, 48063, 48069–72.

Thus, the jury found that the components that make up the core of the Dow/Trinseo PC manufacturing technology were all trade secrets that Defendants misappropriated. ROA.9704:6–9705:3, 9706:17–9707:19, 9714:7–19. As Duane told the jury early in the trial:

> Q. Are there any specific trade secrets or claimed trade secrets that form the **heart or the core of the value** of Dow or now Trinseo's PC technology?
>
> A. Yes, sir, I think there are.
>
> Q. Which ones are those?
>
> A. If you look at the process, you look at what's there, you have the **oligomerization reactor** . . . with the containment system associated with it. You have **the entire devol[atilization] process** and the elements of that.

ROA.10079:3–11 (emphasis added).

Duane made clear that he was referring not simply to scattered individual components but rather to the overall processes comprising multiple components: "Q. So by my count, we have the **oligomerization reactor**, the design details associated with that; the **steam devolatilization process** and all the components of that process — independently integrated process? A. **Collectively**." ROA.10079:19–23 (emphasis added). Duane explained to the jury why these two broad-based trade secrets were "the core and the heart of the process," i.e., "the main ones" or "the core ones" that constituted the essential value or "the value drivers" of Trinseo's PC technology. ROA.10080:10–10081:15, 10082:21–24.

Duane's views were echoed by Defendant Harper when he described the devolatilization process as a Dow trade secret in a 2009 document he authored, admitting that "in the early days, we always thought that devol was a unique technology to Dow. It was what made Dow different." ROA.10912:7–12. Harper also agreed

that the Steam Devolatilization Process was the heart of the Dow/Trinseo PC techno-logy: "Q. Can you explain why you thought devol was the heart of the technology? A. It was what differentiated Dow, okay? Everything else . . . was the same except devol. . . . It was what was the heart of what Dow brought with its technology." ROA.10912:20–10913:3; *accord* ROA.10890:23– 10891:2.

Despite the evidence that the core or heart of Trinseo's trade secrets was its broad "devolatilization **system**," KBR claimed that the real heart or core was merely a narrow **subset** of that system. Accordingly, the premise of KBR's Rule 50(b) attack on the jury's award of reasonable royalty damages was the notion that the "jury specifically found that the 'snake design,' 'atomizer nozzle' and 'thermal stabilizer addition system' that Trinseo called the 'heart[,]' 'core' and 'value drivers' of its technology were *not* trade secrets and *not* misappropriated." ROA.20593 (emphasis omitted). As thoroughly documented above, however, that notion is simply wrong. Duane testified that the heart or the core of the value of Trinseo's PC technology was — in addition to the "oligomerization reactor" that KBR conveniently ignores — the "**entire devol process**," and those two broad-based trade secrets "**Collectively**." ROA.10079:9–11, 23 (emphasis added).

As for the thermal stabilizer system that the jury found was not a trade secret, Trinseo never alleged that such system was, **by itself**, a "core" trade secret. Rather, Duane included it in his list of "core" secrets because it was **part of the Steam**

**Devolatilization Process**, which he testified **was** a "core" of Trinseo's PC technology and which the jury found to be a trade secret. ROA.10079:3–22 ("The thermal stabilizer, you could almost put with the devol system because it's just in front of it.").

Another fundamentally incorrect premise of KBR's argument was that the jury's failure to find that certain individual components of the devolatilization process were trade secrets vitiated the jury's finding that the entire Steam Devolatilization Process was a trade secret. That premise is negated by the long-established rule that the "fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret **combination, compilation, or integration** of the individual elements." *Restatement (Third) of Unfair Competition* § 39, cmt. f (1995) (emphasis added). This Court recently endorsed this rule expressly, agreeing that even if "some or all of the components of the trade secret are well-known," that "does not preclude protection for a secret combination, compilation, or integration of the individual elements." *DHI Group, Inc. v. Kent*, 2022 WL 3755782, at *5 n.9 (5th Cir. Aug. 30, 2022) (per curiam) (quoting *Bishop*, 412 S.W.3d at 767, in turn quoting the *Restatement* comment); *accord Tewari De-Ox Systems, Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 613 (5th Cir. 2011) (citing *Metallurgical Industries, Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1202 (5th Cir. 1986), and opining that "we have specifically rejected the contention that a combination of disclosed technologies cannot itself constitute a trade secret").

Trinseo's Steam Devolatilization Process readily qualifies as a combination trade secret. Both Duane and Harper repeatedly confirmed that this process was "unique" to Dow/Trinseo. ROA.10080:18–19, 10080:24 (Duane); ROA.10891:1–2, 10912:12, 10980:18, 10982:24–25 (Harper). Duane explained that the process, along with the Oligomerization Reactor, afforded Dow/Trinseo a "competitive advantage" because they could not "be acquired anywhere else on the market"; because they were "really at the heart of making high-quality product that we produce"; and because they were the processes that set Trinseo's products apart from those of every other PC manufacturer. ROA.10080:10–10081:15, 10082:21–24, 10980:18–20.

The district court confronted the issue of a combination trade secret, albeit (erroneously) in the context of determining whether to "apply the (already narrowly applied) entire market value rule." ROA.38674; *see also infra* Subsection I.B.2 (pp. 61–65) (addressing that rule and its application here). The court opined that the "question is whether here, [it] can *post hoc* find that the Steam Devolatilization system and the Oligomerization reactor were compilation trade secrets." ROA.38674. The court answered that question in the negative, *see id.*, primarily because "the jury here simply was not asked the question" because (in turn) "Trinseo did not request this instruction." ROA.38675–76.

Respectfully, that is not the right question. Trinseo did not need the district court to find *post hoc* that the Steam Devolatilization System and the Oligomerization

Reactor were combination trade secrets, nor did Trinseo need the jury to so find.  To be awarded reasonable royalty damages that "reflect the value attributable to the misappropriated technology," Trinseo needed only for the jury to find that KBR misappropriated the heart, core, and value driver of Trinseo's PC technology.  In light of the foregoing evidence, the jury did just that in finding that KBR misappropriated the four key secrets, including the System and the Reactor.  The only relevant question is whether those findings are vitiated by, or otherwise inconsistent with, the jury's failure to find that certain individual components of the devolatilization process were trade secrets.  Under the applicable law and the evidence viewed in the light most favorable to Trinseo, the answer to that question is *no*.

In sum, therefore, the jury found that KBR misappropriated trade secrets that stretched from the beginning to the end of Trinseo's polycarbonate manufacturing technology chain, technology that enabled Trinseo (and KBR) to offer to the market the very characteristics and benefits that the market demanded.  In awarding a reasonable royalty based on that "misappropriated technology, and no more," the jury followed the instructions and the law.

*     *     *

Drawing all reasonable inferences in the light most favorable to the verdict, the Court should reject KBR's attack on the properly instructed jury's conscientious work in assessing a reasonable royalty for KBR's misappropriation of Trinseo's trade

secrets.  Even the Federal Circuit merely requires reasonable royalty awards to be "within the range encompassed by the record as a whole," *Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013), and the jury's award here clearly was.  The district court reversibly erred by ruling otherwise.

**B.    Alternatively, there is sufficient evidence of reasonable royalty damages even under patent-law requirements prevailing in the Federal Circuit.**

Even if this Court were inclined to import the patent-law apportionment principles prevailing in the Federal Circuit, the district court should nevertheless have accepted the jury's reasonable royalty award either under the concept of "built-in apportionment" or under the "entire market value" exception, both of which Trinseo's evidence sufficiently established.

**1.    The reasonable royalty award may be sustained under built-in apportionment based on sufficiently comparable licenses.**

The Federal Circuit has repeatedly held that "when a **sufficiently comparable license** is used as the basis for determining the appropriate royalty, further apportionment may not necessarily be required.'" *Pavo Solutions*, 35 F.4th at 1380 (emphasis added).  Consequently, even if apportionment is required, "a damages theory that is dependent on a comparable license (or a comparable negotiation)" may have "built-in apportionment," which "effectively assumes that the negotiators of a comparable license settled on a [license] embodying the value of the asserted patent." *Id.*

As documented in the previous section (pp. 39–41), the jury received evidence on Trinseo's executed and negotiated comparable license agreements, along with testimony from Moore that explained any differences in the economic circumstances in each transaction/negotiation:

| Licensor | Status of Price Agreement | Price Per Ton | Total License Fee | Record Cite |
|---|---|---|---|---|
| LG-Dow JV | Executed | $307.69/ton | $40M plus $100M+ running royalty | ROA.9627:3–8, 11563:3–15, 11567:14–11568:9, 24043–45 |
| PTT (Thailand) | Agreement in principle | $380/ton for first train and $342/ton for second train | $72.4M for two 100kt trains | ROA.11585:18–11586:10 |
| UPC (Russia) | Agreed to price | $342/ton | $34.2M for one 100kt train | ROA.11587:19–11588:3 |
| Yinguang (China) | Discussions | Mid $300's/ton | Mid $30M for one 100kt train | ROA.11587:8 |
| Fujian (China) | Discussions | Low 300's/ton | Low $30M for one 100kt train | ROA.11592:1–2 |
| Various (China) | Discussions | n/a | $25M | ROA.50134; ROA.11589:22–11590:14 |

When "appropriately left for the jury to decide," *Bio-Rad*, 967 F.3d at 1374, a rational jury could readily find these transactions to be "comparable" because they involve licensing the very polycarbonate manufacturing technology that KBR misappropriated. The jury had sufficient evidence to conclude as much, and the fact that the jury's reasonable royalty award exactly matches the figures reflected by Trinseo's royalty negotiations shows that the jury found them to be an appropriate benchmark, as the law permitted it to do. *Id*.

On this record, Trinseo has demonstrated "built-in apportionment" and has thereby satisfied any apportionment requirement that might be imported from patent infringement cases.

###### 2. The reasonable royalty award may also be sustained under the entire market value exception.

The district court recognized that even in patent infringement cases, there is "is a narrow exception to the general rule requiring apportionment called the 'entire market value' exception." ROA.38663 (quoting *Laser Dynamics, Inc. v. Quanta Computing, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012)). If "it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product." 694 F.3d at 67. Properly viewed in the light most favorable to Trinseo, that evidence was before the jury.

The evidence showed that the Dow/Trinseo Oligomerization Reactor and the Steam Devolatilization Process that KBR misappropriated were the heart, core, and value driver of Trinseo's polycarbonate manufacturing technology. *See generally supra* Subparagraph I.A.2.c (pp. 51–59). That technology, particularly the Steam Devolatilization Process, "was a unique technology to Dow. It was what made Dow different." ROA.10912:7–22 (Harper testimony). This unique devolatilization technology was explicitly discussed in the LG-Dow joint venture license. ROA.24038 at ¶ 1.04. Steve Harper testified that "the LG plant design" developed by Dow and

owned by Trinseo was the best polycarbonate plant design in the world, and was "what people in China were asking [him] to provide." ROA.10690:11–17.  In short, "everyone wanted LG" — including KBR, as evidenced by the effort by KBR's Francis Tsang to ensure that Harper was using authentic LG drawings for his work for KBR.  ROA.10690:18–22, 10706:5–8, 10714:3–10715:2.

Abundant evidence confirms that potential licensees demanded the features in the "core" trade secrets that Defendants misappropriated.  Specifically, KBR marketed its PCMAX package by emphasizing the commercial benefits stemming from those very secrets, which benefits enabled Dow (and later Trinseo) to efficiently, consistently, and safely manufacture the widest range of the highest quality, most optically clear PC on the market.[2]  Moreover, the efficient, safe, and reliably consistent production of the widest range of highest quality, most optically clear PC were the very features KBR believed that its potential licensees demanded.  ROA.47854–56, 49885, 49897–902.  That is why KBR told potential licensees (including LG) that

---

[2] ROA.9653:22–9654:3, 9704:6–9707:6, 48054–58 (definition, importance, and benefits of process control strategy); ROA.9715:13–9727:18 (definition and benefits of oligomerization reactor design and components); ROA.9797:12–9830:25, 9858:23–9863:25 (definition and benefits of steam agglomeration and devolatilization process and associated equipment); ROA.10050:13–10051:4, 10054:17–10058:19 (definition and benefits of phosgene reactor design); ROA.9867:10–9868:8, 10068:18–10069:3, 10072:12–10073:3 (benefits of commercially proven design); ROA.10079:3–10082:24 (identification of "core" secrets and how they enable production of highest quality PC).

its PCMAX package was based upon Dow's commercially proven process and could therefore meet those market demands.[3]

The evidence showed that KBR deliberately bundled the misappropriated and non-misappropriated technology into its "proprietary" equipment package that KBR required its PCMAX licensees to buy. That evidence establishes what the district court viewed as an additional element of the entire market value exception, i.e., that "unpatented components and the patented components be so financially and market-ably dependent such that the licensee normally anticipates the sale of the unpatented and patented components together." ROA.38665. The jury had evidence that Trinseo (and KBR as well) never "considered licensing by itself one or just a few of the 10 claimed trade secrets if sought by a potential licensee"; to the contrary, licensing of PC technology "was a complete package," such that components "were not licensed singularly." ROA.10085:19–10086:9, 11587:10–11. The reason that no PC process licensor (including KBR) ever licensed individual components of the process design technology was because the overall performance of the entire process was highly in-terdependent upon the performance of the other process units. Thus, a licensor could never be assured that a PC plant constructed of parts cobbled together from various

---

[3] ROA.10080:14–10082:24, 11106:8–11107:2, 11113:11–11118:15, 11120:18–11121:20, 11146:1–11147:2, 11253:23–11258:21, 14533, 46477–87, 47625, 47632–33, 47854, 48054–58, 49884–85, 49897–902, 49978, 50010–15, 50048; ROA.46697 (KBR's admission that its "technology is 90–95% similar to what LG received from Dow when they first licensed their plant in the early 2000's").

unapproved manufacturers would ever meet the licensor's performance guarantees, the satisfaction of which triggered the licensee's obligation to make the final payment for the package.  ROA.10085:20–10087:1, 13076:2–5, 13546:10–20.

Therefore, Trinseo **and** KBR more than merely "anticipated" the sale of misappropriated and non-misappropriated technology together; their license strategies **required** it.  Neither Dow, Trinseo, nor KBR ever, in actual licensing transactions, offered apportioned licensing prices for different aspects of the technology.  In this light, the district court's determination to impose such restrictive parameters for the hypothetical negotiation not only ignored the "commercial context" in which KBR's misappropriation occurred, it also improperly strayed from the "flexible and imaginative" approach required by *University Computing*.

The district court erroneously refused to credit this abundant evidence by improperly weighing it in derogation of the applicable standard for Rule 50(b) motions.  For example, the district court found Trinseo's evidence regarding the value drivers of its package to be "inconsistent."  ROA.38672.  But **inconsistent** evidence is not legally **insufficient** evidence:  a jury is "free to choose among reasonable constructions of the evidence," even if it might be "inconsistent" with other evidence in the record.  *United States v. Rao*, 123 F.4th 270, 279 (5th Cir. 2024) (quoting *United States v. Delgado*, 668 F.3d 219, 225 (5th Cir. 2012)); *see also Montano v. Orange County*, 842 F.3d 865, 874 (5th Cir. 2016) (holding that "inconsistent testimony . . .

presents a classic example for why it is for the jury alone to judge the credibility of witnesses and weigh the evidence").

If patent-law requirements apply here, Trinseo has satisfied the entire market value exception to strict apportionment. *See Bianco v. Globus Medical, Inc.*, 2014 WL 5462388, at *18 (E.D. Tex. Oct. 27, 2014) (Bryson, Circuit Judge) (upholding jury's reasonable royalty award in a trade secret misappropriation case and ruling that no strict apportionment was required because the defendant never charged or paid royalties on a secret-by-secret basis), *aff'd*, 618 Fed. Appx. 1032 (Fed. Cir. 2015).

For that reason, and for the alternative reasons articulated in this Part I, the district court erred in nullifying the jury's reasonable royalty award because it was supported by legally sufficient evidence.

## II. The district court likewise erred in nullifying the jury's award of unjust enrichment damages against KBR.

KBR's Rule 50(b) motion similarly posited "legally insufficient evidence" to support the jury's award of $21.2M in unjust enrichment damages against KBR. ROA.25110 (capitalization altered). Without undertaking to examine the record "in the light most favorable to the verdict" and determine whether "there is a complete absence of evidence to support" that award, *Treadway*, 2024 WL 1654587, at *1, the district court vacated the award solely on the ground that it was "unsupported by proper evidence" of the district court's patent law-based "strict apportionment" requirement. ROA.38681.

For the reasons set forth in Subsection I.A.1 above (pp. 24–37), that was legal error. When irrelevant patent-law concepts are properly dislodged, much more than a complete absence of evidence supported the unjust enrichment verdict, as we show in Section II.B below (pp. 69–75). But first we address whether the jury or the district judge had the authority to award unjust enrichment damages.

## A. It is the *jury's* province to award unjust enrichment damages under the DTSA.

The DTSA authorizes both "damages for actual loss caused by the misappropriation of the trade secret" and "damages caused by the misappropriation measured by imposition of liability for a reasonable royalty." 18 U.S.C. § 1836(b)(3)(B)(i)(I), (ii). No one questions that the statute imposes on the **jury** the responsibility to award these kinds of relief. The DTSA also authorizes "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss." *Id.* § 1836(b)(3)(B)(i)(II). The district court submitted the question of unjust enrichment to the jury, ROA.7558–59, but later opined that "there may be an open question of whether the Court should take the jury's response in the unjust enrichment context as merely advisory," ROA.38681. Although the district court did not answer that open question, ROA.38681–82 & n.27, this Court should do so and should rule that the **jury** has the responsibility to award unjust enrichment damages under the DTSA.

The right to a jury trial on a federal statutory claim like the DTSA may arise either from the statute itself or from the Seventh Amendment. The Supreme Court has long followed the practice of closely examining the statute before addressing any constitutional question. *See, e.g., Lorillard v. Pons*, 434 U.S. 575, 577 (1978) (ruling that the Age Discrimination in Employment Act [ADEA] requires the jury to assess compensatory damages, "turn[ing] first to the statutory question," and opining that because "we find the statutory issue dispositive, we need not address the constitutional issue"). Therefore, we look first to the DTSA itself. As with the ADEA, "the statute "provides no express answer," but long-established rules of construction yield the conclusion that "Congress intended that in a private action under the [statute] a trial by jury would be available where sought by one of the parties." *Id.* at 585.

When the purpose of a trial is to award "damages," the **jury** typically fulfills that purpose, because "an action for money damages was 'the traditional form of relief offered in the courts of law.'" *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990) (quoting *Curtis v. Loether*, 415 U.S. 189, 196 (1974)). Thus, the Supreme Court and the courts of appeals have consistently held that awards of "damages" — including "statutory" damages unavailable at common law — are triable to a jury, whether by statute or by the Seventh Amendment. *See, e.g., Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998) ("statutory damages under § 504(c) of the Copyright Act, including the amount itself"); *Kobs*

67

*v. Arrow Services Bureau, Inc.*, 134 F.3d 893, 895 (7th Cir. 1998) ("statutory additional damages" under Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(a)); *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 224–25 (4th Cir. 1978) ("statutorily-authorized punitive damages" under Truth in Lending Act, 15 U.S.C. § 1640(a)(2)(B)).

This Court recently explained the rationale for these results in finding a right to trial by jury on the government's claims under the Oil Pollution Act, 33 U.S.C. §§ 2702(a), 2712(f), and 2715. *See United States v. ERR, LLC*, 35 F.4th 405, 411 (5th Cir. 2022). Historically, "actions at law that were triable to juries" included any action that was "at its foundation, one for tort," i.e., a means "to sue a tortfeasor for monetary compensation." *Id.* Accordingly, the right to trial by jury exists whenever Congress "first creates a legal duty and then provides a right of action to compensate the injured party for a breach of that duty." *Id.* at 412. The DTSA does precisely that: it creates a legal duty under federal law (i.e., not to misappropriate trade secrets) and then provides a right of action to compensate the victim of any misappropriation for breach of that duty. *See* 18 U.S.C. § 1836(c).

But even "more important" than the nature of the action is the "type of remedy." *ERR*, 35 F.4th at 412. The Supreme Court has long held that "an action for **money damages** was the traditional form of relief offered in the courts of law." *Chauffeurs*, 494 U.S. at 570 (emphasis added). This Court made clear in *ERR* that even "a form of restitution" can qualify as a "remedy . . . **at law**" for which a jury trial is required,

35 F.4th at 412 (emphasis in original), particularly in cases seeking "a judgment imposing a merely personal liability upon the defendant to pay a sum of money, *id.* at 413 (internal quotation marks omitted). Similarly, the DTSA's unjust enrichment remedy imposes personal liability for money "damages" just as the OPA did in *ERR*.

For these reasons, this Court should read the DTSA to give the jury the task of assessing "damages for any unjust enrichment."

## B. Sufficient evidence supports the jury's unjust enrichment award against KBR.

As with reasonable royalty damages, the jury was "properly instructed" on unjust enrichment damages. The instruction defined unjust enrichment as "the net profit to the Defendant **resulting from** [KBR's] alleged misappropriation of Trinseo's trade secrets," and it emphasized that the jury "should consider only profits **caused by** trade secrets misappropriated by [KBR]." ROA.7556 (emphasis added). KBR expressly confirmed that this instruction is the "proper measure of unjust enrichment damages." ROA.25117. Thus, the district court should have viewed the evidence in the light most favorable to the verdict and asked whether there was "complete absence of evidence to support" that verdict. *Treadway*, 2024 WL 1654587, at *1. We do so here.

### 1. The jury had evidence of the net profits to KBR resulting from its misappropriation of Trinseo's trade secrets.

We start with the basics. Using "KBR's own books," Trinseo's damages expert Thomas Pastore "determined an unjust enrichment amount for KBR **attributable to**

the misappropriation of Trinseo's trade secrets for the two projects that KBR was involved with, Cangzhou and Pingmei." ROA.11828:15–19, 11829:15 (emphasis added). In particular, he "determined the cumulative **profit** . . . for the years 2017 through 2022," i.e., "**revenues less expenses**." ROA.11829:7–15 (emphasis added).

Pastore forthrightly admitted that "he did not deduct **certain costs** from his calculations of compensatory damages measured by unjust enrichment." ROA.25118 (emphasis altered). KBR insinuated that this non-deduction doomed that evidence. *Id.* But KBR's own cross-examination revealed that the costs that Pastore declined to deduct consisted precisely of "5.3 million and 2.1 million of labor associated with the engineering for [Cangzhou and Pingmei] and then . . . outside consulting costs, nonlabor." ROA.11937:17–23. Those amounts represented either labor associated with the misappropriation of Trinseo's trade secrets or KBR payments to the other Defendants. ROA.11938:9–20. That is, Pastore "exclude[d] those labor expenses involved in the alleged misappropriation," namely, "the labor expenses for [KBR's] engineers and Harper and Davis and the tech team." ROA.11830:20–11831:6; *see also* ROA.11831:10–11 ("Misappropriated labor is not an allowable deduction.").

Pastore's non-deductions or exclusions are consistent with governing law. In *Liu v. SEC*, 591 U.S. 71 (2020), the Supreme Court held that "courts must deduct **legitimate** expenses before ordering disgorgement." *Id.* at 91–92 (emphasis added). *Liu* makes clear that not every expense is legitimate, as some proffered expenses

"are merely wrongful gains under another name"; thus, *Liu* confirms that "a defendant may be denied inequitable deductions," which include those "fueling a fraudulent scheme." *Id.* at 92. A rational jury could conclude that paying employees to produce engineering packages that contain misappropriated trade secrets and paying fellow misappropriators for those secrets "fuel" the misappropriation scheme and therefore fall within the category of non-legitimate, wrongful, and inequitable deductions.

## 2. KBR's "apportionment"-based attacks lack merit.

KBR first attacked the award because, it claimed, there was "*no testimony and no evidence* that identifies profits from the use of any of" the secrets that the jury found KBR to have misappropriated. ROA.25111. That is false: as explained and documented below, a material and meaningful portion of the PC manufacturing technology in KBR's PCMAX package derived from the four trade secrets that the jury found were misappropriated by KBR, including the Process Control Strategy, the Oligomerization Reactor, and the Steam Devolatilization Process that constituted the heart, core, and value driver of Trinseo's PC manufacturing technology. Crucially, these were the very items KBR required its licensees to purchase from KBR, because "no PC plant using the KBR design would work" without them. ROA.11251:4–16; *see also supra* Subsection I.B.2 (pp. 61–65).

Moreover, Duane testified that he saw in KBR's "basic engineering design packages that [KBR] created for Pingmei and Cangzhou, that all of these elements

[i.e., trade secrets] were included in there." ROA.10084:4–7. Accordingly, Pingmei and Cangzhou are now "using the core or the core technology and/or the 10 claimed trade secrets that we've discussed to manufacture polycarbonate." ROA.10084:21–10085:8. In particular, Duane testified to KBR's use of Trinseo's Oligomerization Reactor in the PCMAX package for Pingmei and Cangzhou, as well as components of Trinseo's Steam Devolatilization Process. ROA.9736:19–9737:13, 9737:17–21, 9739:2–16, 9740:11–9741:12, 9742:16–9743:10, 9792:13–9794:5, 9818:4–12, 9851:14–0853:13.

In short, in the absence of the misappropriated Trinseo PC manufacturing technology, there was nothing for KBR to sell to Cangzhou or Pingmei. Likewise, there was nothing for Cangzhou or Pingmei to buy, because without the misappropriated technology, "no PC plant using the KBR design would work." This is more than sufficient evidence for a rational jury to conclude that KBR's profits related to PCMAX "result[ed] from" the trade secrets that KBR misappropriated from Trinseo.

KBR also argued that Trinseo did not apportion the trade secrets from the **non-secret** components of KBR's PCMAX offering. ROA.25113. KBR relied on the precept that if "the trade secret accounts for only a portion of the profits earned on the defendant's sales, such as when the trade secret relates to a single component of **a product marketable without the secret**, an award to the plaintiff of defendant's entire profit may be unjust." ROA.25111–13 (quoting *Restatement (Third) of*

*Unfair Competition* § 45, cmt. f (1995)).  This argument, however, relies on the false premise that PCMAX was marketable without the Trinseo trade secrets, false because (to reiterate) KBR's Tsang admitted that "no PC plant using the KBR design would work," which is to say no one would have purchased PCMAX without such equipment.  ROA.11251:4–9.  Consequently, KBR could not have sold any "services that did not rely on trade secrets" (e.g., "training"), ROA.25114, apart from its misappropriation.  ROA.11251:17–11252:8 (admitting that all follow-on revenue for training and engineering stemmed from the PCMAX license).  This evidence enabled the properly instructed jury to reasonably infer, as it had the right to do, that KBR simply had no product to market absent the use of the misappropriated trade secrets. *See Adams v. Ethyl Corp.,* 838 Fed. Appx. 822, 827 (5th Cir. 2020) ("A jury is entitled to draw reasonable inferences from the evidence, and those inferences may constitute sufficient proof to support a verdict." (cleaned up)).

In any case, KBR conceded that the jury was properly instructed that in awarding unjust enrichment damages, it must "consider only profits caused by trade secrets misappropriated by that Defendant."  ROA.25117 (quoting ROA.7557).  Although Trinseo asked for $44.9M in total such damages, ROA.11831:20–25 (Cangzhou); ROA.11832:16–18 (Pingmei), the jury awarded only $21.2M, or just 47% of that total, ROA.7558.  A jury "is presumed to follow its instructions," *Wellogix,* 716 F.3d at 876 (quoting *Weeks v. Angelone,* 528 U.S. 225, 234 (2000)), and a jury "is entitled

to choose a damages award within the amounts advocated by the opposing parties and is not bound to accept a rate proffered by one party's expert," *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 983 (Fed. Cir. 2021) (internal quotation marks omitted).  Therefore, it must be presumed that the jury "apportioned" unjust enrichment damages as required by the above-quoted instruction.  On either view (or both), the unjust enrichment award is supported by the facts and law.

### 3.  The jury had sufficient evidence of causation.

KBR asserted that there was "no evidence that Cangzhou or Pingmei would not have purchased or would have paid less for KBR's PCMax technology and other package services but for the 4 secrets the jury found."  ROA.25115–16.  That argument bordered on the frivolous.  Harper testified that "the LG plant design" developed by Dow and owned by Trinseo was "the best polycarbonate plant design in the world, and it was "what people in China were asking [him] to provide."  ROA.10690:11–21.  And Harper "told KBR in September of 2017 . . . explicitly . . . that the PDP that [he] had . . . and [was] about to sell them . . . [was] based on the LG Train 1 design."  ROA.10874:8–17.  And it was "Steve's design data," as KBR's Francis Tsang called it, that became "the basis of design . . . for Cangzhou."  ROA.11229:6–10 (testifying about ROA.47698, Tsang's Jan. 15, 2018 e-mail to KBR's Tom Hsu).

As discussed in the previous section, there was nothing for KBR to sell, and nothing for Cangzhou or Pingmei to buy, absent the Oligomerization Reactor and

the Steam Devolatilization Process that Defendants misappropriated. That was more than sufficient evidence for a rational jury to conclude — contrary to KBR's assertion — that "Cangzhou or Pingmei would not have purchased or would have paid less for KBR's PCMax technology and other package services but for the [misappropriated] secrets the jury found." ROA.25115–16. That, in turn, was more than sufficient evidence of causation to support the jury's award.

*     *     *

In sum, under a proper legal standard, sufficient evidence supports the unjust enrichment award against KBR.

## C.    The district court's "remittitur" should be rejected.

The district court made a "Contingent Alternative Finding" on the possibility that this Court might (as Trinseo argues above) "determine that the doctrine of [strict] apportionment taken from patent law . . . is not applicable to unjust enrichment awards in DTSA cases." ROA.38681. In that scenario, the district court "would find the jury's unjust enrichment award of $21,206,132.00 is unsupported by evidence," and it "would grant KBR's request for remittitur and find Trinseo entitled to $10.5 million in unjust enrichment damages from KBR." ROA.38681–82. As set out below, this Court should reject that remittitur.

Remittitur is an available remedy when "**the strongest of showings**" proves that a damage award "exceeds the bounds of any reasonable recovery." *GlobeRanger*,

<u>836 F.3d at 500</u> (emphasis added; internal quotation marks omitted). That showing is not made simply because a court believes that the defendant's expert was more persuasive than the plaintiff's expert. *See id.* (rejecting remittitur because "the jury did not have to use [the defendant expert's] measure, nor believe that it was accurate" when "the jury also heard [competing] evidence from [plaintiff's expert] and other witnesses"). In all events, a court is "not to substitute [its] judgment for that of the jury." *Homoki v. Conversion Services, Inc.*, <u>717 F.3d 388, 398</u> (5th Cir. 2013). But that is essentially what the district court did here, accepting the $10.5M figure of KBR's expert in preference to the analysis of Trinseo's expert and other evidence. <u>ROA.38683</u>–84.

Section II.B above (pp. 69–75) recounts that evidence, and we will not repeat it here. In reviewing the evidence, this Court's task is "to merely ensure that a reasonable interpretation of the evidence supports the verdict." *Homoki*, <u>717 F.3d at 398</u>. The evidence indeed supports the verdict, and the fact that "the jury did not blindly accept the number of [Trinseo's] expert" — awarding only $21.2M in contrast to the expert's $44.9M figure — confirms that the award was the product of "reasoned evaluation of competing evidence." *GlobeRanger*, <u>836 F.3d at 501</u>.

The district court's contingent remittitur should be rejected, as should its prior nullification of the unjust enrichment award against KBR.

**III. The district court likewise erred in nullifying the jury's award of unjust enrichment damages against the Harper Defendants.**

The jury also awarded unjust enrichment damages against Steve Harper's consulting entities: $2.9M from Steve Harper Consulting and $2.5M from Polycarbonate Consulting Services. ROA.7558. The district court nullified those awards as well, solely for the "reasons that the Court vacated the jury's damages against KBR," i.e., Trinseo's failure to "apportion." ROA.38686–87. For all of the reasons set forth in Subsection I.A.1 above (pp. 24–37), the lower court reversibly erred in that respect.

Like KBR, the Harper Defendants conceded that the district court "correctly instructed the jury" on unjust enrichment damages. ROA.25208. That correct instruction emphasized in two ways the required "causal link" (or "tie") between the misappropriated trade secrets and Defendants' profits:

- defining "unjust enrichment" as "the net profit to the Defendant **resulting from** its/his alleged misappropriation of Trinseo's trade secrets"; and

- admonishing that in determining such profits, the jury "should consider only profits **caused by** trade secrets misappropriated by that Defendant."

ROA.7557 (emphasis added). The jury is presumed to have followed this instruction. *See Wellogix*, 716 F.3d at 876.

The jury had evidence from which it rationally could have found that the Harper Defendants would have obtained **no profits at all** had they not misappropriated the Dow/Trinseo technology that the jury determined to be trade secrets. That is to say, evidence that Luxi and KBR engaged the Harper Defendants and paid them millions

of dollars in "consulting" fees because — **and only because** — Steve Harper illegally acquired "Dow Confidential" documents and was willing to use them (and did use them) to aid Luxi and KBR. Those documents, of course, embodied the very trade secrets the jury found were misappropriated. ROA.10651:20–10652:19, 10713:13–10715:1, 47022–29; *see also* ROA.14470 (Harper's assurance to KBR that he had "revised [KBR's] PFD to LG train 1"); ROA.10722:8–19, 47796 (Harper's informing KBR that he was "working from" the LG PFD); ROA.10873:7–10874:5, 47039 (Harper's admitting that the LG documents were the basis for the Tech Team's PDP, which KBR purchased for $1.3M).

For these reasons, the Court should reinstate the award of unjust enrichment damages against the Harper Defendants.

## IV. If this Court does not reinstate the jury's award of damages to Trinseo, it should order a new trial on damages.

After the district court granted Defendants' Rule 50(b) motions regarding damages, Trinseo timely moved for a new trial on damages pursuant to Federal Rule of Civil Procedure 59(a)(1). *See* ROA.8235–41. The district court summarily denied that motion. *See* ROA.8422.

If this Court reinstates the jury's award of damages, it need **not** consider Trinseo's request for a new trial on damages. But if this Court declines to reinstate such award because Trinseo failed to satisfy a "strict apportionment" requirement imported from patent law, then the Court should order a new trial, as explained in the

immediately following Section IV.A.  And if the Court orders a new trial, it should rule that the district court wrongfully excluded relevant evidence bearing on KBR's knowledge and willfulness, as explained in the subsequent Section IV.B.

**A.    If the Court newly adopts a "strict apportionment" requirement from patent law, fairness demands that Trinseo receive a new trial on damages.**

This Court "review[s] the denial of a motion for a new trial for abuse of discretion." *Holmes*, 117 F.4th at 319.  Trinseo moved for a new trial under Rule 59(a)(1), which authorizes a district court to "grant a new trial on all or some of the issues — and to any party — . . . (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  A "district court has discretion to grant a new trial under [this rule] when it is necessary to do so 'to prevent an injustice.'"  *Jones v. Ruiz*, 478 Fed. Appx. 834, 835 (5th Cir. 2012) (quoting *United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993)).  As elaborated below, a new trial on damages is necessary to prevent injustice to Trinseo arising from the retroactive application of new rules of law.

The district court rightly recognized that this Court formulated "the proper measure of damages in the case of a trade secret appropriation" fully a half-century ago in its seminal decision in *University Computing*.  ROA.38657.  Those measures are "to be determined **by reference to** the analogous line of cases involving patent infringement." 504 F.2d at 535.  The district court further recognized, however, that

in the ensuing half-century, this Court "does not appear to have encountered a case involving apportionment in trade secrets cases." ROA.38658; *see also* ROA.38680 (conceding "the absence of Fifth Circuit authority supporting its position"). Indeed, despite having formulated the law of trade secret damages more than fifty years ago, and despite having done so "by reference to" cases involving patent infringement, **this Court has *never* applied the patent-law doctrine of "strict apportionment" to damages in trade secret misappropriation cases**.

As the district court conceded, this could be because "patent law is perhaps an imperfect overlay," meaning that there is an "inherent difficulty in translating patent law to a trade secret trial, especially cases involving multiple alleged trade secrets." ROA.38658 & n.10. Or perhaps it is because the rigid application of the patent-law apportionment doctrine cannot be reconciled with this Court's holding that "every [trade secret] case requires a flexible and imaginative approach to the problem of damages." *University Computing*, 504 F.2d at 538. Whatever the reason, the fact remains that neither this Court nor any district court in this Circuit has **ever** applied the patent-law doctrine of "strict apportionment" to damages in trade secret cases. ROA.38658–60. Rather, the solitary court that consistently applies the apportionment doctrine is (not surprisingly) the court that superintends patent law, the Federal Circuit. ROA.38657–59, 38663–64 (relying on decisions issued or affirmed by that court); ROA.38680 (looking to "the policies articulated by the Federal Circuit").

The non-Federal Circuit cases on which the district court relied are either on appeal to the Sixth Circuit, which has refused to apply the Federal Circuit's decisions, *see Caudill Seed*, 53 F.4th at 388–90; or are in accord with the relief sought by Trinseo in this section, *see Management & Engineering Technologies International, Inc. v. Information Systems Support, Inc.*, 490 Fed. Appx. 30, 33–34 (9th Cir. 2012) (holding that "the evidence supports the jury's decision to award [plaintiff] damages under a reasonable royalty theory of liability" but "vacat[ing] the damages award and remand[ing] the matter for further proceedings"). Those cases are also in conflict with more recent cases under the DTSA that have not required the **plaintiff** to apportion its damages, at least for unjust enrichment damages; for that, the Seventh Circuit reads the DTSA, like the Copyright Act, to require the **defendant** "to seek apportionment by proving how its own efforts contributed to those profits." *Motorola Solutions*, 108 F.4th at 489–90 (citing 17 U.S.C. § 504(b)).

Given the absence of authority that mandates some kind of patent-law apportionment under the DTSA, Trinseo could not reasonably have anticipated the district court's imposition of such requirements, at least not in time to do anything about it, especially since the court did not include those instructions in the jury charge. If this Court were to affirm the district court's requirement, it would be an injustice to apply that ruling retroactively to nullify all monetary relief awarded in recompense for the jury's "clearly supported" finding that Defendants misappropriated Trinseo's trade

secrets. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Texas Entertainment Ass'n, Inc. v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994)). Or to say the same thing, "the rules should not change after the game has been played." *Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 139 (Tex. 2010).

For these reasons, a new trial on damages is necessary to prevent the injustice of retroactively applying a not-reasonably-foreseen new rule to enable Defendants to escape all monetary liability for their illegal, "abundantly" proven theft of trade secrets. Trinseo should have the opportunity at that trial to present new evidence — including, at Trinseo's election, new or supplemental expert testimony — satisfying any new rules of apportionment.

### B. If this Court orders a new trial on Trinseo's damages, it should rule that the district court wrongfully excluded relevant evidence bearing on KBR's knowledge and willfulness.

The DTSA authorizes exemplary damages and reasonable attorney's fees if the jury finds that the defendant "willfully and maliciously misappropriated" the plaintiff's trade secret. 18 U.S.C. § 1836(b)(3)(C)–(D). Trinseo twice alleged that KBR willfully and maliciously misappropriated its PC technology. *See* ROA.734, 736, ¶¶ 61, 64. The jury disagreed. *See* ROA.7561.

But in reaching that decision, the jury did not have key evidence before it showing that KBR **knew** that Trinseo would file suit if KBR obtained access to the LG Plant design materials the Tech Team used to help KBR create its copycat design package. This evidence consists of statements made by LG personnel to KBR employee Nam Soo Park in the context of licensing discussions between LG and KBR. A licensee of Trinseo's PC technology at that time, LG made it clear to Park that Trinseo considered its PC technology confidential and would likely sue anyone who improperly acquired, disclosed, or used the technology. Park then warned KBR's top brass — including President of Technology Doug Kelly and Chief IP Counsel Gary Machetta — that misusing Trinseo's technology was a "**legal** issue," a "**legal** concern," and a "**legal** threat" that could create a "**legal** risk," a "**legal** headache," and "**legal** trouble." ROA.58534, 58544, 58554, 58603, 58605, 58612 (emphasis added).

Park recounted LG's warning to KBR's officers and in-house counsel that misuse of Trinseo's technology could result in a "big . . . penalty" totaling as much as "several hundred million" dollars. ROA.58536, 58554. In fact, LG was so concerned about facing a lawsuit that it asked KBR for indemnity "in case LG is sued by Trinseo," which KBR was willing to provide. ROA.58599, 58601. Yet in August 2017, mere weeks after hearing LG's warning, KBR's in-house legal department approved hiring Harper's Tech Team, knowing that Harper possessed and intended to use the stolen LG Plant Process Design Package (PDP) to help KBR

design its copycat package. ROA.10872:7–10874:17, 11225:5–11226:3, 12561:3–12562:18; *see also* ROA.47039 (Harper's warranty to KBR that his "PDP is based on LG train 1"); ROA.14470 (Harper's assurance to KBR that he had "revised [its] PFD to LG train 1"). The LG PDP constituted the same materials that LG refused to show KBR for fear of misusing Trinseo's trade secrets.

Trinseo offered these documents into evidence before trial, but Defendants objected to them. ROA.8790:24–8792:12, 14148–50. Ultimately, the district court admitted the documents but excluded the relevant portions by redaction, preventing the jury from considering this critical evidence in determining whether KBR willfully and maliciously misappropriated Trinseo's trade secrets. ROA.9476–9520, 10788:4–10794:7. As set out below, that exclusion was erroneous, and it precluded Trinseo from offering important evidence to support its request for exemplary damages and attorney's fees. Consequently, if this Court orders a new trial, it should rule that the district court wrongfully excluded this evidence. This Court reviews "evidentiary rulings under the abuse of discretion standard . . . and will reverse a judgment on the basis of evidentiary rulings only where the challenged ruling affects a substantial right of a party." *E.R. ex rel. E.R. v. Spring Branch ISD*, 909 F.3d 754, 763 (5th Cir. 2018) (internal quotation marks omitted).

### 1. The district court erred in excluding the evidence.

"[C]ompetent evidence cannot be excluded without a sound and acceptable reason." *Perez v. TDCJ-ID*, 395 F.3d 206, 210 (5th Cir. 2004). The district court excluded the above-described evidence believing it to be unfairly prejudicial to KBR and to be hearsay. Neither reason is legally sound.

### a. The probative value of the evidence substantially out-weighed any alleged unfair prejudice to KBR.

Under "the general standards of Rules 402 and 403, the evidence should be admitted if it is relevant and if its probative value is not substantially outweighed by the danger of unfair prejudice." *United States v. Carter*, 953 F.2d 1449, 1458 (5th Cir. 1992). The excluded evidence was relevant not only to whether KBR "misappropriated" the trade secrets as defined by 18 U.S.C. § 1839(5), but also to whether KBR did so willfully and maliciously such that Trinseo might recover exemplary damages and attorney's fees under the DTSA, *id.* § 1836(b)(3)(C), (D).

Thus, the real question is whether that relevance was substantially outweighed by the danger of unfair prejudice to KBR. It was not: "The scope of Rule 403 is narrow," *United States v. El-Mezain*, 664 F.3d 467, 508 (5th Cir. 2011), because "[r]elevant evidence is inherently prejudicial," *United States v. King*, 93 F.4th 845, 852 (5th Cir. 2024). Thus, "only **unfair** prejudice, **substantially** outweighing probative value . . . permits exclusion of relevant matter under Rule 403." *Id.* (emphasis in original). The subject communications from KBR employee Park to his colleagues

describe **LG's** risk of being sued by Trinseo if **LG** misused Trinseo's PC technology. That does not render these communications unfairly prejudicial or less relevant, because potential legal liability for misusing Trinseo's intellectual property was not LG's alone. A jury could reasonably discern from the excluded evidence that **any** entity, including KBR, that misused Trinseo's intellectual property could face similar legal exposure. Thus, any concerns about juror confusion or other unfair prejudice to KBR are grossly exaggerated and come nowhere close to substantially outweighing the probative value of these communications. Accordingly, the district court should not have excluded the evidence under Rules 402 and 403(b).

### b.    The hearsay rule does not justify exclusion.

The district court also erred in concluding that the evidence constituted inadmissible double-hearsay. The first "layer" of statements consists of communications from LG personnel to KBR's Park regarding LG's concerns that it could be sued by Trinseo if it improperly used Trinseo's PC technology. These statements are not hearsay: Trinseo did not offer them to prove that Trinseo would in fact sue LG if LG misused Trinseo's technology. *See* Fed. R. Evid. 801(c)(2). Instead, Trinseo offered them to show that KBR was **aware** from a knowledgeable source that Trinseo's PC technology was confidential and could result in legal liability if misused. *See In re Morrison*, 555 F.3d 473, 483 (5th Cir. 2009) ("Testimony offered to prove that the party had knowledge or notice is not hearsay."); *United States v. Parry*, 649 F.2d

292, 295 (5th Cir. 1981) (holding that out-of-court statement offered as circumstantial evidence of declarant's knowledge "does not offend the hearsay rule").

The second "layer" of statements are likewise not hearsay. They were made by or to Park, a KBR employee, to or by other KBR employees; therefore, they are statements of a party-opponent or its agents. *See* Fed. R. Evid. 801(d)(2)(C)–(D). Again, Park's statements were not offered to prove the truth of the matter asserted. Rather, Trinseo offered the statements to show that relevant KBR decisionmakers had **knowledge** that Trinseo viewed its PC technology as confidential and would sue anyone who misused it. *See Morrison*, 555 F.3d at 483; *Parry*, 649 F.2d at 295.

In short, the statements made by LG to Park, and then by Park to his KBR colleagues are not hearsay. In holding otherwise and excluding this evidence, the district court erred.

### 2.  The error adversely affected Trinseo's substantial rights.

The Court must next determine whether there is "a reasonable likelihood that the exclusion affected [Trinseo's] substantial rights." *Perez*, 395 F.3d at 211. An error is harmless only "if the court is sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict." *Novick v. Shipcom Wireless, Inc.*, 946 F.3d 735, 741 (5th Cir. 2020).

The district court's exclusion of evidence demonstrating KBR had reason to expect legal liability by misusing Trinseo's intellectual property **materially** impacted

the jury's decision as to whether KBR willfully and maliciously misappropriated Trinseo's trade secrets. In fact, the district court's erroneous exclusion of this evidence is a textbook example of a reversible error that impairs a party's substantial rights. *See Gibson, Inc. v. Armadillo Distribution Enterprises, Inc.*, 107 F.4th 441, 451 (5th Cir. 2024) (finding that district court affected litigant's substantial rights by erroneously excluding evidence pertaining to whether plaintiff was entitled to recover certain damages); *Bocanegra v. Vicmar Services, Inc.*, 320 F.3d 581, 590 (5th Cir. 2003) (reversing and remanding for a new trial where jury returned a take-nothing verdict after the district court excluded evidence on a "critical issue"). As in *Gibson*, the district court's error deprived the jury of "the complete picture of" whether Trinseo was entitled to exemplary damages and attorney's fees for KBR's willful and malicious misappropriation of Trinseo's trade secrets. 107 F.4th at 451.

The harmful impact of the district court's error is magnified when viewing the substance of the excluded evidence in context with the definition of "willful and malicious." The DTSA does not define that phrase, but "the DTSA largely mirrors the Uniform Trade Secrets Act." *Beijing Neu Cloud Oriental Systems Technology Co., Ltd. v. IBM Corp.*, 110 F.4th 106, 117 (2d Cir. 2024). Thus, courts regularly rely on interpretations of the UTSA to interpret provisions of the DTSA. *See, e.g., Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 908–10 (3d Cir. 2021). Texas statutory trade secret law defines "willful and malicious" as "intentional misappropriation

resulting from the conscious disregard of the rights of the owner of the trade secret." Tex. Civ. Prac. & Rem. Code § 134A.002(7). District courts in this Circuit have applied this definition in DTSA cases. *See, e.g., Silverthorne Seismic, LLC v. Sterling Seismic Services, Ltd.*, 2021 WL 4710813, at *7 (S.D. Tex. Oct. 7, 2021).

The evidence excluded by the district court shows that KBR intentionally and consciously disregarded Trinseo's intellectual property rights by hiring Harper to use what LG warned KBR was off limits, knowing well the "probable consequences" that would flow from this illegal act. The court's exclusion of that evidence deprived Trinseo of evidence supporting exemplary damages and attorney's fees. Thus, if this Court orders a new trial on damages, it should rule that the district court wrongfully excluded this evidence and ensure that it is admissible on retrial.

## V. The district court erred in dismissing Trinseo's common-law claim for "misappropriation of confidential information."

Texas law recognizes that **trade secrets** and **confidential information** are distinct. *See, e.g., Reynolds v. Sanchez Oil & Gas Corp.*, 2023 WL 8262764, at *18 (Tex. App.—Houston [1st Dist.] Nov. 30, 2023, no pet.). In brief, something that is confidential information is not necessarily a trade secret. *Id.* Accordingly, Trinseo permissibly pled in the alternative that Defendants were liable for misappropriating its **confidential information** under Texas common law if the jury found that some or all of the components of Trinseo's PC technology were not trade secrets. *See* ROA.736–37, ¶¶ 65–68.

The jury found that six of the ten components that Defendants misappropriated were **not** "trade secrets" under the DTSA. *See* ROA.7546. But the jury had no opportunity thereafter to determine whether the Defendants misappropriated these components as **confidential information** because the district court had dismissed Trinseo's Texas common-law claim on the ground that it was preempted by the Texas Uniform Trade Secrets Act (TUTSA), Tex. Civ. Prac. & Rem. Code § 134A.007(a). ROA.23395–400. In so doing, the district court abdicated its duty to faithfully apply the plain meaning of TUTSA's preemption provision. Specifically, the district court's ruling is at odds with the text of TUTSA, decisions from this Court, and principles of uniformity. Accordingly, that ruling must be reversed.

This Court "review[s] a district court's interpretation of a statute de novo." *Rothe Development, Inc. v. U.S. DOD*, 666 F.3d 336, 338 (5th Cir. 2011). Because the Texas Supreme Court has not determined whether TUTSA preempts claims for misappropriation of confidential information brought under Texas common law, this Court must make a so-called "*Erie* guess" by deciding "how the Texas Supreme Court would decide the question before" it. *Gilbane Building Co. v. Admiral Insurance Co.*, 664 F.3d 589, 593 (5th Cir. 2011).

## A. TUTSA's plain text exempts Trinseo's claim from preemption.

TUTSA generally "displaces [i.e., preempts] conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a **trade**

**secret**." § 134A.007(a) (emphasis added). But that displacement (or preemption) does not extend to contractual remedies or "other civil remedies that are not based upon misappropriation of a **trade secret**." § 134.007(b)(2) (emphasis added). Under the plain text of the statute, therefore, TUTSA preempts only those claims based on the misappropriation of "**trade secrets**" — not confidential information. The Texas Legislature defined a "trade secret" as (1) all forms and types of information; (2) that the owner has taken reasonable measures to keep secret; and (3) that derives independent economic value by not being known to others or readily ascertainable through proper means. § 134A.002(6).

Under Texas law, however, "confidential information" is similar but not identical. *See Reynolds*, 2023 WL 8262764, at *18. Unlike a "trade secret," something that is kept secret can constitute "confidential information," even if it does not derive independent economic value from being generally unknown to or readily ascertainable by others. *See, e.g., Providence Title Co. v. Truly Title, Inc.,* 547 F. Supp. 3d 585, 609 (E.D. Tex. 2021) ("Notably, business information is not necessarily a trade secret simply because it is confidential."), *aff'd*, 2023 WL 316138 (5th Cir. Jan. 19, 2023). "Under the **plain language of TUTSA**," therefore, "confidential information is **not necessarily** a trade secret." *Reynolds*, 2023 WL 8262764, at *18 (emphasis added).

Because TUTSA expressly preempts claims based on the misappropriation of "trade secrets" and expressly does **not** preempt claims "**not** based upon misappropriation of a trade secret," the only credible construction of the statute is that it preempts **only** claims based on the misappropriation of **trade secrets per se**. *See, e.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (rejecting construction that would read absent word into statute because it "would result not in a construction of the statute, but, in effect, an enlargement of it by the court" (cleaned up)); *Environmental Integrity Project v. U.S. EPA*, 969 F.3d 529, 541 (5th Cir. 2020) ("The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it." (internal quotation marks omitted)); *In re Allen*, 366 S.W.3d 696, 708 (Tex. 2012) ("The Court must adopt the interpretation of the statute that is most faithful to its text." (cleaned up)).

Notably, this Court reached the same conclusion in interpreting the nearly identical preemption provision of Louisiana's trade secret statute.[4] In *Brand Services*, this Court made an *Erie* guess as to whether the Louisiana Uniform Trade Secrets

---

[4] *Compare* Tex. Civ. Prac. & Rem. Code § 134A.007(a), (b)(2) (providing that "this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret" but "does not affect . . . other civil remedies that are not based upon misappropriation of a trade secret"), *with* La. Stat. Ann. § 51:1437(A), (B)(1) (providing that this "Chapter displaces conflicting tort, restitutionary, and other laws of this state pertaining to civil liability for misappropriation of a trade secret" but "does not affect . . . other civil liability or relief that is not based upon misappropriation of a trade secret").

Act (LUTSA) preempts "a civilian law conversion claim for confidential information that is not a trade secret." 909 F.3d at 157. Although the Court consulted the decisions of Louisiana intermediate appellate courts — finding them "consistent with" its own decision, *id.* at 159 — the Court began and ended its inquiry with LUTSA's "plain text." *Id.* at 158, 159. From that text, the Court "conclude[d] that LUTSA preempts a civilian law claim for conversion of trade secrets, but does not preempt a civilian law conversion claim for confidential information that is **not** a trade secret." *Id.* at 157 (emphasis added).[5]

TUTSA's plain text, coupled with this Court's decision in *Brand Services*, makes clear that TUTSA preempts common-law claims for the misappropriation of **trade secrets** but does not preempt such claims for the misappropriation of merely **confidential information**. For this reason alone, the district court reversibly erred in dismissing Trinseo's common-law claim based on a contrary interpretation.

---

[5] The district court thought that two Texas intermediate appellate decisions supported its decision. *See* ROA.23398. They did not. *Super Starr International, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 843 (Tex. App.—Corpus Christi 2017, no pet.), held that TUTSA preempted a claim for breach of fiduciary duty because the alleged breach necessarily involved "the use of alleged trade secrets." *Title Source, Inc. v. HouseCanary, Inc.*, 612 S.W.3d 517, 534 (Tex. App.—San Antonio 2020, pet. denied), expressly disclaimed any ability to "definitively resolve this [preemption] issue" because the plaintiff had "obtained a jury verdict on a common law claim that alleged both the unauthorized taking of trade secret information and other wrongful acts that did not involve the trade secrets."

**B.    The district court erred in abrogating Trinseo's common law rights absent a clear command from the Texas Legislature.**

Despite the clarity of TUTSA's text, the district court opined that "the text of the statute alone cannot answer the question of whether claims involving confidential information that does not constitute a trade secret are preempted." ROA.23397. Notwithstanding its uncertainty, the district court dismissed Trinseo's common-law claim.  Even on the court's own terms, this was error.

"A statute will be construed to alter the common law only when that disposition is clear." *In re Black Elk Energy Offshore Operations, LLC*, 114 F.4th 343, 353 (5th Cir. 2024) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 318 (2012)).  Courts regularly apply this canon.  *See, e.g., Norfolk Redevelopment & Housing Authority v. Chesapeake & Potomac Telephone Co.*, 464 U.S. 30, 35–36 (1983); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928 (5th Cir. 1997); *In re CenterPoint Energy Houston Electric, LLC*, 629 S.W.3d 149, 163 (Tex. 2021).  Even though Trinseo advanced this canon twice, ROA.20044, 22472, the district court nevertheless ignored it, ROA.23395–400.

In dismissing Trinseo's common-law claim based on TUTSA's preemption clause, the district court effectively held that TUTSA abrogated Trinseo's common-law rights.  But since TUTSA does not **clearly** abrogate common-law claims based on the misappropriation of confidential information, the court erred.

## C. Principles of uniformity confirm that reversal is required.

The district court correctly acknowledged that the "preemption provisions of LUTSA and TUTSA are, in relevant part, identical." ROA.23396 n.4. In nevertheless holding that TUTSA preempts claims of misappropriation based on merely confidential information, the district court erred in yet another respect. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (The "normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted)); Scalia & Garner, *supra*, at 323 ("[W]hen a statute uses the very same terminology as an earlier statute — especially in the very same field . . . — it is reasonable to believe that the terminology bears a consistent meaning.").

Were this Court to hold otherwise, it would create one set of rules for Texans and another for Louisianans under the **same** statutory text. That result would defy common sense while undermining the uniformity that the Uniform Trade Secrets Act is expressly designed to create. *See* Tex. Civ. Prac. & Rem. Code § 134A.008 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."); La. Stat. Ann. § 51:1438 (same). For this reason as well, the district court's dismissal of Trinseo's common law claim must be reversed.

\*　　\*　　\*

In dismissing Trinseo's claim for misappropriation of confidential information, the district court failed to properly apply both TUTSA's plain text and a decision of this Court, it abrogated Trinseo's common-law rights without a clear command from the Texas Legislature, and it deprived the Uniform Trade Secrets Act of uniformity within this Circuit. For these reasons, this Court should reverse the district court's dismissal of Trinseo's claim and remand for a new trial so that a jury can determine whether Defendants misappropriated intellectual property belonging to Trinseo that **is** confidential information but **is not** a trade secret under Texas law.[6]

## CONCLUSION

The district court's judgment nullifying the jury's verdict on damages should be reversed, and the case should be remanded with instructions that the court resolve on the merits Trinseo's claim for misappropriation of confidential information, consider pre-judgment interest, and thereafter enter judgment in favor of Trinseo.

---

[6] In the alternative, this Court should certify a question to the Texas Supreme Court asking whether TUTSA preempts common-law claims for misappropriation of confidential information. *See, e.g., Silguero v. CSL Plasma, Inc.*, 907 F.3d 323, 332 (5th Cir. 2018) (citing Tex. R. App. P. 58.1).

Dated:  February 5, 2025

Respectfully submitted,

s/ *Eric Grant*
Eric Grant
Stewart Hoffer
Hicks Thomas LLP

Justin R. Braga
Hinckley, Allen & Snyder LLP

*Counsel for Plaintiff-Appellant/*
*Cross-Appellee Trinseo Europe GmbH*

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit established by this Court's order dated January 27, 2025 — namely, 23,000 words — because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and by Circuit Rule 32.1, this document contains 22,877 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32.1 and with the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

s/ *Eric Grant*
Eric Grant