No. 24-20460

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

TRINSEO EUROPE GmbH,

*Plaintiff - Appellant/Cross - Appellee*

v.

KELLOGG BROWN & ROOT, L.L.C.;
STEPHEN HARPER, *also known as* STEVE HARPER;
STEVE HARPER CONSULTING, INCORPORATED;
POLYCARBONATE CONSULTING SERVICES, INCORPORATED,

*Defendants - Appellees/Cross - Appellants*

On Appeal from the U.S. District Court
for the Southern District of Texas
Civil Action No. 4:20-cv-478

**BRIEF OF APPELLEE/CROSS-APPELLANT
STEPHEN HARPER, also known as STEVE HARPER,
STEVE HARPER CONSULTING, INCORPORATED, and
POLYCARBONATE CONSULTING SERVICES,
INCORPORATED**

Benjamin F. Foster
Alisa A. Lipski
**Foster Yarborough PLLC**
917 Franklin Street, Suite 220
Houston, Texas 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202

*Counsel for Stephen Harper, Steve
Harper Consulting, Inc., and
Polycarbonate Consulting Services, Inc.*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### *Plaintiff-Appellant/Cross-Appellee*

Trinseo Europe GmbH

### *Counsel for Plaintiff-Appellant/Cross-Appellee*

Eric Grant
Stewart Hoffer
**Hicks Thomas LLP**
700 Louisiana Street, Suite 2300
Houston Texas 77002
Telephone: (713) 547-9100

Justin Braga
**Hinckley, Allen & Snyder, L.L.P.**
650 Elm Street, Suite 5
Manchester, New Hampshire 03101
Telephone: (630) 545-6106

### *Defendant-Appellee/Cross-Appellant*

Kellogg Brown & Root LLC

Kellogg Brown & Root LLC is a direct wholly owned subsidiary of KBR Holdings, LLC. KBR Holdings, LLC is a direct wholly owned subsidiary of KBR, Inc. KBR Inc. is a publicly held company whose shares are traded on the New York Stock Exchange and has no parent corporation. KBR, Inc. is a publicly held corporation that indirectly owns 10% or more of Kellogg Brown & Root LLC's stock.

***Counsel for Defendant-Appellee/Cross-Appellant***

Geoffrey L. Harrison
Matthew Behncke
Abigail C. Noebels
Katherine Rose James
**Susman Godfrey LLP**
1000 Louisiana Street, Suite 5100
Houston Texas 77002-5096
Telephone: (713) 653-7807

Warren W. Harris
Jeffrey L. Oldham
Walter A. Simons
**Bracewell LLP**
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713 223-2300

***Defendant-Appellee/Cross-Appellant***

Stephen Harper (a/k/a Steve Harper), Steve Harper Consulting, Inc.,

Polycarbonate Consulting Services, Inc.

Steve Harper Consulting, Inc., and Polycarbonate Consulting Services, Inc.,

are closely held companies wholly owned by Stephen Harper.

***Counsel for Defendant-Appellee/Cross-Appellant***
Benjamin F. Foster
Alisa A. Lipski
**Foster Yarborough PLLC**
917 Franklin Street, Suite 220
Houston, Texas 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202

/s/ *Benjamin F. Foster*
Benjamin F. Foster

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This appeal and cross appeal arise from a multi-week trial in a trade-secrets matter and involve a voluminous record. Stephen Harper (a/k/a Steve Harper), Steve Harper Consulting, Inc.("SHC"), and Polycarbonate Consulting Services, Inc. ("PCS") collectively ("Harper Parties") believe that oral argument is likely to be helpful to the Court and request the opportunity to present their position.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... I

STATEMENT REGARDING ORAL ARGUMENT ............................................. II

TABLE OF CONTENTS ..................................................................................... III

TABLE OF AUTHORITIES ................................................................................. V

INTRODUCTION .................................................................................................. 1

JURISDICTIONAL STATEMENT ...................................................................... 3

STATEMENT OF THE ISSUES ........................................................................... 4

STATEMENT OF THE CASE .............................................................................. 5

SUMMARY OF ARGUMENT ............................................................................. 9

STANDARD OF REVIEW ................................................................................. 11

ARGUMENT ON TRINSEO'S APPEAL ........................................................... 12

   I.    Trinseo's appeal fails to challenge the District Court's alternative ground for granting the Harper Parties' JMOL, therefore Trinseo has abandoned this argument on appeal. ............................................................................................. 12

   II.    The District Court's ruling should be affirmed on the alternative ground that there is legally insufficient evidence of the "Unjust Enrichment" caused by the four alleged trade secrets the jury found misappropriated. ............................. 13

      A.    Trinseo failed to present evidence of net profits and only presented evidence of revenue. ............................................................................................ 15

      B.    Trinseo failed to present evidence to distinguish between revenue generated from its alleged trade secrets and other revenue. ............................. 18

      C.    Trinseo failed to present evidence that its damages were caused by the four alleged trade secrets the jury found. ......................................................... 21

      D.    In the Alternative, the Court should accept the District Court's factual determination that there was no evidence of profits for the Harper Parties. .... 27

ARGUMENT ON HARPER-PARTIES' CROSS APPEAL ................................. 28

   I.   The District Court Erred in Denying the Harper Parties' Motion for Judgment as a Matter of Law on the Jury's Alter Ego Findings. ........................ 28

      A.    There is not legally sufficient evidence of a lack of separateness between the entities and the individual. ........................................................... 29

         1.    Trinseo presented no alter ego evidence for SHC. ................................. 29

    2.    Trinseo presented legally insufficient alter ego evidence for PCS. .......30

  B.    There is not legally sufficient evidence that the corporate form was used to protect a wrong. ..........................................................................................31

    1.    Step 2 requires the corporate fiction be used to defeat a rightful claim.32

    2.    Step 2 requires diverting funds. ...........................................................33

II.    The evidence Introduced at trial establishes the Harper Parties' statute of limitations defense as a matter of law.................................................................34

  A.    Trinseo knew by no later than 2014 that its trade secrets had been misappropriated. ..........................................................................................35

  B.    Accrual under the DTSA does not require the identity of the misappropriator to be known...........................................................................36

  C.    In the alternative, Trinseo did nothing to try and find the Tech Team, as objectively, reasonable diligence would have found them..............................38

  D.    Cases where courts have found a fact issue on statute of limitations involve materially less information about misappropriation than it is undisputed that Trinseo possessed.....................................................................42

CONCLUSION ........................................................................................................44

CERTIFICATE OF SERVICE..................................................................................45

CERTIFICATE OF COMPLIANCE ........................................................................45

# TABLE OF AUTHORITIES

## CASES

*02 Micro International Ltd. v. Monolithic Power Systems, Inc.*,
  399 F. Supp. 2d 1064 (N.D. Cal. 2005) ..............................................27

*Compass Mktg., Inc. v. Flywheel Digital LLC*,
  No. 23-1324, 2024 WL 3292676 (4th Cir. July 3, 2024)....................44

*Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.*,
  No. 13-CV-3206-WJM-KMT, 2017 WL 4988667 (D. Colo. Nov. 2, 2017).......33

*Elcor Chem. Corp. v. Agri–Sul, Inc.*,
  494 S.W.2d 204 (Tex. Civ. App.—Dallas 1973, writ ref'd n.r.e.) ......................15

*Fink v. Montgomery Elevator Co. of Colo.*,
  421 P.2d 735 (Colo. 1966) ..................................................31

*Ford Motor Co. v. Versata Software, Inc.*,
  2018 WL 10733561 (E.D. Mich. July 9, 2018) ..................................27

*Garretson v. Clark*,
  *111 U.S. 120 (1884)* ........................................................26

*Herster v. Bd. of Supervisors of La. State Univ.*,
  887 F.3d 177 (5th Cir. 2018) ................................................11

*Hollis v. Hill*,
  232 F.3d 460 (5th Cir. 2000) ...............................................28

*In re Phillips*,
  139 P.3d 639 (Colo. 2006).........................................28, 31, 32

*In re Thomas*,
  No. 10-38306 MER, 2013 WL 6840527 (Bankr. D. Colo. Dec. 27, 2013).........33

*Indus. Comm'n v. Lavach*,
  439 P.2d 359 (Colo. 1968) .................................................29

*Kellmann v. Workstation Integrations, Inc.*,
  332 S.W.3d 679 (Tex. App.—Houston [14th Dist.] 2010, no pet.)....................15

*Liu v. Sec. & Exch. Comm'n,*
    591 U.S. 71, 140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020) ........................15, 17, 18

*LivePerson, Inc. v. 7.AI, Inc.,*
    *2018 WL 6257460 (N.D. Cal. Nov. 30, 2018)* .....................................................27

*Martin v. Freeman,*
    272 P.3d 1182 (Colo. App. 2012) .......................................................................33

*MGE UPS Systems, Inc. v. GE Consumer & Industrial, Inc.,*
    622 F.3d 361 (5th Cir. 2010) .............................................................................27

*Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.,*
    407 F.2d 288 (9th Cir. 1969) .............................................................................34

*Motion Med. Techs., L.L.C. v. Thermotek, Inc.,*
    875 F.3d 765 (5th Cir. 2017) .............................................................................15

*PTP OneClick, LLC v. Avalara, Inc.,*
    2020 WL 4729174 (W.D. Wa. May 27, 2020) ...................................................38

*Sammons v. Tex. State Bd. of Med. Examiners,*
    251 F.3d 157 (5th Cir. 2001) .............................................................................13

*Schwan 's Co. v. Cai,*
    No. CV 20-2157 (JRT/HB), 2021 WL 5745791 (D. Minn. Dec. 2, 2021) ..........43

*Seatrax, Inc. v. Sonbeck Intern., Inc.,*
    200 F.3d 358 (5th Cir. 2000) .............................................................................43

*Slapstick, LLC, v. Larimer Cnty. Sports, LLC,  et al.,*
    No. 22CA1281, 2023 WL 12057066 (Colo. App. Aug. 24, 2023) ................30, 33

*Stockdale v. Ellsworth,*
    407 P.3d 571 (Colo. 2017) ...........................................................................29, 31

*Sw. Energy Prod. Co. v. Berry-Helfand,*
    *491 S.W.3d 699 (Tex. 2016)* .............................................................................43

*Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics America, Inc.*,
    895 F.3d 1304 (Fed. Cir. 2018)............................................................................27

*Trench Tech Int'l, Inc. v. Tech Con Trenching, Inc.*,
    No. 4:19-CV-00201-O, 2022 WL 1998466 (N.D. Tex. June 6, 2022)...............43

*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
    F.2d 518 (5th Cir. 1974) ....................................................................................15

*Walker v. Thompson*,
    214 F.3d 615 (5th Cir.2000) ..............................................................................13

*Westinghouse Elec. & Man. Co. v. Wagner Elec. & Man. Co.*,
    225 U.S. 604 (1912).....................................................................................20, 27

*Zirvi v. Flatley*,
    838 Fed. Appx. 582 (2d Cir. 2020) ....................................................................44

## STATUTES

18 U.S. Code § 1839(6)..........................................................................................37

18 U.S.C. § 1836(d) ........................................................................................34, 37

18 U.S.C. § 1839(5)(B)(i) ......................................................................................37

28 U.S.C. § 1291 ......................................................................................................3

## RULES

Fed. R. Civ. P. 50(a)-(b) ........................................................................................11

# INTRODUCTION

*This brief should be read after KBR's brief. Rather than repeat arguments that are shared between the Harper Parties and KBR, this brief incorporates certain shared arguments by reference where applicable.*

Steve Harper worked as an engineer for Dow Chemical for decades, including in polycarbonate for five years in the 1980s. When he retired from Dow in 1999, he did not retain any Dow documents. In 2007, fifteen years after last working in polycarbonate, Harper began consulting in the polycarbonate field and continued to do so through 2019. Over those dozen years Harper built and led a team of ex-Dow engineers ("Tech Team") with experience in polycarbonate, including co-defendant William Davis. The Tech Team consulted publicly in China and worked with American clients including KBR.

Over the years of consulting the Tech Team built up its polycarbonate expertise. As part of this, they assembled public information such as expired patents and trade publications along with other information, including documents retained by Tech Team members other than Harper after leaving Dow.

In 2020 Trinseo, who had acquired the Dow polycarbonate business, sued the Harper Parties (Harper and his consulting companies PCS and SHC), KBR, and eventually Davis for misappropriating 11 distinct trade secrets. Trinseo alleged that PCS and SHC had been unjustly enriched by the alleged misappropriation.

Specifically, Trinseo claimed 100% of PCS and SHC's revenue as damages, including amounts that PCS and SHC paid out to members of the Tech Team, or spent on other expenses. But a theory of "unjust enrichment" does not support such a punitive result.

Trinseo dropped one alleged secret before trial, but did not modify its damages model in any way. The jury found that only four of the ten "trade secrets" presented qualified as trade secrets. It found that Davis had not misappropriated any trade secrets. Fatally, the Jury was given no instruction, no guidance, and no evidence from which it could determine how much profit PCS or SHC made, or how much of that profit can be traced to the four still standing "secrets."

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over Trinseo's appeal.  Br.2. This Court has jurisdiction over the Harper Parties cross appeal under 28 U.S.C. § 1291. On September 11, 2024, the district court entered a final judgment.  ROA.8201. The court denied Trinseo's motion for new trial on November 13.  ROA.8422. Trinseo filed its amended notice of appeal on November 22. ROA.58285. The Harper Parties timely filed their amended notice of cross appeal on December 5, 2024. Dkt.460; see ROA.58287.

# STATEMENT OF THE ISSUES

## *Trinseo's Appeal*

1. Whether Trinseo adequately briefed its challenge to the district court's order on unjust enrichment for the Harper Parties.

2. Whether the district court erred in granting judgment as matter of law on Trinseo's unapportioned, revenue-based, unjust enrichment damages.

3. Whether the district court abused its discretion in denying Trinseo's motion for new trial.

4. Whether the district court erred in dismissing Trinseo's claim for misappropriation of confidential information because it was preempted.

## *Harper Parties' Cross Appeal*

1. Whether the district court erred in denying the Harper Parties' Motion for Judgment as a Matter of Law on alter ego.

2. Whether the district court erred in denying the Harper Parties' Motion for Judgment as a Matter of Law on statute of limitations.

## STATEMENT OF THE CASE

Steve Harper is a chemical engineer. ROA.10906. He spent 23 years at Dow Chemical, from college graduation until his retirement in 1999. ROA.10906, ROA.10642. During that time, he worked in as many as ten different technologies. ROA.10906–07. He spent five years in the 1980s working on Dow's polycarbonate technology. ROA.10642.

Harper was one of a small team of Dow engineers and scientists who built Dow's first large scale polycarbonate plant in Freeport Texas. ROA.9613–9616. That team also included Jerry Duane, who, at the trial acted as Trinseo's technical expert and star witness. ROA.9613–9616.

Harper was trained by Dow on the handling of Dow trade secrets. ROA.9601. In his final role at Dow, he was responsible for, among other things, protecting Dow trade secrets related to its chlor-alklali technology. ROA.10909. Harper learned that when Dow considers something to be a trade secret it takes specific steps to protect that information, marking trade secret documents conspicuously, and keeping them under lock and key. ROA.10909. During Harper's time working in polycarbonate, Dow took none of those steps for polycarbonate information. ROA.10910.

When Harper left Dow, he did not understand any of the polycarbonate technology to be a trade secret, except for Dow's snakes and nozzles which he

understood to be secret until learning those technologies were disclosed in an expired patent. ROA.10681–10686.

When Harper began consulting in polycarbonate in 2007, he told many people, including people at Dow and Duane personally. ROA.10676, 10754–10757, ROA.10950–10953. As his consulting work expanded, Harper reached out to other former Dow employees for technical assistance, forming what became known as the "Tech Team". ROA.10674. The core group of the Tech Team were Steve Harper, William "Bill" Davis, Bryce Koslan, Richard Kirk and Chip Melton, but other former Dow employees would play minor roles on the Tech Team, with each member bringing his own unique skills and areas of expertise. ROA.10674–10677, 10701 As the years passed, the Tech Team also developed its own materials based on their own experience in polycarbonate and polycarbonate consulting. ROA.10878. Two Tech Team members, Chip Melton and Bryce Koslan, contributed non-public Dow documents they had retained from their time at Dow, however, both men told Harper he could use the documents in their consulting work. ROA.9688-90, 14317, 10254-55, 10735-36,10650-51, 10692-93, 10707-08, 12384; *see also* ROA.10258-59, 9627-29, 45122-386.

Harper, as leader of the Tech Team, would enter into agreements with clients through his company. Tech Team members would then work as independent contractors for that company, and after the company was paid, the Tech Team

members would be paid by the company for their services including all time billed. ROA.10947–10949.

Harper's first consulting company, Steve Harper Consulting, Inc., ("SHC"), existed until 2018. ROA.7524. In 2017, Harper discontinued consulting under SHC, and founded Polycarbonate Consulting Services Inc., ("PCS"). ROA.7524, 10889.

In 2012, SHC entered into a consulting agreement with a company called Prime 3. ROA.10265, 45845-46. In 2013, SHC provided Prime 3 with a basic engineering design package for a polycarbonate plant for Luxi Chemical Group in China. ROA.10259-60, 10655, 10659-60, 10708, 45889-93, 45896-98. In April 2013, Enex International became the Luxi project's engineering services provider and detailed designs provider. ROA.9660-61, 10655-56, 38798-803. SHC continued to provide consulting work to Prime 3. ROA.10726–10728. That plant came online and began making polycarbonate. Years later KBR would also hire Enex, and subsequently, as that relationship deteriorated, hired PCS and the Tech Team to provide polycarbonate consulting. ROA.11218–19.

Trinseo, then called Styron, acquired the Dow technology in 2010. 10124-25. In 2019 after learning about PCS's consulting work for KBR via a lawsuit between Enex and Prime 3, filed suit against KBR, Harper, SHC, PCS as well as Tech Team member Bill Davis, and his entity Polycarbonate Resin Consulting Services. ROA.10958–10960, 10987, 7525.

In the litigation Trinseo identified 11 trade secrets. ROA.10367. Of the 11, it accused KBR and the Harper Parties of misappropriating all 11. Trinseo accused Davis and his entity of misappropriating three. ROA.7553. Trinseo, through its damages expert Thomas Pastore, pursued a no accounting required all or nothing damages model against SHC and PCS, seeking 100% of all monies received by those entities from Prime 3 and KBR, whether for expenses or otherwise. ROA.11833–34. It sought from Davis 100% of the revenue he was paid by PCS for consulting. ROA.11835.

Trinseo dropped one of its 11 alleged trade secrets before trial, and the jury rejected Trinseo's six of the 10 trade secrets presented to it, including (1) all the secrets alleged against Davis, and (2) four of the five trade secrets that Trinseo (via its fact/expert witness Jerry Duane) alleged were the "heart, core, and value driver" of its technology. ROA.7546, 10079–80. The jury found misappropriation against the Harper Parties on four trade secrets but concluded that the misappropriation was *not* willful and malicious.  ROA.7549–52, 7561.

For SHC, the jury awarded all $2,930,817 of SHC's revenues as damages. For PCS, the jury awarded $2,549,706, all but $44,162 of PCS's revenues. *Compare* ROA.7558, *with* ROA.11833–34.

After post-trial briefing, the District Court denied Defendants' judgment as a matter of law (JMOL) on liability.  ROA.38651–52. However, the Court granted the

JMOL for KBR and the Harper Parties on damages, and entered a take nothing judgment because Trinseo did not present legally sufficient (or any) damages evidence specific to the four-out-of-ten trade secrets the jury found. ROA.38652-81, 38686-87, 38693, 8201.

## SUMMARY OF ARGUMENT

The District Court correctly entered a take nothing judgment because Trinseo's damages model of all revenues received by PCS and SHC is not a proper quantification of "unjust enrichment." Seeking all revenues received as damages does not quantify how much a defendant was "enriched" because revenues are not profits. Seeking all revenues received as damages does not quantify how much of the enrichment is "unjust" because it does not quantify how much of the revenue related to the trade secrets. This simple issue is dispositive of the damages claim in this case. The District Court correctly reached this result in two ways. First, the District Court held that damages must be apportioned between the value of the wrong and the value of what was found not to be wrong, rather than the entire value of the economic undertaking. Second, the District Court correctly held that Trinseo had introduced no evidence to separate revenues from profits. Both holdings are correct.

On appeal, despite a 22,800 word brief, Trinseo elected not to challenge the district court's determination that it presented no evidence of profits. Accordingly,

as there is an independent unchallenged basis for the District Court's order, so the Order must stand.

The District Court was correct to find that apportionment was required. But even if some specific subset of apportionment law is not applicable here, Trinseo's damages model cannot be sustained under basic damages principles. Trinseo has not presented evidence from which a reasonable fact finder could determine the proportion of the Harper Parties' revenues that were generated from the use of the alleged trade secrets. The Harper Parties would also argue that the fact finder for unjust enrichment is the judge and not the jury, and so an alternative basis for affirmation is that the Court, as fact finder, found no evidence of damages against the Harper Parties.

For its part, in the alternative Trinseo requests a new trial based on its inaccurate prediction of how the District Court would resolve legal questions. This is not proper basis for a new trial.

Trinseo also seeks to revive its preempted Texas common law misappropriation claim. Since Trinseo's common law claim is an exact duplicate of its DTSA claim, it is preempted, as every Court to consider the issue in Texas has held.

On cross appeal the Harper Parties contend that there was legally insufficient evidence to support the jury's decision to pierce the corporate veil of SHC and PCS.

Trinseo's incorrect view of veil piercing law would eliminate the corporate veil in every trade secret case involving a single owner company.

Finally, the Harper Parties contend that as a matter of law, the evidence presented at trial demonstrates that Trinseo violated the statute of limitations by sitting on its hands for more than nine years after learning that its alleged trade secrets were being used in the market place.

## STANDARD OF REVIEW

With some exceptions noted below, this appeal and cross appeal concern the district court's ruling on the Harper Parties' Motion for Judgment as a Matter of Law. This Court reviews the district court's ruling on a motion for judgment as a matter of law *de novo*. *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 184 (5th Cir. 2018). The court examines all evidence in the record as a whole. *Id.* "A motion for judgment as a matter of law is properly granted where there is no legally sufficient evidence upon which the jury could find for a party on its claim." *Id.* There is not legally sufficient evidence to allow a jury to find for a party "where the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict." *Id.*; *see also* Fed. R. Civ. P. 50(a)-(b).

## ARGUMENT ON TRINSEO'S APPEAL

The Harper Parties join and incorporate by reference: (1) KBR's Part I addressing apportionment (2) KBR's Part IV.A addressing Trinseo's request for a new trial and (3) Part V addressing preemption of Trinseo's common-law confidential information claim. The Harper Parties write separately on (1) appellate abandonment and (2) unjust enrichment.

## I. Trinseo's appeal fails to challenge the District Court's alternative ground for granting the Harper Parties' JMOL, therefore Trinseo has abandoned this argument on appeal.

The District Court granted the Defendants' JMOL because Trinseo failed to apportion its damages among its trade secrets. For the Harper Parties the Court identified an alternative ground for granting the motion:

> Pastore testified that he used *revenue* statements—not profit statements—to assess damages against the Harper Defendants. While Leathers filled in the evidentiary gaps as to KBR, he did not do the same for the Harper Defendants. There was no evidence by either side apportioning the Harper Defendants' profits from Revenues or deducting expenses. This is one more reason why any unjust enrichment award would be guesswork.

ROA.38687. Therefore, with respect to the Harper Parties, the District Court presented two alternative reasons why Trinseo's evidence was legally insufficient to support the award: first, the failure to apportion, and second, the failure to present evidence of profits.

Trinseo does not challenge this second basis on appeal. To the contrary, Trinseo concedes in its brief that profits are the right measure: "The Harper Defendants conceded that the district court 'correctly instructed the jury' on unjust enrichment damages." And that "[t]he jury had evidence from which it rationally could have found that the Harper Defendants would have obtained **no profits** at all had they not misappropriated…" Br.77 (emphasis in original). Failure by a party to address all a district court's stated alternative grounds constitutes abandonment on appeal and requires affirmation of the District Court. *Sammons v. Tex. State Bd. of Med. Examiners*, 251 F.3d 157 (5th Cir. 2001) *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir.2000) (district court dismissed claim on procedural grounds and on merits; although procedural ruling was in error, failure to brief one of alternative grounds constituted abandonment on appeal, and therefore dismissal should be affirmed).

## II. <u>The District Court's ruling should be affirmed on the alternative ground that there is legally insufficient evidence of the "Unjust Enrichment" caused by the four alleged trade secrets the jury found misappropriated.</u>

Trinseo's unjust enrichment damages model has three failings. First, Trinseo made the decision to only put on evidence of revenue instead of profits. Second, Trinseo never distinguished between the value of its eleven alleged trade secrets and polycarbonate technology more generally, making it impossible to evaluate how

much of PCS and SHC's profits would be attributable to the trade secrets asserted by Trinseo. Third, because it did not value each trade secret separately, Trinseo introduced no evidence about which parts of SHC or PCS's consulting work corresponded to the four secrets ultimately found by the jury, and thus Trinseo failed to provide evidence of what revenue, let alone profits, might be attributable to those four secrets in isolation. These are all fatal causation flaws in Trinseo's damages model.

Trinseo insists that this work did not need to be done, but that if it did need to be done, the jury did so without needing instruction. If Trinseo's arguments are accepted, there is no valuation difference between a jury verdict finding 11, 10, nine, eight, seven, six, five, four, three, two or one trade secrets. Trinseo's contention that each of these scenarios would support a jury award of 100% of the alleged damages— damages that were calculated assuming misappropriation of all alleged secrets—is wrong. Trinseo spent weeks presenting 10 distinct trade secrets to the jury. The jury's rejection of more than half of those secrets must have meaning. Trinseo's current position renders the jury's work in answering question 1 irrelevant.

**A.** ***Trinseo failed to present evidence of net profits and only presented evidence of revenue.***

The only unjust enrichment damages evidence Trinseo presented for the Harper Parties is revenue. ROA.11833–34. The jury was correctly instructed only to consider profits, not revenue. Br.77.

Controlling authority is clear that unjust enrichment awards are limited to "net unlawful profits." Liu v. Sec. & Exch. Comm'n, 591 U.S. 71, 79, 140 S. Ct. 1936, 1943, 207 L. Ed. 2d 401 (2020) ("Courts consistently restricted awards to net profits from wrongdoing after deducting legitimate expenses"). In *Liu* the Supreme Court speaks at length broadly about the nature of unjust enrichment as a remedy in a variety of contexts including intellectual property claims. *Id.* at 1946. *See also*, *Univ. Computing Co. v. Lykes-Youngstown Corp.*, F.2d 518, 536 (5th Cir. 1974) ("Normally only the defendant's actual profits can be used as a measure of damages"). This result is in accord with Texas precedent, where a plaintiff's failure to present evidence of net profits is always fatal. *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 686–87 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 779 (5th Cir. 2017); *Elcor Chem. Corp. v. Agri–Sul, Inc.*, 494 S.W.2d 204, 214 (Tex. Civ. App.— Dallas 1973, writ ref'd n.r.e.).

Trinseo's damages expert Pastore testified on direct, and confirmed on cross, that the damages numbers he presented represented revenue and not profit.

ROA.11833-11834, 11951. Pastore testified that SHC was paid a total of $2,930,817 by Prime3 and that number unmodified was his measure of unjust enrichment for SHC. ROA.11833. Likewise, he testified that the total amount paid to PCS by KBR was $2,593,868 and presented that number unmodified as his measure of unjust enrichment for PCS. ROA.11834.[1]

Pastore confirmed that he made no deduction for expenses, though expenses were incurred by PCS and SHC. ROA.11941–42, 11950–51. Pastore also admitted that if the jury was asked about PCS's profits, his testimony would not answer that question. ROA.11953–54.

> Q. Okay. So, again, if the jury is asked the question: What are PCS's profits? Your testimony and your report doesn't answer that question because you've only told them what the revenues are; right?
> A. Again, yes.

ROA.11954. But profits are exactly what the jury was asked to determine. ROA.25070. Nor is the difference between revenue and profit trivial. PCS's invoices show dozens and dozens of out-of-pocket expenses for items like air travel and hotel.

---

[1] Trinseo asked for all monies paid to PCS by KBR and double dipping, asked to recover the exact same money from KBR. This would result in Trinseo receiving double damages for any wrongdoing by PCS, which goes against the equitable principle that the wrongdoer should not be punished by "'[pay]ing more than a fair compensation to the person wronged.'" *Liu* at 1943. The jury cannot have wanted this punitive result, as it declined to award exemplary damages against either KBR or PCS. ROA.7560–61. Trinseo, by also seeking damages against Davis, actually sought to triple recover the money paid to Davis: once from Davis, once from PCS and once from KBR.

ROA.47227. While only a handful of SHC invoices are in evidence, they also show out of pocket expenses. For example, the invoice for the trip to the Freeport plant contains more than $1,000 in travel expenses. ROA.14330. Expenses must be deducted from revenue to reach a net profit number.

PCS and SHC also paid Tech Team members for work performed.[2] The undisputed testimony is that both SHC and PCS paid out substantial sums to Tech Team members other than Steve Harper: Chip Melton, Bryce Koslan and Bill Davis. ROA.11943–45. Tech Team members were paid the vast majority of the collections each member generated. ROA.10947–48. The exact amount paid by PCS to Bill Davis was quantified at trial as $486,000. ROA.11954–55. However, for other Tech Team members, and for Bill Davis's work for SHC, Trinseo put on no evidence of how much was paid out to Tech Team members. While there is insufficient evidence in the record to determine the totality of these payments the evidence shows that the payments were substantial. *See for example*, ROA.47668–47675.

Trinseo has previously pointed to *Liu* to support the notion that it could claim revenue and not profit. The Court in *Liu* does discuss a narrow exception: if "the entire profit of a business or undertaking results from the wrongful activity" certain

---

[2] Steve Harper was one of the Tech Team members paid by SHC and PSC. Notably, the jury found that Steve Harper as an individual did not owe Trinseo any damages. ROA.7558

narrow classes of expenses may not be deductible. *Id.* at 1950. *Liu* is much narrower than Trinseo's crude reading.

First, *Liu* does not embody a variant of the "entire market rule." The question is *Liu* is not whether the unlawful activity drove the value of the business, but rather whether all the revenue the business received was unlawful. Here, as is discussed in Section II.B and II.C, significant amounts of PSC and SHC activity were directed towards parts of the polycarbonate process that were not trade secrets. Most obviously, all $486,000 of the revenues generated by Davis were generated from his lawful (as determined by the jury) work for PCS. Second, even if the conditions in , *Liu* were met, *Liu* rejects excluding all expenses, instead it only counsels to reject profits, masquerading as expenses. *Id*.

**B.** ***Trinseo failed to present evidence to distinguish between revenue generated from its alleged trade secrets and other revenue.***

SHC and PCS received revenue from clients in two ways. First, there were lump sum payments. ROA.1948–49. Second, hourly consulting work, where the consultants would do work such as answering client questions, and troubleshooting client issues. ROA.10948, 47227–47287.

Trinseo introduced no evidence that would have allowed a jury to determine how much of the hourly consulting work performed by SHC or PCS related to the parts of the polycarbonate technology that Trinseo did not allege to be a trade secret.

Duane testified that not all the work done by the Tech Team involved the 10 alleged secrets. ROA.10543–44. There are many examples of such lawful work in the record, here three are presented:

**Work on the dry side:** During trial, Trinseo drew a distinction between the "wet" side and the "dry" side of a polycarbonate plant. ROA.9593. Duane testified that only one of the alleged secrets, formulations (the chemical makeup of the plastics created) related to the "dry" side of the plant. ROA.9652. The rest of the dry side, including equipment and processes, were not alleged to be protected by trade secret. PCS and SHC provided consultation services for the entire plant, wet and dry side. Tech Team member Bryce Kolsan was a dry side expert and primarily worked on that side of the plant, thus most of his work for the Tech Team did not involve even alleged secrets. ROA.9627, 10677. But Trinseo's damages model demands that it be paid for all Koslan's work.[3]

**Harper/Duane Lunch:** PCS billed KBR for Harper's 2018 lunch with Duane, a lunch during which both Duane and Harper agree no trade secret information was discussed. ROA.52836–52838, 10922–10923. But Trinseo's damages model mandates payment to Trinseo for the time Harper spent at the lunch and the food

---

[3] In reality, Trinseo's model demands that it be paid for that same work twice: once by PCS and once by KBR.

eaten by Trinseo's own employee at that lunch. ROA.47246.

**Freeport Trip:** SHC billed Prime 3 for Harper and Davis's trip to the Freeport plant closing ceremony, another event where there is no allegation of trade secret misappropriation. ROA.14330. Trinseo says it is entitled to be paid for that time and those expenses.

For SHC, there are very few invoices or other documents in the record that show how much it was paid for doing particular tasks. For PCS, the invoices are in evidence but typically lack sufficient detail to enable anyone to look at just the invoices and determine what part of the work might involve Trinseo's trade secrets. ROA.47228–47287. As Pastore conceded on the stand, the invoices could be for anything, even something clearly not related to Trinseo's trade secrets, there is no way to know from the current record. ROA.11962.

None of this is to suggest that it was impossible for Trinseo to present a valid damages calculation, had it but tried. *Westinghouse Elec. & Man. Co. v. Wagner Elec. & Man. Co.*, 225 U.S. 604, 620 (1912) (relieving a Plaintiff of the burden of apportionment if apportionment is impossible). Duane, who studied the scope of PSC and SHC's activities, could have rendered an opinion as to the overall percentage of their work that implicated each alleged trade secret. The damages expert could have relied on that analysis and opined on what percentage of the Tech

Team's revenues were attributable to each alleged secret. However, since neither expert performed this analysis, and since this evidence was not provided, the jury was given no way to do this work themselves.

### C. *Trinseo failed to present evidence that its damages were caused by the four alleged trade secrets the jury found.*

The problem discussed in Section II.B is compounded by the jury's mixed verdict. The jury only found for Trinseo on four of the 10 alleged trade secrets presented at trial, of the 11 originally alleged.

| Plaintiff's No. | | YES | NO | Defendants' No. |
|---|---|:---:|:---:|---|
| No. 1: | Process control strategy and Concepts and Control Algorithms | ✓ | | (1) |
| No. 2: | Raw Materials Specifications/Composition | | ✓ | (9) |
| No. 3: | Phosgene Reactor Design and Associated Pressure Vessel Containment | ✓ | | (2) |
| No. 4: | Continuous Plug Flow Oligomerization Reactor Inside Pressure Vessel Containment (with static mixer design) | ✓ | | (3) |
| No. 5: | Thermal Stabilizer Addition System | | ✓ | (8) |
| No. 6: | Steam Devolatilization Process | ✓ | | (7) |
| No. 7: | Polymer Solution Atomizer Nozzle | | ✓ | (4) |
| No. 8: | "Snake" Design | | ✓ | (5) |
| No. 9: | Polycarbonate Product Composition, Formulations or "Recipes" | | ✓ | (10) |
| No. 10: | Negative and Positive Knowledge | | ✓ | (11) |

ROA.7546. Pastore provided a single number valuing all 11 trade secrets, and did not change his calculation to correspond to the subset of the 10 presented at trial much less the smaller subset of four that were found by the jury. Pastore did not do an individual valuation of each of the trade secrets.[4] Pastore volunteered that he would not be able to value a subset of trade secrets until *after* a jury verdict and then *after* receiving additional information from the technical expert.[5] As Trinseo's expert told the jury that such a damages calculation was not possible, Trinseo cannot now argue that the jury could have done so.

Trinseo argues that "the jury could have readily have found that the 'misappropriated technology' here was the heart, core, and value driver of Trinseo's PC technology." Br.51. But it was not asked that question. As the District Court noted "Trinseo did not request a jury instruction or question pertaining to any

---

[4] "I have not done an individual valuation of each of the trade secrets." ROA.11925.

[5] Q. So if the jury were to decide that Trinseo has proved only one of its now ten, no longer 11, alleged trade secrets was, in fact, a trade secret and was, in fact, misappropriated, it is still your opinion that the full license fee is owed. Is that correct?
A. Wait a minute. You said if there is only one trade secret left out of 11 or 10?
Q. Correct.
A. Well, I have to see what the opinion is, what that is, confer with Mr. Duane and see if I have to revise my valuation.
Q. And you haven't done that work, Mr. Pastore?
A. How can I do that work until there is a verdict? ROA.11928-29.

interpretation of the entire market value rule." ROA.38669 n.18. KBR requested an instruction on the entire market value rule but Trinseo opposed it. ROA.38669 n.18; *see also* ROA.7392, 7937–98, 13383-86. As Trinseo requested, the jury was not instructed on the entire market value rule. ROA.13386. As a practical as well as a procedural matter, Trinseo cannot now rely on that rule to save it from its failed litigation strategy, as properly held by the District Court.[6]

While Trinseo now states that "the Steam Devolatilization Process is the secret that quintessentially defines the value of Trinseo's PC technology" it tellingly provides no cite to the record for this belated assertion. One might think that based on this assertion, this is *the* trade secret which provides the value Trinseo seeks. Not so. Trinseo immediately goes on to state that "[a]nother driver of the demand for Trinseo's unique manufacturing process is the design of the Oligomerization Reactor…" Br.52. Adding to the confusion, Trinseo goes on to state that "[o]f course, the 'heart' of the entire operation must contain a brain, and that is how the Dow/Trinseo 'process control strategy" (Trade Secret No.1) contributes." Br.53. Setting aside the fact that this is both anatomically and factually incorrect, this kind

---

[6] The court noted that Trinseo had "fought to avoid mentioning the rule throughout most of its post-verdict briefing." ROA.38669 n.18. The court determined that Trinseo's "heart, core, and value driver" arguments were simply disguised entire market value rule arguments. ROA.38653 n.7. Although the court addressed Trinseo's arguments on the merits, the court also held that they were waived. ROA.38669-72 & n.18, 38676.

of nonsensical analogy illustrates the difficulty facing Trinseo in now post hoc Frankensteining a damages model that purportedly supports the jury's decision to recognize only a subset of the alleged trade secrets should be given trade secret protection. Trinseo knows it has the worst side of this argument, as shown by its misquotation of Duane's testimony about the core of the technology. *Compare* Br.54 (identifying three secrets, with ROA.10079 identifying five alleged secrets, including three the jury answered in the negative). *See also* ROA.10294–5(Duane: snake design is heart); ROA.9618 (Duane: agglomeration i.e. snake and nozzle and devolatilization are heart); ROA.10681 (Harper: snake and nozzle are heart).

Pastore relied on the assurance that the 10 trade secrets contained in Mr. Duane's revised report were together the "core technology" in choosing not to change his valuation when one of the trade secrets was dropped. ROA.11928. If all 10 alleged trade secrets presented to the jury were the "core technology" then four trade secrets recognized by the jury must be less than all the core technology.

While it is not possible from the record to evaluate how much of PCS and SHC's work related to the four secrets, a significant work were in areas found not to be trade secret. Four examples:

**Davis Work:** Since David was found to have misappropriated no secrets, Davis was paid nearly $500,000 for entirely lawful polycarbonate consulting work. Accordingly, all of Davis's work, including extensive work on product formulations,

snakes and nozzles must be excluded from an unjust enrichment award. Yet the jury did not do so and was not given the tools to do so. The jury awarded Trinseo 100% of SHC's revenues as sought by Trinseo and awarded Trinseo all but $44,162 of the $2,593,868 sought against PCS. Merely subtracting the undisputed amount Davis was paid by PCS yields a number lower than the damages figure returned by the jury. *Compare* ROA.7558(jury verdict) *with* ROA.11833–34(showing Pastore's numbers).

**Dry Side Work:** As discussed above, Trinseo only alleged a single trade secret on the "dry" side of the plant: product formulations. ROA.9652. The jury found that the product formulations was not a trade secret. ROA.25064. Accordingly, all the Tech Teams' work on the entire "dry" side of the plant did not involve trade secrets and is not recoverable by Trinseo. The jury was provided no expert opinion or evidence about what deduction from Trinseo's damages model to make if it concluded that there no "dry side" trade secrets.

**Snake Trip:** Davis and Harper took a trip to China to help Luxi with snake plugging as part of their work for Prime3. The jury heard extensive evidence about this trip, and Trinseo introduced into evidence the report from this trip. *See* ROA.46356 ROA.46356–46367. That trip concerned the unprotected snake and nozzle technologies. The jury, by holding that Davis's work was not related to trade

secret necessarily held that work to be lawful, yet made no deduction for the revenues earned on that trip.

KBR/Kirk Meeting: Richard Kirk (a now deceased Tech Team member), Davis, and KBR met to discuss the snakes and nozzles. ROA.11232; ROA.47710. Again, no damages can be recovered by Trinseo for work on the snake and nozzles as the jury rejected those alleged trade secrets, and again, Trinseo seeks the revenue earned from this meeting.

These examples—and there are many more— demonstrate that a significant amount of revenue was generated by PCS and SHC for lawful non-trade secret work and the number provided by the jury is by law too high. What cannot be ascertained from this record is what a correct lower number related only to the four technologies found to be trade secret would be.

This failure to establish a causal link between liability and damages is lethal. Whether considered a failure of causation, or as a failure to apportion between the work that was unlawful (using the subset of four trade secrets) and lawful (everything else), the failure to tie the damages number presented to the jury to liability is fatal. KBR's brief walks through the key cases, and that analysis will not be repeated here. While the phrasing of the cases may all be different, the through line is the same: a plaintiff must connect its damages model to specifics of the wrong alleged. *Garretson v. Clark, 111 U.S. 120, 121 (1884); Westinghouse v. Wagner,*

225 U.S. at 618; *LivePerson, Inc. v. 7.AI, Inc.*, 2018 WL 6257460, at *2 (N.D. Cal. Nov. 30, 2018); *Ford Motor Co. v. Versata Software, Inc.*, 2018 WL 10733561, at *8 (E.D. Mich. July 9, 2018); *02 Micro International Ltd. v. Monolithic Power Systems, Inc.*, 399 F. Supp. 2d 1064, 1076 (N.D. Cal. 2005); *MGE UPS Systems, Inc. v. GE Consumer & Industrial, Inc.*, 622 F.3d 361, 369–70 (5th Cir. 2010).

**D.** ***In the Alternative, the Court should accept the District Court's factual determination that there was no evidence of profits for the Harper Parties.***

The parties below briefed the question of whether unjust enrichment is for the judge or the jury to decide. The District Court carried the issue and ultimately decided that the issue need not be decided because the outcome, no damages, would be the same either way. ROA.38681.

Unjust enrichment is for the judge and not the jury. *Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Electronics America, Inc.*, 895 F.3d 1304, 1319-26 (Fed. Cir. 2018). Accordingly, and in the alternative, this Court should rule that the Trial Court is the fact finder for unjust enrichment. As the District Court has already determined on the record presented by Trinseo that any award of unjust enrichment would be "mere guess work" this Court should not disturb the trial Court's fact determination on this point. It can uphold the District Court's outcome on the basis that as fact finder, the District Court has determined that no unjust enrichment damages were proven against the Harper Parties.

# ARGUMENT ON HARPER-PARTIES'  CROSS APPEAL

The Harper Parties raise two issues on its cross appeal. First, the evidence is not legally sufficient to support the jury's alter ego findings against PCS and SHC. Second, Trinseo, as a matter of law, violated the statute of limitations by filing suit more than three years after the alleged infringement began.

## I. The District Court Erred in Denying the Harper Parties'  Motion for Judgment as a Matter of Law on the Jury' s Alter Ego Findings.

In assessing damages, the jury awarded damages against PCS and SHC, and awarded $0 against Steve Harper personally. ROA.7555–7558. The jury answered "yes" to Trinseo's alter ego questions for both SHC and PCS. ROA.7567–68. A reasonable jury could not have reached this conclusion based on the evidence before it.

PCS and SHC are Colorado companies, so Colorado law controls this issue. *Hollis v. Hill*, 232 F.3d 460, 465 (5th Cir. 2000). Veil piercing is "an extraordinary remedy" justified only in limited circumstances. *In re Phillips*, 139 P.3d 639, 647 (Colo. 2006). Colorado law imposes a three-step veil-piercing test, and a party seeking to pierce the veil must present sufficient evidence at each step. *Id.* The Harper Parties challenge the jury's conclusion at Step 1 and Step 2.

**A.** ***There is not legally sufficient evidence of a lack of separateness between the entities and the individual.***

Step 1 requires evidence that the entity is a "mere instrumentality for the transaction of the shareholders' own affairs". *Stockdale v. Ellsworth*, 407 P.3d 571, 576 (Colo. 2017) (internal citation omitted). Colorado courts have developed a list of eight non-exhaustive factors to consider at Step 1. These include familiar veil piercing concepts such as commingling of funds, undercapitalization, and lack of maintenance of corporate records. *Id.* For both PSC and SHC, Trinseo presented legally insufficient evidence at Step 1.

1. Trinseo presented no alter ego evidence for SHC.

Trinseo presented evidence that Harper and his wife are the only shareholders of SHC; that Harper directed the affairs of SHC; and that some SHC invoices have the words "Steve Harper" and "Steve Harper Consulting Services" on them not "Steve Harper Consulting Inc.". The first two pieces of evidence (true of all single shareholder companies) are legally insufficient evidence at the Step 1 of the veil piercing analysis. *Indus. Comm'n v. Lavach*, 439 P.2d 359, 361 (Colo. 1968). The final piece of evidence does not relate to any of the eight factors, given that all payments for SHC work were made to SHC bank accounts, and not Harper's personal account. ROA.10948. Uncareful phrasing in the title of an invoice is not evidence of alter ego. There is no evidence of undercapitalization, comingling funds, personal expenses run through the business, the failure to observe corporate

formalities or any of the traditional markers of alter ego. Harper's unrebutted testimony is that he observed the corporate formalities, maintained separate bank accounts, and performed separate accounting for the entities. ROA.10946–47.

        2.     Trinseo presented legally insufficient alter ego evidence for PCS.

Trinseo presents evidence of single shareholder and directing corporate affairs for PCS which is insufficient to meet its burden at Step 1. Trinseo presented no evidence of comingling funds, failure to observe corporate formalities or undercapitalization. For PCS Trinseo did identify four times PCS paid a personal expense on Harper's behalf. When asked about these expenses, Harper testified— unrebutted— that (1) he only used money he was otherwise entitled to take as a distribution from his business and (2) that his accountant would classify these payments as distributions. ROA.10857, 10949. One unpublished decision by an appellate court in Colorado has reasoned that spending company profits to which one is entitled on personal expenses is not using corporate funds for personal purposes. *Slapstick, LLC, v. Larimer Cnty. Sports, LLC, et al.*, No. 22CA1281, 2023 WL 12057066, at *6 (Colo. App. Aug. 24, 2023)(unpublished). Once again, Harper testified unrebutted that he observed the corporate formalities, maintained separate bank accounts, and separate accounting for PCS. ROA.10946–47.

**B.** *There is not legally sufficient evidence that the corporate form was used to protect a wrong.*

The Colorado Supreme Court has articulated Step 2 in various ways. In 1966 it described Step 2 as: "the corporate entity was used to defeat public convenience, or to justify or protect wrong, fraud or crime" *Fink v. Montgomery Elevator Co. of Colo.*, 421 P.2d 735, 739 (Colo. 1966). In 2006, sitting *en banc* it stated "[o]nly when the corporate form was used to shield a dominant shareholder's improprieties may the veil be pierced." *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006). The Colorado Supreme Court's most recent pronouncement describes Step 2 as whether: "the corporate fiction was used to perpetrate a fraud or defeat a rightful claim." *Stockdale v. Ellsworth*, 407 P.3d at 577.

Trinseo argued in the trial court that this step requires nothing more than corporate entities having been used to commit a wrongful act—here, the misappropriation of trade secrets. ROA.29735–6. But this must be wrong, as veil piercing is a theory of vicarious liability which holds the principal liable for the acts of the company. Accordingly, a finding of liability against the corporation is always a prerequisite to veil piercing, not a step in the veil piercing analysis.

Moreover, because Step 1 already asks if the company is a "mere instrumentality for the transaction of the shareholders' own affairs" it is redundant for Trinseo to describe Step 2 as asking whether Harper was "using" the entities to commit the misappropriation. *Id.* at 576 In short, Trinseo has never articulated what

Step 2 requires in addition to the necessary prerequisites for reaching Step 2 and never identified any evidence that would meet its burden at Step 2.

        1.      Step 2 requires the corporate fiction be used to defeat a rightful claim.

Step 2 requires that the "corporate *fiction* was used to . . . defeat a rightful claim." *In re Phillips*, 139 P.3d at 644. In other words, the use of a corporation must deprive the wronged of a remedy against the wrongdoer. Here any alleged corporate fiction offered Harper no shield. He was individually accused of misappropriating trade secrets. That claim was tried against Harper directly, he was found individually liable, and the jury independently decided the damages issue against Harper as an individual.

If, as here, the dominant shareholder is an individual defendant—not merely on the alter ego claim but on the underlying cause of action— none of the equitable concerns giving rise to alter ego are implicated. Alter ego normally involves a wrong for which the dominant shareholder, by virtue of the corporate form, cannot be held directly responsible, e.g. a contract breached by the company, or a tort committed by an employee of the company. In other words, alter ego is implicated when an individual uses the corporate form to skirt individual liability. In those circumstances, at Step 2, the corporate fiction would defeat a rightful claim, and alter ego provides a limited exception to that result. That is not the circumstances here,

where Harper did individually stand trial. Therefore, there was no misuse of the corporate form to defeat a rightful claim that would support an alter ego claim.

2. Step 2 requires diverting funds.

A review of Colorado cases demonstrates that finding alter ego at Step 2 also involves a finding of some kind of wrongful transfer of assets out of the company, facts analogous to a fraudulent transfer. *Martin v. Freeman*, 272 P.3d 1182, 1186 (Colo. App. 2012)(selling the company's only asset during litigation and transferring the proceeds to the shareholder); *In re Thomas*, No. 10-38306 MER, 2013 WL 6840527 at *9-10 (Bankr. D. Colo. Dec. 27, 2013) (not reported) (massive withdrawals by insiders after the debts arose supported a finding of alter ego) *Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.*, No. 13-CV-3206-WJM-KMT, 2017 WL 4988667 at *13-15 (D. Colo. Nov. 2, 2017) (diverting payments to evade garnishment order supported veil piercing). *Slapstick v. Larimer Cnty. Sports*, 2023 WL 12057066, at *6(unpublished) (refusing to find veil piercing without evidence of improper transfers).[7]

---

[7] One judge in *Martin v. Freeman* dissented, arguing that the correct reading of Colorado Supreme Court precedent is that a plaintiff must demonstrate bad intent on the part of the shareholder before Step 2 can be satisfied. 272 P.3d 1183-84 (J. Jones dissenting). The Colorado Supreme Court has not addressed this issue since *Martin*. The Harper Parties argue that Judge Jones reading of Binding Colorado Supreme Court precedent is correct. To the extent Trinseo presented evidence of bad intent, the jury rejected it. ROA.7560–61.

Trinseo presented no evidence of any kind of diversion of funds. SHC closed in 2018 which was before Harper became aware of Trinseo's allegations via its June 2019 demand letter. ROA.7524, 14528. PCS had also shut down before Harper was notified of Trinseo's claim. ROA.10949.

II. **The evidence Introduced at trial establishes the Harper Parties' statute of limitations defense as a matter of law.**

A DTSA claim must be brought no "later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). "For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation." *Id.* The DTSA adopts the confidential relationship approach to trade secrets. *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 407 F.2d 288, 293 (9th Cir. 1969)("It is the relationship between the parties at the time the trade secret is disclosed that is protected," not the trade secret itself as property). Therefore, because Trinseo's DTSA claims were based on the allegation that Harper breached his alleged confidential relationship and revealed the alleged secrets to SHC, PCS and KBR. If the Court agrees that judgment as a matter of law is required because Trinseo knew or reasonably should have known of Harper's alleged misappropriation before February 12, 2017, then the claims against PCS, SHC and KBR must also fail.

SHC began its consulting activities in 2007. ROA.10668. The Harper Parties were not sued until 2020. ROA.14525. The jury was asked a limitations question with a correct critical date of three years prior to suit being filed against the Harper Parties: February 12, 2017. ROA.7563. The jury answered this question "no." ROA.7563.

## A. *Trinseo knew by no later than 2014 that its trade secrets had been misappropriated.*

At least two pieces of evidence conclusively demonstrate that Trinseo had formed the belief that its alleged trade secrets had been misappropriated by mid-2014: the SRI Report and the KBR/Styron/Trinseo meeting.

**SRI Report:** In August of 2011, SRI consulting published its 61-page report on "Polycarbonate via Dow Phosgenation Process" ("SRI Report"). ROA.51548-50, 53764-824, 10146, 10148. This report was prepared using information from multiple sources, including the Harper Parties. ROA.12934-37. Trinseo/Styron's[8] then-Chief IP Counsel Angelo Chaclas wrote to SRI's General Counsel and expressed "great concern" over the Report, requested it be withdrawn, and asked that SRI direct its subscribers to destroy all copies. ROA.51549, 10148-49, 12095. Chaclas wrote that Styron was "***certain that this Report contains*** highly confidential, proprietary, and non-public, ***trade secret information of Styron.***" ROA.51549, 12064.(emphasis

---

[8] Styron changed its name to Trinseo around this time. ROA.9588.

added). Chaclas assigned Duane to work with SRI on a revised version that would remove objectionable content. ROA.12065-66, 51649-61. SRI eventually removed a few minor references in the Report, but ultimately released a revised version in November 2011 that still contained a detailed description of the Dow polycarbonate process, including many of the same items Trinseo now alleges are trade secrets. *See* ROA.45761–832, 51649–61. ROA.10323-1326.

**KBR/Styron/Trinseo Meeting:** In May 2014, Styron/Trinseo and KBR were discussing a potential collaboration, and Styron learned about the disclosure of its alleged trade secrets after hearing that there were "ex-Dow employees rumored to be practicing outside confidentiality boundary," which created a "competitive situation with the ex-Dow employees." ROA.52029, 52011, 12127–28. Styron specifically heard that ex-Dow employees were violating their confidentiality obligations and performing polycarbonate consulting in China. ROA.12131-32.

**B.** ***Accrual under the DTSA does not require the identity of the misappropriator to be known.***

Trinseo argued below that knowledge of the identity of the people who were misappropriating its trade secrets is required for its claim to accrue, and therefore its claim did not accrue until 2018 or 2019, when it conclusively learned that Harper was the consultant practicing in China. However, under the plain language of the DTSA, a claim accrues once a trade secret owner discovers, or by the exercise of

reasonable diligence should have . . . discovered" the misappropriation. 18 U.S.C. § 1836(d). Misappropriation, as defined by statute, does not require knowledge of the identity of the person engaged in misappropriation to accrue. The question is not whether Trinseo knew the identity of specific wrongdoers, but rather, whether Trinseo knew that its secrets had been misappropriated.

There are many ways to misappropriate under the DTSA. One way is "use of a trade secret . . . by a person who used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(B)(i). Perhaps the most common "improper means" is a "breach of a duty to maintain secrecy" by a former employee. 18 U.S. Code § 1839(6). This is what the 2014 meeting establishes. By that meeting Trinseo had actual knowledge that there were "ex-Dow employees rumored to be practicing outside confidentiality boundar[ies]." ROA.52029. That document, either alone, but certainly in combination with Trinseo's 2011 interaction with SRI, conclusively demonstrates that Trinseo had formed the belief that there were ex-employees violating their confidentiality boundaries and disclosing Trinseo trade secrets. Trinseo believed that SRI had information about Dow's polycarbonate process that went beyond the public patents. SRI must have gotten that information from somewhere. Even if there were evidence to support Trinseo's claim it did not know, and could not through diligence learn, the specific identity of the wrongdoers the identity of those ex-Dow employees is not part of the definition of misappropriation

and therefore is not required for accrual under the DTSA.

### C. *In the alternative, Trinseo did nothing to try and find the Tech Team, as objectively, reasonable diligence would have found them.*

Assuming arguendo that accrual under the DTSA requires the identity of the wrongdoer, here the evidence establishes as a matter of law that Trinseo would have discovered the identity of the Harper Parties through the exercise of even minimal reasonable diligence. Diligence is measured objectively not subjectively. *PTP OneClick, LLC v. Avalara, Inc.*, 2020 WL 4729174, at *5, 11 (W.D. Wa. May 27, 2020). Despite learning about the alleged misappropriation in 2011, Trinseo did not investigate.

**SRI Report:** Report author Pavlechko told Duane that the information he used came from "various consultants." ROA.10170–71, 12938. Neither Chaclas nor Duane followed up to identify the consultants or any other sources. ROA.10170–71, 10175–80, 12938–40, 12942. Despite certainty that the Report disclosed trade secrets, Duane admitted he never took any steps to determine where SRI obtained the Report's information. ROA.10167-68; *see also* ROA.10226. Trinseo performed no investigation. ROA.10168-70, 10226-28, 12098-103, 12109-11, 12113, 12331. Duane conceded at trial that he should have done more to investigate. ROA.10224–25.

**KBR/Styron/Trinseo Meeting:** After the May 2014 meeting with KBR, Chaclas and Duane were assigned to investigate the "ex-Dow employees" rumor.

ROA.52029, 12130. They did not. Chaclas and Duane (again) admitted they did *nothing* to investigate these reports and they were not aware of anyone else at Styron/Trinseo doing so either, and Trinseo has introduced no evidence of such an investigation. ROA.10240-41, 10244, 10246-54, 10495-96, 12134-35.

**Freeport Trip:** Despite being tasked with (and failing to) investigate, Duane was informed in person by Davis and Harper in September of 2014 that they were doing polycarbonate consulting alongside other ex-Dow employees. ROA.10095-96, 10273-75, 10917-19, 12864-65. The occasion was the official closure of Dow's polycarbonate Freeport plant. ROA.10094, 10272-73, 10917. Harper testified that he told Duane they were doing polycarbonate consulting in China. ROA.10919. Duane did not ask any questions about the consulting. ROA.10277-79, 10919, 12865-66. Because Duane and Harper had worked together at Dow, Duane was familiar with Harper's knowledge of the Dow polycarbonate technology. ROA.9614. Duane disputes that he was told they were doing polycarbonate consulting, but concedes that he spoke with Harper, and that Harper told him that Harper and other former Dow employees who worked on polycarbonate were providing consulting services. ROA.10275–10278.

While the jury was free to disbelieve Harper, and believe Duane, measured objectively, if Duane knows (1) someone gave Trinseo/Dow polycarbonate trade secrets to SRI; (2) ex-Dow employees are consulting in violation of their (alleged)

confidentiality obligations; and (3) that Harper and other former Dow employees with expertise in polycarbonate are consulting together, it cannot seriously be suggested that Duane did not have sufficient information to discover, through the exercise of reasonable diligence, that Harper was the ex-Dow employee doing polycarbonate consulting.

After all, the Tech Team work was not kept secret. Each Tech Team member testified either that Duane knew they were consulting in polycarbonate, or that had they been asked for information about their consulting by Duane, they would have told him. Chip Melton said so. ROA.12536–37. Pavelako, the author of the SRI Report, testified that he told Trinseo he didn't remember the names of the consultants, but if they wanted, he would look them up for Trinseo, but Trinseo never asked him to do that. ROA.12938–39. Koslan testified that he was friends with Duane through the 2010s, would routinely have dinner with Duane and both of their wives, and that Duane knew he was consulting in polycarbonate. ROA.13331–13332. There is also objective contemporaneous evidence that the Tech Team would have told Duane they were consulting in polycarbonate if asked. In May of 2018, Koslan tried to hire Duane to join the Tech Team and told him in writing that Harper was consulting in polycarbonate in China. ROA.47845. Duane expressed no surprise and instead agreed to have lunch with Harper. ROA.47844, 10289-90, 12178. Duane and Harper had lunch after this email, and Harper freely told Duane

details of the consulting work his team had been doing over the last decade, even bringing with him a sample of polycarbonate flake. ROA.10292-99, 10097-102, 47846-48, 52836-37, 10919-20. While these two events occurred later than 2017, they show that at least Koslan and Harper would have told Duane everything if Duane had bothered to ask.

Duane knew Dow polycarbonate, and knew who else knew Dow polycarbonate. The photograph below was taken to commemorate the first successful production of polycarbonate at scale by Dow in Freeport in the 1980s using Dow's polycarbonate technology. ROA.9613–9616.



ROA.14164. The substance the men are holding is polycarbonate flake. Duane is in plaid, and directly to his left is Harper. ROA.10962. Also pictured are Rodger

Coday, a minor Tech Team member, and major Tech Team member Richard Kirk, who was at the time of the photo, was Duane's boss. ROA.10962, ROA.9812, ROA.10676, 10680. When Duane talked to the man photographed beside him when Freeport came online at the closing of the Freeport plant he was speaking to the head of the Tech Team. If he had called his old boss, he would have found the Tech Team. If he had randomly picked someone in this photo to call, he would have had better than even odds of speaking to someone on the Tech Team. On cross examination, all Duane could offer is that he didn't make the connection, he did not put two and two together. ROA.10278.

There is no evidence that Harper tried to conceal the identity of himself, or other Tech Team members, no scintilla of evidence suggests that Harper or any other Tech Team member sought to conceal their identities from Duane—the exact person tasked by Trinseo to find them. Viewed from an objective standard, Trinseo knew its alleged trade secrets were out, knew who had access and knew who was doing polycarbonate consulting.

**D.** ***Cases where courts have found a fact issue on statute of limitations involve materially less information about misappropriation than it is undisputed that Trinseo possessed.***

In the trial court Trinseo relied on three cases to argue that a fact issue existed as to whether the exercise of reasonable diligence would have discovered the misappropriation. In two of those cases, the plaintiff did not even know someone

was using their trade secrets. *In Trench Tech Int'l, Inc. v. Tech Con Trenching, Inc.*, the court concluded that despite some evidence should have made the plaintiff suspicious there was a fact dispute on whether the plaintiff knew its secrets were being used. No. 4:19-CV-00201-O, 2022 WL 1998466, at *5 (N.D. Tex. June 6, 2022). In *Sw. Energy Prod. Co. v. Berry-Helfand,* the plaintiff knew facts that meant misappropriation could have occurred, the plaintiff did not know misappropriation had occurred. *491 S.W.3d 699, 721-25 (Tex. 2016).* By contrast here Chaclas, an intellectual property lawyer for Trinseo (then called Styron), wrote in 2011 that Styron was "certain that this Report contains highly confidential, proprietary, and non-public, trade secret information of Styron." ROA.51549, 12064. In Trinseo's final case, *Schwan 's Co. v. Cai*, the plaintiff did have knowledge that an ex-employee had taken secrets, and gone to work for a competitor, but there was nothing outside limitations to suggest that the competitor was using the secrets. No. CV 20-2157 (JRT/HB), 2021 WL 5745791 at *4-7 (D. Minn. Dec. 2, 2021).

In a case much closer to the facts of this appeal, this Court concluded that limitations applied as matter of law in a Texas common law trade secret misappropriation case where the plaintiff knew: (1) employees had left who had access to trade secrets. (2) those employees started a new company and (3) plaintiff heard "innuendos and rumors" that the new company was selling a competing product. *Seatrax, Inc. v. Sonbeck Intern., Inc.,* 200 F.3d 358, 367 (5th Cir. 2000).

*See* also *Zirvi v. Flatley*, 838 Fed. Appx. 582, 585–86 (2d Cir. 2020)(public disclosure of secrets triggers limitations even though Plaintiff had no knowledge of the disclosure). *Compass Mktg., Inc. v. Flywheel Digital LLC*, No. 23-1324, 2024 WL 3292676, at *1 (4th Cir. July 3, 2024) (same). Here, Trinseo knew former Dow employees had access to trade secrets, knew they were consulting and heard innuendos and rumors that ex-Dow employees were providing services involving the trade secrets. But in addition, they had a report which their IP counsel analyzed and used to identify the trade secrets that had been misappropriated. Given all this, Trinseo knew its trade secrets had been misappropriated and any diligence would have identified the alleged wrongdoers.

## CONCLUSION

Appellees/Cross-Appellants Harper Parties requests that the Court affirm the judgment that Trinseo take nothing against the Harper Parties, reverse the judgment on the Harper Parties' liability for trade-secret misappropriation. The Harper Parties also pray for all other relief to which they may be entitled.

Respectfully submitted,

_/s/ Benjamin F. Foster_

Benjamin F. Foster
Alisa A. Lipski
**Foster Yarborough PLLC**
917 Franklin Street, Suite 220
Houston, Texas 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202

Counsel for Stephen Harper, Steve Harper
Consulting, Inc., and Polycarbonate
Consulting Services, Inc.

## CERTIFICATE OF SERVICE

I certify that this document was filed with this Court via the Court's CM/ECF system and that an electronic copy of the document was served on counsel of record via the Court's CM/ECF system on April 7, 2025.

_/s/ Benjamin F. Foster_
Benjamin F. Foster

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(i). This brief consists of 10,172 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).  This brief incorporates by reference Parts I, IV.A

and V, from Appellee/Cross-Appellant KBR's Arguments on Trinseo's Appeal, incorporating 5,028 words from that brief for a total aggregate word count of 15,200.

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ *Benjamin F. Foster*
Benjamin F. Foster
